Slip Op. 20-189

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| YC RUBBER CO. (NORTH AMERICA) LLC AND SUTONG TIRE RESOURCES, INC.,<br><br>    Plaintiffs,<br><br> and<br><br>KENDA RUBBER (CHINA) CO., LTD.,<br><br>    Plaintiff-Intervenor,<br><br> and<br><br>MAYRUN TYRE (HONG KONG) LIMITED AND ITG VOMA CORPORATION,<br><br>    Consolidated-Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>    Defendant. | Before: Mark A. Barnett, Judge<br>Consol. Court No. 19-00069 |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's final results in the second administrative review of the antidumping duty order covering certain passenger vehicle and light truck tires from the People's Republic of China.]

Dated: December 22, 2020

<u>Jordan C. Kahn</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for Plaintiffs YC Rubber Co. (North America) LLC and Sutong Tire Resources, Inc.  With him on the brief were <u>Ned H. Marshak</u>, <u>Alan G. Lebowitz</u>, and <u>Max F. Schutzman</u>.

<u>John M. Peterson</u>, Neville Peterson, LLP, of New York, NY, argued for Consolidated Plaintiff Mayrun Tyre (Hong Kong) Limited.  With him on the brief were <u>Richard F. O'Neill</u> and <u>Patrick B. Klein</u>.

Nicholas R. Sparks, Hogan Lovells US LLP, of Washington, DC, argued for Consolidated Plaintiff ITG Voma Corporation.  With him on the brief were Jonathan T. Stoel and Craig A. Lewis.

Ronald M. Wisla, Fox Rothschild LLP, of Washington, DC, for Plaintiff-Intervenor, Kenda Rubber (China) Co., Ltd.

Ashley Akers, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Barnett, Judge: This matter is before the court following the U.S. Department of

Commerce's ("Commerce" or "the agency") final results in the second administrative

review ("AR2") of the antidumping duty order covering certain passenger vehicle and

light truck tires ("passenger tires") from the People's Republic of China ("the PRC" or

"China") for the period of review August 1, 2016, through July 31, 2017 ("the POR").

*See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of*

*China*, 84 Fed. Reg. 17,781 (Dep't Commerce Apr. 26, 2019) (final results of

antidumping duty admin. review and final determination of no shipments; 2016–2017)

("*Final Results*"), ECF No. 24-4, and accompanying Issues and Decision Mem., A-570-

016 (Apr. 19, 2019) ("I&D Mem."), ECF No. 24-5.[1]

---

[1] The administrative record associated with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 24-2, and a Confidential Administrative Record ("CR"), ECF No. 24-3.  Parties submitted joint appendices containing record documents cited in their Rule 56.2 briefs.  *See* Public J.A., ECF No. 47; Confidential J.A. ("CJA"), ECF No. 46.  Plaintiffs YC Rubber Co. (North America) LLC and Sutong Tire Resources, Inc., together with Consolidated Plaintiff ITG Voma Corporation (collectively, "Plaintiffs"), physically filed two native exhibits (CR 45 and CR 307).  *See* Certification of

Plaintiffs challenge Commerce's determinations to rely on a single mandatory respondent's rate as the rate for non-individually examined respondents qualifying for separate rate status (hereinafter, "the separate rate respondents"); to reject the withdrawal requests of certain non-individually examined respondents; and to exclude certain import data from surrogate value data.  *See* Confidential Mot. for J. on the Agency R., ECF No. 35, and accompanying Confidential Mem. of P & A in Supp. of Pls.' and Consol. [Pl.'s] Mot. for J. on the Agency R. ("Pls.' Mem."), ECF No. 35-1; Pls.' and Consol. Pl. ITG Voma's Reply in Supp. of Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 44.

Consolidated Plaintiff Mayrun Tyre (Hong Kong) Ltd. ("Mayrun") also contests Commerce's decisions to rely on a single mandatory respondent's rate as the dumping margin for the separate rate respondents and to reject Mayrun's withdrawal request. *See* Consol. Pl. [Mayrun's] Rule 56.2 Mot. for J. on the Agency R., ECF No. 39, and accompanying Mem. of Law in Supp. of Pl. [Mayrun's] Rule 56.2 Mot. for J. on the Agency R. ("Mayrun's Mem."), ECF No. 39-2; Reply Br. in Supp. of Pl. [Mayrun's] Rule 56.2 Mot. for J. on the Agency R., ECF No. 45.[2]

Defendant United States ("the Government") filed a response supporting Commerce's *Final Results*.  *See* Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mots. for J. Upon the Agency R. ("Gov't's Resp."), ECF No. 41.

---

Filing and Service of Physical Ex. or Item, ECF No. 46.  The court references the confidential version of the relevant record documents, unless otherwise specified.
[2] Plaintiff-Intervenor Kenda Rubber (China) Co., Ltd. filed a statement incorporating by reference Plaintiffs' and Consolidated Plaintiff's Rule 56.2 motions in lieu of filing a motion of its own.  *See* Pl.-Int.'s Notice, ECF No. 37.

Consol. Court No. 19-00069                                              Page 4

For the following reasons, the court denies Plaintiffs' and Mayrun's motions for

judgment on the agency record and sustains Commerce's *Final Results*.

BACKGROUND

On August 1, 2017, Commerce published a notice of opportunity to request an

administrative review of the antidumping duty order on passenger tires from China.  *See*

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 82

Fed. Reg. 35,754, 35,755 (Dep't Commerce Aug. 1, 2017) (opportunity to request

admin. review), PR 1, CJA Tab 1.  Review requests were submitted by several foreign

exporters and producers and by certain domestic companies.  Respondent Selection

Mem. (Apr. 12, 2018) ("Selection Mem.") at 2 & n.3, 7, PR 140, CR 47, CJA Tab 24

(citations omitted).  On October 16, 2017, Commerce initiated AR2.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 48,051,

48,055 (Dep't Commerce Oct. 16, 2017) ("*Initiation Notice*").

On April 12, 2018, Commerce selected Shandong Haohua Tire Co., Ltd

("Haohua") and Zhaoqing Junhong Co., Ltd. ("Junhong") as mandatory respondents.

Selection Mem. at 1.  Two weeks later, on April 28, 2018, Haohua informed Commerce

that it was withdrawing from participation in the administrative review.  Haohua

Withdrawal from Admin. Review (Apr. 26, 2018), PR 150, CJA Tab 29.

Commerce issued the *Preliminary Results* without selecting a respondent to

replace Haohua.  *See* Decision Mem. for the Prelim. Results (Sept. 4, 2018) ("Prelim.

Decision Mem.") at 12, PR 224, CJA Tab 32; *Certain Passenger Vehicle and Light*

*Truck Tires From the People's Republic of China*, 83 Fed. Reg. 45,893, 45,895 (Dep't

Commerce Sept. 11, 2018) (prelim. results of antidumping duty admin. review, prelim.

determination of no shipments, and rescission, in part; 2016–2017) ("*Prelim. Results*"),

PR 225, CJA Tab 33.  Consistent with 19 U.S.C. § 1673d(c)(5)(A), Commerce relied on

Junhong's rate of 73.63 percent to establish the rate for the separate rate respondents.

Prelim. Decision Mem. at 11–12; *see also Prelim. Results*, 83 Fed. Reg. at 45,895.  To

value Junhong's factors of production, Commerce selected Thailand as the primary

surrogate country, Prelim. Decision Mem. at 15, but disregarded values from countries

providing non-industry specific export subsidies, *id.* at 20.

  Following the *Preliminary Results*, several respondents—including Plaintiffs,

Shandong Hengyu Science and Technology Co., Ltd. ("Hengyu"), Winrun Tyre Co., Ltd.

("Winrun"), and Shandong Linglong Tyre Co., Ltd. ("Linglong")—sought to withdraw their

review requests and separately filed case briefs challenging certain aspects of the

*Preliminary Results*.  I&D Mem. at 2 & nn.3–4 (citations omitted); *see also* Case Br. of

[Hengyu] (Nov. 6, 2018) ("Hengyu Case Br."), PR 256, CJA Tab 42; GDLSK Clients'

Case Br. (Nov. 8, 2018) ("YCR & Sutong Case Br.") at ECF pp. 606–14, PR 258, CJA

Tab 43; Case Br. of [Winrun] (Nov. 8, 2018) ("Winrun Case Br."), PR 262, CR 309, CJA

Tab 44; Case Br. of Shandong Wanda Boto Tyre Co. Ltd. and ITG Voma Corp. (Nov. 8,

2018), PR 263, CJA Tab 45; [Mayrun's] Cmts. in Lieu of Case Br. (Nov. 8, 2018) at 1–6,

PR 265, CJA Tab 46.

  For the *Final Results*, Commerce rejected the withdrawal requests submitted

after the *Preliminary Results*, I&D Mem. at 8–9, and continued to disregard import

values from countries providing non-industry specific export subsidies, *id.* at 18–19.

Commerce calculated a rate of 64.57 percent for Junhong and relied on that margin as the separate rate respondents' margin.  *Final Results*, 84 Fed. Reg. at 17,782–83.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[3] and 28 U.S.C. § 1581(c) (2018).  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

The court's review of Commerce's statutory interpretation is guided by the two-prong *Chevron* framework.  *See Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017); *see generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Apex Frozen Foods*, 862 F.3d at 1344 (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id*. (quoting *Chevron*, 467 U.S. at 842–43).  However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute."  *Id*. (quoting *Chevron*, 467 U.S. at 843).

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

DISCUSSION

**I.  Commerce's Reliance on Junhong as the Sole Mandatory Respondent**

**A.  Legal Framework**

For purposes of the antidumping duty laws, China is a non-market economy country; therefore, Commerce begins with a "rebuttable presumption that all companies within China are subject to government control and, thus, should be assessed a single weighted-average dumping margin."  Prelim. Decision Mem. at 8–9.  However, if an exporter or producer can demonstrate the absence of government control, Commerce will calculate a separate rate for the company.  *See id.* at 9.

Section 1677f-1(c) contains a general rule and an exception with respect to Commerce's selection of respondents.  In relevant part, the statute provides:

> (1) General Rule
> In determining weighted average dumping margins under section 1673b(d), 1673d(c), or 1675(a) of this title, [Commerce] shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.

> (2) Exception
> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to--

> . . .

> (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

19 U.S.C. § 1677f-1(c).

When Commerce utilizes the exception and selects a subset of respondents for individual examination, it refers to the selected respondents as "mandatory" respondents, distinguishing them from any voluntary respondents that may provide questionnaire responses based on the possibility that Commerce will have the resources to examine them.  *Cf.* 19 C.F.R. § 351.204(c)–(d) (discussing Commerce's treatment of individually-examined (i.e., mandatory) and voluntary respondents).  Non-selected respondents that demonstrate their eligibility for a separate rate (i.e., the separate rate respondents) receive an all-others rate determined using the methodology provided in section 1673d(c)(5).  *See Soc Trang Seafood Joint Stock Co. v. United States*, 42 CIT ___, ___, 321 F. Supp. 3d 1329, 1346 (2018) (discussing the relevant statutory provisions for determining the all-others rate).  Section 1673d(c)(5) provides that the all-others rate generally is the weighted average of the individually-investigated exporters' and producers' dumping margins, excluding any margins that are *de minimis*, zero, or determined entirely based on facts otherwise available.  19 U.S.C. § 1673d(c)(5)(A).

## B.  Additional Background

Commerce selected Haohua and Junhong as mandatory respondents pursuant 19 U.S.C. § 1677f-1(c)(2) because they accounted for the largest volume of subject merchandise imported during the POR that Commerce determined it could reasonably examine.  Selection Mem. at 1, 7.[4]  Haohua, by withdrawing from participation, failed to

---

[4] Commerce used data from U.S. Customs and Border Protection ("CBP") to select respondents and invited interested parties to comment on that data.  U.S. Customs Entries (Nov. 30, 2017), PR 119, CR 44–45, CJA Tab 22.  Petitioner United Steel,

establish its eligibility for a separate rate and was considered part of the "China-wide

entity."  Unpublished Prelim. Results (Sept. 5, 2018), app. 2, PR 223, CJA Tab 31.  The

other mandatory respondent, Junhong, participated in the review and responded to

Commerce's questionnaires.  *See* Prelim. Decision Mem. at 3–4.  Commerce found that

Junhong, along with several other companies, qualified for separate rate status because

they exercised "both *de facto* and *de jure* control of [their] operations."  *Id.* at 11; *see*

*also* Prelim. Separate Rate Status Mem. (Sept. 4, 2018) at 1, PR 231, CR 298, CJA Tab

35.

For the *Preliminary Results*, Commerce relied on Junhong's rate for the separate

rate respondents because that was the only calculated rate in the review.  Prelim.

Decision Mem. at 12; *see also* 19 U.S.C. § 1673d(c)(5)(A).  In the administrative

briefing, several respondents challenged Commerce's reliance on Junhong's rate for the

separate rate respondents.  *See, e.g.*, Hengyu Case Br; YCR & Sutong Case Br. at

ECF pp. 606–14; Winrun Case Br.

For the *Final Results*, Commerce continued to rely on Junhong's rate to

determine the rate for the separate rate respondents.  I&D Mem. at 11.  Commerce

construed the statute as not requiring it to use multiple rates to determine the separate

rate respondents' rate.  *Id.* at 14; *see also id.* at 11 ("Nothing in the statutory framework

requires Commerce to calculate the all-others rate using multiple rates, nor precludes

---

Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service
Workers International Union, AFL-CIO, CLC ("USW") urged Commerce to examine
three respondents.  Pet'r's Respondent Selection Cmts. (Dec. 7, 2017) at 5, PR 120,
CR 46, CJA Tab 23.  Commerce declined USW's request and selected Junhong and
Haohua.  Selection Mem. at 7.

Commerce from relying on a single rate.").  Citing *Soc Trang*, 321 F. Supp. 3d at 1347–

48, Commerce stated that "it is not an unforeseeable occurrence for Commerce . . . to

be left with only one [mandatory] respondent" at the end of a review or an investigation.

*Id.* at 14 & n.65.

Commerce acknowledged that, in other reviews, including the prior administrative

review, it has "selected a[ replacement] respondent when a prior-selected mandatory

respondent [did] not participate in the proceeding."  *Id.* at 14; *see also id.* 16 & n.79

(citation omitted).  The agency noted, however, that the separate rate respondents did

not comment on Commerce's examination of one respondent until after the *Preliminary*

*Results*, at which point "it was not feasible to select an additional respondent."  *Id.* at 14;

*see also id.* at 16.  Further, Commerce explained, no respondent requested treatment

as a mandatory respondent after Haohua withdrew.  *Id.* at 15–16.

### C.  Parties' Contentions

Plaintiffs and Mayrun challenge Commerce's reliance on Junhong's rate to

determine the margin for the separate rate respondents on two grounds.[5]

First, they contend that Commerce's construction of the statute is unlawful under

both prongs of the *Chevron* analysis.  *See* Pls.' Mem. at 17–23, 26–27; Mayrun's Mem.

at 27–28.  With respect to the first prong of *Chevron*, Plaintiffs and Mayrun assert that

the plain language of the statute obligates Commerce to examine more than one

---

[5] Mayrun asserts that it was unreasonable for Commerce to examine only a single respondent and that Junhong is not a representative producer in support of its argument that Commerce should have granted its withdrawal request.  *See* Mayrun's Mem. at 22–24.  The court construes these arguments as challenging Commerce's examination of Junhong as the sole mandatory respondent.

respondent.  Pls.' Mem at 18–19; Mayrun's Mem. at 27.  With respect to the second

prong of *Chevron*, Plaintiffs argue that 19 U.S.C. § 1677f-1(c)(2)—as an exception to

the general rule provided in section 1677f-1(c)(1)—is to be construed narrowly.  Pls.'

Mem. at 23.  Plaintiffs aver that permitting Commerce to examine only a single

respondent in a review would unreasonably broaden Commerce's authority to utilize the

exception, thereby undermining the general rule.  *Id.*

　　　Second, Plaintiffs and Mayrun contend that Junhong's rate is not representative

of the separate rate respondents' pricing based on Junhong's import volume.  *Id.* at 28–

29; Mayrun's Mem. at 23.  Plaintiffs also assert that Junhong's rate is not representative

because it is significantly higher than the rates determined in prior segments of this

proceeding.  Pls.' Mem. at 28.

　　　The Government contends that if Congress intended to bar Commerce from

examining only one respondent it would have done so through a specific statutory

provision.  Gov't's Resp. at 24.  The Government also cites 1 U.S.C. § 1 ("the

Definitions Act") and *Soc Trang*, 321 F. Supp. 3d at 1347–48, in support of its argument

that the plural terms "exporters and producers" should be interpreted to include the

singular (i.e., one exporter or producer).  *Id.* at 24–25.  The Government further argues

that Commerce did not have the resources to investigate more than two respondents

when it selected respondents and no party requested treatment as a voluntary

respondent.  *Id.* at 25–26.

　　　Regarding representativeness, the Government contends that having selected

respondents pursuant to 19 U.S.C. § 1677f-1(c)(2)(B), no further representativeness

examination is required and there is no evidence suggesting that Junhong's rate is not representative.  *Id.* at 28–29.

### D.  Analysis

#### 1.  Commerce's Construction of the Statute is Lawful Under *Chevron*

According to Plaintiffs and Mayrun, Commerce's statutory interpretation fails both prongs of the *Chevron* analysis.  They assert that when Commerce limits the number of exporters or producers it examines pursuant to 19 U.S.C. § 1677f-1(c)(2), Commerce must replace any respondent that withdraws from participation in the administrative review to ensure that the number of mandatory respondents is greater than one.  *See* Pls.' Mem. at 17–23; Mayrun's Mem. at 26–28.  For the reasons that follow, the statute does not speak directly to this issue and the agency's construction of the statute is permissible.

##### a.  *Chevron* Prong One

When examining an issue of statutory interpretation, the court must "carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable."  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998).  That inquiry involves an examination of "the statute's text, structure, and legislative history," applying, if necessary, "the relevant canons of interpretation."  *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)).

As an initial matter, this case does not require the court to address whether 19 U.S.C. § 1677f-1(c)(2)(B) permits Commerce to select only one respondent for examination.  Commerce initially selected two mandatory respondents and no party has

challenged that decision before Commerce or the court.  *See* I&D Mem. at 14–15.

Nevertheless, Plaintiffs and Mayrun now assert that Congress's use of the plural terms

"exporters and producers" in section 1677f-1(c)(2)(B) creates a continuing obligation for

Commerce to examine more than one company.  *See* Pls.' Mem. at 18–19; Mayrun's

Mem. at 27; Oral Arg. at 6:20–7:20 (time stamp from oral argument) *available at*

https://www.cit.uscourts.gov/sites/cit/files/082620-19-00069-MAB.mp3.mp3 (last

accessed December 22, 2020).  In other words, Plaintiffs and Mayrun argue, Commerce

was statutorily required to select a replacement respondent when Haohua withdrew its

participation.

Section 1677f-1(c)(2)(B) permits Commerce, when certain conditions are met, to

"limit[] its examination to" those "exporters and producers accounting for the largest

volume of the subject merchandise from the exporting country that the [agency]

determines can be reasonably examined."[6]  In the Definitions Act, Congress prescribed

that, "unless the context indicates otherwise-- . . . words importing the plural include the

singular."  1 U.S.C. § 1.  Plaintiffs argue that relevant context is provided by 19 U.S.C.

§ 1673d(c)(5), such that "it is impossible to 'average' the margins assigned to a single

party."  Pls.' Reply at 5; *see also* Pls.' Mem. at 19–21 (arguing that 19 U.S.C.

---

[6] The legislative history of 19 U.S.C. § 1677f-1(c) is silent with respect to the number of
respondents Commerce must examine.  The Statement of Administrative Action ("SAA")
states that, when Commerce limits its examination pursuant to 19 U.S.C. § 1677f-1(c),
the agency "either limits its examination to those firms accounting for the largest volume
of exports to the United States or employs sampling techniques."  Uruguay Round
Trade Agreements, SAA, H.R. Doc. No. 103–316, vol. 1, at 872 (1994), *reprinted in*
1994 U.S.C.C.A.N. 4040, 4200.  "[T]he authority to select samples rests exclusively with
Commerce . . . ."  *Id.* at 872, *reprinted in* 1994 U.S.C.C.A.N. at 4201.  Thus, the SAA
does not speak to the instant issue.

§ 1673d(c)(5) provides context demonstrating that Commerce must examine more than

one respondent pursuant to section 1677f-1(c)(2)(B)).  Plaintiffs' argument is not

persuasive.

Section 1673d(c)(5) governs Commerce's calculation of the all-others rate in

investigations, is utilized by Commerce in reviews, and provides relevant context for the

terms "exporters and producers" as used in the statute.  Subsection (c)(5)(A) provides

that Commerce is to determine the all-others rate (for exporters and producers not

individually investigated) using the "amount equal to the weighted average of the

estimated weighted average dumping margins established for exporters and producers

individually investigated, excluding any zero and *de minimis* margins, and any margins

determined entirely [on the basis of the facts otherwise available]."  19 U.S.C.

§ 1673d(c)(5)(A).  If, however, "any one or all three of those circumstances occur,

Commerce can be left with only one" rate suitable for use in determining the all-others

rate.  *Soc Trang*, 321 F. Supp. 3d at 1347; *see also* I&D Mem. at 11–12 (construing the

use of the plural terms "exporters" and "producers" in the statute as providing "for the

possibility of Commerce having multiple [calculated] rates at the end of a given

investigation or review" but not as necessitating "the calculation of a separate rate using

multiple respondents' rates").[7]

---

[7] Plaintiffs contend that *Soc Trang* is distinguishable because, in that case, Commerce
rescinded the review with respect to one of two mandatory respondents more than four
months after publishing the preliminary results.  Pls.' Mem. at 22.  The *Soc Trang* court
did not suggest that the timing of the respondent's withdrawal was relevant to its
interpretation of the statute.  321 F. Supp. 3d at 1346–48.  Moreover, Plaintiffs' and
Mayrun's reliance on *Schaeffler Italia S.R.L. v. United States*, 35 CIT 725, 729, 781 F.

While Plaintiffs argue that the statutory reference to an "average" in section 1673d(c)(5)(A) requires more than one rate, *see* Pls.' Mem at 21, there is no requirement for multiple data points to determine an average.  An average is simply the aggregate of *x* data points divided by *x*.  *See, e.g.*, OXFORD ENGLISH DICTIONARY, https://oed.com/view/Entry/13684 (last visited Dec. 22, 2020) (defining "average" as "dividing the aggregate of a series by the number of its units"); MIKE HAMMETT, DICTIONARY OF INT'L TRADE FINANCE 33 (2001) (providing that "[t]he average of *n* values is the sum of the values divided by *n*").  While it may be common for an average to be based on more than one data point, the mechanical process of determining a weighted average is the same whether there is a single data point or multiple data points.  In the case of a single data point, both the simple average and the weighted average will be the same as the single data point.  *See, e.g.*, *Soc Trang*, 321 F. Supp. 3d at 1347 (the statute "does not necessitate the calculation of an all-others rate using multiple respondents' rates at the end of every investigation or review").

Plaintiffs' interpretation of section 1673d(c)(5)(A), on the other hand, is untenable.  Plaintiffs suggest that when Commerce selects multiple respondents for individual investigation and, nevertheless, ends up with a single above-*de minimis*, non-facts-available, calculated rate, the agency would be required to restart the process and select another respondent to investigate in order to have more than one rate to average

---

Supp. 2d 1358, 1362–63 (2011), is inapposite.  *See* Mayrun's Mem. at 27; Pls.' Reply at 4.  *Schaeffler* is not binding on this court and its reasoning is not persuasive because it did not address the Definitions Act or the statutory framework of 19 U.S.C. § 1677f-1(c), including 19 U.S.C. § 1673d(c)(5).

to determine the all-others rate.  *See, e.g.*, Pls.' Reply at 5 (stating that it is "impossible

to 'average' the margin[] assigned to a single party").  Such a circular approach is

difficult to reconcile with the statutory deadlines Congress made applicable to

antidumping proceedings.  Plaintiffs would avoid this scenario by asserting that

Commerce could resort to the exception provided for in 19 U.S.C. § 1673d(c)(5)(B),

which allows the agency to use "any reasonable method" to establish the all-others rate.

*See* Pls.' Mem. at 31–32 (arguing that Commerce should have used "an alternative

methodology to assign a reasonable separate rate").  Plaintiffs' argument fails, however,

because the plain language of the statute limits this exception to situations when the

margins established for "*all* exporters and producers individually investigated" are found

to be zero, *de minimis*, or based entirely on facts available.  19 U.S.C. § 1673d(c)(5)(B)

(emphasis added); *see also Fine Furniture (Shanghai) Ltd. v. United States*, 42 CIT

___, ___, 353 F. Supp. 3d 1323, 1356 (2018) (noting that section 1673d(c)(5) "leaves

little room for discretion" with respect to applying the general rule).  Thus, the exception

would be unavailable when Commerce calculated a non-*de minimis* rate for one

mandatory respondent.

      For these reasons, Plaintiffs and Mayrun fail to persuade the court that the

statutory text or context unambiguously requires Commerce to maintain at least two

respondents for individual investigation pursuant to section 1677f-1(c)(2)(B) after a

respondent withdraws its participation in the review.  Simply put, section 1677f-1(c)(2) is

silent as to the consequences when one or more of the selected respondents withdraws

from the proceeding or otherwise ceases to participate following Commerce's decision

to limit its examination.  Accordingly, the court turns to *Chevron* prong two in order to consider whether Commerce's statutory construction is permissible.

### b. *Chevron* Prong Two

To determine whether an agency's statutory construction is permissible, a court considers whether the construction is reasonable, consistent with statutory goals, and reflects agency practice.  *Apex Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015).  "The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation."  *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020).

Here, Commerce explained that it is not required to select "a [replacement] mandatory respondent[] once a previously selected mandatory respondent refuses to participate."  I&D Mem. at 14.  Commerce further noted that when Haohua withdrew, none of the exporters or producers subject to the review "requested individual examination, treatment as a voluntary respondent, or that Commerce select an additional respondent."  *Id.* at 15–16.  In fact, none of the separate rate respondents requested Commerce to select another mandatory respondent "until *after* Commerce calculated Junhong's allegedly 'aberrational' margin [for] the *Preliminary Results*."  *Id.* at 14.

On these facts, Commerce's interpretation of the requirements placed upon the agency by section 1677f-1(c)(2)(B) is reasonable.  The separate rate respondents had the opportunity to comment on Commerce's respondent selection when Commerce released the CBP data and when Haohua withdrew from participation in the review in late April 2018.  *Id.* at 14.  Instead of seizing these opportunities, the separate rate

respondents waited until after the agency issued the *Preliminary Results* in September

2018 to comment, at which point "it was not feasible to select an additional respondent."

*Id*.[8]

Plaintiffs argue that the separate rate respondents' failure to request voluntary

respondent status does not excuse Commerce's failure to select an additional

respondent.  Pls.' Mem. at 25–26.  Plaintiffs suggest that it was unreasonable for

Commerce not to replace Haohua when Commerce had previously decided that it had

the resources to examine two mandatory respondents.  *See id.* at 26 (arguing that

because "Commerce had the time and ability to investigate two or more mandatory

respondents, the legal duty to do so exists independent of any filings or requests by

respondents").  As discussed above, however, the statute places no such explicit

obligation on Commerce.  Commerce's declination to select another mandatory

respondent is reasonable given the separate rate respondents' failure to take timely

action in this regard.  The court, however, need not and does not address whether it

would have been reasonable for Commerce to decline a timely request to replace

Haohua as a mandatory respondent.

---

[8] While the court does not find that the doctrine of laches bars Plaintiffs and Mayrun from arguing that Commerce was obligated to a select a replacement respondent, the court's conclusion cannot be divorced from the fact that the separate rate respondents waited at least five months, until it was too late as a practical matter, to ask Commerce to add another mandatory respondent.  *See Kokusai Elec. Co. v. United States*, 10 CIT 166, 171, 632 F. Supp. 23, 27–28 (1986) (rejecting the plaintiff's argument for failure to exhaust administrative remedies but stating that laches would bar the plaintiff's argument because the "plaintiff slept on its rights").

Plaintiffs also argue that Commerce's interpretation of section 1677f-1(c)(2)(B) allows this exception, whereby Commerce selects only the largest exporters or producers for individual examination, to undermine the general rule of determining an individual margin for each known exporter and producer.  Pls.' Mem. at 23 (citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 1730, 662 F. Supp. 2d 1337, 1344 (2009)); *see also* Oral Arg. at 43:32–45:30 (arguing that Commerce's examination of one respondent is contrary to the statutory purpose).[9]  Notably, however, Plaintiffs do not challenge Commerce's decision to select a subset of exporters and producers for individual investigation, *see* Pls.' Mem. at 18, nor do they offer any argument as to why Commerce's use of the respondent selection exception in this case undermines the general rule.[10]  Thus, Plaintiffs fail to provide a basis to disturb Commerce's determination.

---

[9] In *Carpenter Technology*, Commerce found that it was unable to examine more than two companies and resorted to 19 U.S.C. § 1677f-1(c)(2)(A) to limit its review.  33 CIT at 1727, 662 F. Supp. 2d at 1342.  The court construed Commerce's determination as an implicit interpretation of the phrase "large number of exporters and producers" to mean "any number larger than two."  33 CIT at 1727, 662 F. Supp. 2d at 1342; *see also* 19 U.S.C. § 1677f-1(c)(2)(B) (premising Commerce's invocation of the exception on situations when there are a "large number of exporters or producers involved in the investigation or review").  The court rejected the agency's construction of the statute under *Chevron* prong one and remanded for the agency to reconsider the number of respondents it practically may examine.  *Carpenter Tech.*, 33 CIT at 1727–32, 662 F. Supp. 2d at 1342–46.  *Carpenter Technology* is distinguishable because, in that case, the court addressed Commerce's decision to invoke the exception, which decision Plaintiffs do not challenge here.

[10] Plaintiffs argue that Commerce had the time and resources to select an additional (i.e., a replacement) mandatory respondent.  Pls.' Mem. at 23–25; Oral Arg. at 45:45–46:23.  While Plaintiffs make out a case that it would have been reasonable for Commerce to have selected a replacement respondent for investigation when Haohua withdrew from participation and, as noted above, Commerce has done so in other

Lastly, Plaintiffs and Mayrun have not shown that Commerce's conduct is demonstrably inconsistent with agency practice.  *See* Pls.' Reply at 8–9; Mayrun's Mem. at 22.  Commerce acknowledged that it has in some cases, including the first administrative review ("AR1") of this antidumping duty order, selected a replacement respondent when a mandatory respondent does not participate in a proceeding.  I&D Mem. at 14, 16.  Citing four administrative reviews, Plaintiffs aver that Commerce has a practice of replacing a mandatory respondent when necessary to ensure examination of two mandatory respondents when a respondent withdraws its request for review, all requests for review of that respondent are withdrawn, or the respondent fails to respond to Commerce's questionnaire.  *See* Pls.' Reply at 8–9; [Pls.'] Resp. to the Court's Request (Aug. 28, 2020), ECF No. 55.  Commerce, however, treats "each segment as an isolated proceeding in the absence of relevant evidence of similarities between proceedings."  I&D Mem. at 16.  In light of the numerous possible differences in demands on the agency's resources, timing of the withdrawal or decision not to participate, and degrees of expressed interest in participating as a voluntary or replacement respondent, Plaintiffs have not shown that the circumstances of the administrative reviews they cite are similar to this case.

Accordingly, the court finds that Commerce's construction of section 1677f-1(c)(2)(B) is permissible under the *Chevron* analysis and the court will defer to the agency's interpretation of the statute.

---

cases, Plaintiffs do not make the case that taking such action is the only reasonable interpretation of the statute.

### 2. Commerce Properly Relied on Section 1673d(c)(5)(A) to Determine the Separate Rate Respondents' Rate

Plaintiffs and Mayrun contend that Junhong's rate is unrepresentative of any dumping by the separate rate respondents and, therefore, substantial evidence does not support Commerce's determination of the rate for the separate rate respondents. These Parties do not, however, identify any legal authority that requires Commerce to evaluate the representativeness of a calculated rate determined pursuant to the general rule provided in 19 U.S.C. § 1673d(c)(5)(A).

Plaintiffs rely on the U.S. Court of Appeals for the Federal Circuit's ("the Federal Circuit") discussion of "representativeness" in *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016), to make their argument that Junhong's rate must be representative of their level of dumping in order to be assigned to them and that substantial evidence does not support such a finding.[11]  *See* Pls.' Mem. at 27, 32. *Albemarle* speaks to the application of section 1673d(c)(5)(B)—the exception to the general rule provided for in section 1673d(c)(5)(A)—which is used when the rates for all mandatory respondents are *de minimis*, zero, or based entirely on facts otherwise available.  821 F.3d at 1351–53; *see also* 19 U.S.C. § 1673d(c)(5)(B).  Conversely, in

---

[11] In *Albemarle*, the Federal Circuit rejected Commerce's decision to "carry forward" rates determined for the non-individually examined respondents in lieu of using "the expected method" discussed in the SAA (the weighted average of the zero rates, *de minimis* rates, and rates determined entirely on the facts otherwise available) when the expected method would have resulted in averaging the *de minimis* rates calculated for the individually examined respondents.  821 F.3d 1349–51; *see also* SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201.  The Federal Circuit relied on the SAA to find that Commerce could not avoid using the expected methodology without first determining that the result of that method would not be representative of the level of dumping of the separate rate respondents.  *Albemarle*, 821 F.3d at 1353–54.

this case, Commerce determined the all-others rate by applying the general rule in 19

U.S.C. § 1673d(c)(5)(A) (i.e., averaging the rate calculated in the review).  *See* I&D

Mem. at 13.  Commerce's use of the general rule is consistent with the statute because

Junhong's calculated rate was not zero, *de minimis*, or based on the facts available.

*See Fine Furniture*, 353 F. Supp. 3d at 1356 (affirming Commerce's determination of

the separate rate based on the rate calculated for a single mandatory respondent); *Mid*

*Continent Steel & Wire, Inc. v. United States*, 42 CIT ___, ___, 321 F. Supp. 3d 1313,

1321 (2018) (same).  Plaintiffs fail to articulate any basis for avoiding the results of the

general rule.  Thus, Plaintiffs' reliance on *Albemarle* is mistaken.

   Moreover, notwithstanding *Albemarle*'s lack of direct relevance to this case,

some of the reasoning invoked by the Federal Circuit undermines Plaintiffs' and

Mayrun's position.  The *Albemarle* court found that the statutory authority to limit a

proceeding to the largest exporters and producers suggests that the selected

respondents "can be viewed as representative of all exporters."  821 F.3d at 1353.

Similarly, in *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed.

Cir. 2017), the Federal Circuit rejected Commerce's deviation from the expected

method because mandatory respondents "are assumed to be representative" of non-

individually examined respondents "unless evidence shows otherwise."  That reasoning,

coupled with the absence of clear discretion in applying the general rule, supports

Commerce's reliance on Junhong's rate here.

   While Plaintiffs and Mayrun have not established that Commerce was required to

consider evidence they assert undermines the representativeness of Junhong's rate for

the separate rate respondents, their arguments nevertheless fail to impeach

Commerce's determination.  Plaintiffs and Mayrun contend that Junhong's rate is

aberrationally high compared to the rates determined in previous segments of this

proceeding.  *See* Pls.' Mem. at 28; Mayrun's Mem. at 24.  Commerce considered this

argument and determined that although Junhong's rate "was relatively higher than

margins calculated in previous [segments of this] proceeding[]," it was "not automatically

. . . inaccurate or inappropriate for use as the rate for the non-selected companies."  I&D

Mem. at 12.

Plaintiffs' and Mayrun's argument before the court provides no legal basis for

disregarding Junhong's rate even if it is higher than previous administrative reviews.

Otherwise, their "mere disagreement with Commerce's weighing of the evidence[] . . .

mistakes the function of the court, which is to determine whether the [*Final Results*] are

supported by substantial evidence, not to 'reweigh the evidence or . . . reconsider

questions of fact anew.'"  *Haixing Jingmei Chem. Prods. Sales Co. v. United States*, 42

CIT ___, ___, 335 F. Supp. 3d 1330, 1346 (2018) (quoting *Downhole Pipe & Equip.,

L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)).

Next, Plaintiffs and Mayrun argue that Junhong's import volume demonstrates

that its dumping margin is not representative of the separate rate respondents' pricing.

*See* Pls.' Mem. at 28–29; Mayrun's Mem. at 23.[12]  It is undisputed that Junhong is one

---

[12] Unlike Plaintiffs, Mayrun relies on 19 U.S.C. § 1677f-1(c)(2)(B) to argue that Junhong is not representative because it's import volume did not account for the "largest volume of the subject merchandise from the exporting country that can be reasonably examined."  Mayrun's Mem. at 23 (quoting 19 U.S.C. § 1677f-1(c)(2)(B)).  As discussed

of the largest exporters by volume of subject merchandise in this review according to

CBP data.  Selection Mem. at 7, Attach. 1; *see also* I&D Mem. at 14 (Commerce may

limit its examination to exporters accounting for the largest volume of subject

merchandise imported during the period of review).  No Party explains the legal

relevance of this argument to the application of the general rule and, as discussed

above with respect to *Albemarle*, Commerce's statutory authorization to select the

largest exporters supports Commerce's reliance on that rate for the separate rate

respondents.  Bald assertions that Junhong's import volume resulted in an

unrepresentative margin are unavailing.

      Plaintiffs also seek to rely on *Diamond Sawblades Manufacturers' Coalition v.*

*United States*, 43 CIT ___, 359 F. Supp. 3d 1374 (2019), and *Baoding Mantong Fine*

*Chemistry Co. v. United States*, 39 CIT ___, 113 F. Supp. 3d 1332 (2015), in support of

their argument that Junhong's rate is unrepresentative.  *See* Pls.' Mem. at 29–30.

Those cases do not provide a basis to remand Commerce's determination.

      In *Baoding*, the court found that a respondent's calculated rate, 453.79 percent,

was "so prohibitive a dumping margin" that it was difficult to comprehend as a remedial

measure.  113 F. Supp. at 1338.  *Baoding* is simply inapposite because it addresses

Commerce's calculation of a mandatory respondent's own rate, not the application of

that rate, pursuant to the general rule of 19 U.S.C. § 1673d(c)(5)(A), to the separate

rate respondents.

--------

above, however, Mayrun does not challenge the initial respondent selection
determination and fails to establish that the statute contains a continuing obligation to
re-evaluate respondent selection throughout the review.

In *Diamond Sawblades*, Commerce originally determined rates for two exporters: "Weihai" and "Jiangsu."  359 F. Supp. 3d at 1376.  The court remanded the final results for Commerce to reconsider its denial of a request to withdraw the review of Weihai.  *Id*. On remand, Commerce accepted the withdrawal request, and "rescinded its review of Weihai leaving only a single mandatory respondent–Jiangsu."  *Id*. at 1377.  Commerce used Jiangsu's rate as the all-others rate, resulting in an increase to the all-others rate from 29.76 percent in the final results to 56.67 percent in the remand results.  *See id*.

The court found that substantial evidence did not support Commerce's reliance on Jiangsu's rate to determine the all-others rate in the remand results, explaining that:

> This case is *sui generis* for several reasons.  On remand Commerce was in the unique position of deciding whether or not to rescind the administrative review of Weihai after it had already completed a full individual examination of Weihai. This is significant, in part, because the resulting rate for Weihai was drastically different from that of . . . Jiangsu.

*Id*. at 1381 (footnote omitted).  The *Diamond Sawblades* court appeared to find that the prior calculation of an antidumping duty margin for Weihai and its inclusion in the determination of the rate for the separate rate respondents created a basis to further consider whether Jiangsu's individual rate should be assigned to the separate rate respondents once Weihai was excluded from the review on remand.  *See id*. at 1381– 82.  Here, there are no facts on the record, comparable to those which existed in *Diamond Sawblades*, to suggest that the general rule, as written by Congress, should not be applied.  Thus, Plaintiffs' reliance on *Diamond Sawblades* is inapposite.

For these reasons, Commerce's reliance on Junhong's rate for the separate rate respondents is in accordance with law and supported by substantial evidence.

II. **Commerce's Decisions to Deny the Untimely Requests for Withdrawal and Rescission**

A. **Legal and Factual Background**

While the antidumping duty statute provides for annual administrative reviews upon request, the statute does not provide for what happens if a request, once made, is withdrawn.  *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1337 (Fed. Cir. 2018).  Commerce has promulgated a regulation, which states:

> The [agency] will rescind an administrative review under this section, in whole or in part, if a party that requested a review withdraws the request within 90 days of the date of publication of notice of initiation of the requested review. The [agency] may extend this time limit if the [agency] decides that it is reasonable to do so.

19 C.F.R. § 351.213(d)(1).

On October 16, 2017, Commerce initiated the underlying review and, in the *Initiation Notice*, advised the parties that the agency did "not intend to extend the 90-day deadline [to request withdrawal from the administrative review] unless the requestor demonstrates that an extraordinary circumstance has prevented it from submitting a timely withdrawal request."  82 Fed. Reg. at 48,052.  Commerce would determine whether to extend the 90-day deadline "on a case-by-case basis."  *Id.*  The 90-day period to withdraw a review request pursuant to 19 C.F.R. § 351.213(d)(1) therefore expired on January 15, 2018.  I&D Mem. at 8.

On January 23, 2018, the Federal Circuit decided *Glycine*.  The Federal Circuit held that Commerce's statement of general policy that required "extraordinary circumstances" to support an untimely request to withdraw a review request was inconsistent with the regulation.  880 F.3d at 1345.  Nevertheless, Commerce has discretion "to apply a reasonableness test in making the decision whether to extend the

deadline for filing a withdrawal notice." *Id.* at 1345.  The Federal Circuit also noted the history of Commerce's regulation, recognizing the relevance to a party of knowing the results of the immediately preceding review, if any, to a party's decision to withdraw its review request.  *See id.* at 1339.

On March 9, 2018, after the 90-day deadline, Commerce issued the final results in AR1.  *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 83 Fed. Reg. 11,690 (Dep't Commerce Mar. 16, 2018) (final results of antidumping duty admin. review and final determination of no shipments; 2015– 2016).

On September 4, 2018, Commerce issued the *Preliminary Results*, announcing a 73.63 percent margin for the separate rate respondents.  83 Fed. Reg. at 45,895. Subsequently, in October and November 2018, several respondents attempted to withdraw their review requests and asked Commerce to rescind their respective administrative reviews.  I&D Mem. at 2 & n.3 (citation omitted).  Relevant to this discussion, Winrun, Linglong, Hengyu, and Mayrun submitted withdrawal and rescission requests.  *See* Withdrawal of Request for AD Admin. Review and Request for Rescission (Oct. 2, 2018), PR 239, CR 306–07, CJA Tab 37; Ext. of Time to File Withdraw[a]l of Request for AD Admin. Review and Request for Rescission (Oct. 9, 2018) ("Mayrun Withdrawal Request"), PR 245, CJA Tab 38; GDLSK Respondents' Request to Extend Time to File Withdrawal of Review Requests and Request for Rescission of Review (Oct. 25, 2018), PR 251, CJA Tab 39; Withdrawal of Request for Admin. Review and Request for Rescission (Nov. 6, 2018), PR 254, CJA Tab 41.

In the *Final Results*, Commerce denied the requests for withdrawal filed by separate rate respondents after the *Preliminary Results*.  I&D Mem. at 8–9.  Commerce noted that the requests were made approximately nine months after the expiration of the 90-day deadline and six months after the publication of the final results in AR1.  *Id.* at 9.  Commerce further explained that the agency

> has expended considerable resources in the preliminary phase of this review, including but not limited to, the selection of mandatory respondents, the analysis of extensive information regarding separate rate eligibility for 16 companies, the evaluation of company-specific information regarding ownership, sales processes, financial statements, and factors of production, and the selection of surrogate country and surrogate values.  Moreover, the petitioner objected to the separate rate respondents' request to withdraw their requests for review.

*Id.*

Commerce acknowledged that, pursuant to *Glycine*, it cannot require "extraordinary circumstances" to support an untimely withdrawal request, but that the agency maintains discretion to deny untimely requests.  *Id.*  Commerce further found that this case raised concerns that it could devote "considerable time and resources in the review, and then the party withdraws its request[] once it ascertains that the results of the review are not likely to be in its favor."  *Id.*

## B. Parties' Contentions

Plaintiffs and Mayrun contend that a series of factors weighed in favor of granting the withdrawal requests.  First, Plaintiffs and Mayrun contend that Commerce should have granted the withdrawal requests because the AR1 final results were not announced until two months after the 90-day deadline.  Pls.' Mem. at 37; Mayrun's Mem. at 20.  Second, Plaintiffs and Mayrun argue that Commerce did not expend

significant resources investigating the separate rate respondents but instead "improperly bootstrapped *all* of its administrative efforts" in support of its conclusion that it expended significant time and resources reviewing the respondents at issue. Pls.' Mem. at 38–39; *see also* Mayrun's Mem. at 16. Third, Plaintiffs argue that Commerce inappropriately relied on USW's objection to the withdrawal requests. Pls.' Mem. at 40. Fourth, Mayrun argues that the agency's delay in selecting mandatory respondents prejudiced Mayrun by delaying its withdrawal request. *See* Mayrun's Mem. at 20–21.[13]

Plaintiffs also contend that although Commerce stated it did not rely on the "extraordinary circumstances" standard struck down in *Glycine*, the agency applied an equivalent standard by not allowing the parties to withdraw. Pls.' Reply at 16, 18.

The Government contends that the separate rate respondents did not submit withdrawal requests until nine months after the 90-day deadline expired and the *Preliminary Results* had been issued. Gov't Resp. at 15. The Government contends that the separate rate respondents sought to withdraw their review requests over six months after Commerce published the final results in AR1, compared to *Glycine,* in which Commerce published the results of the prior administrative review one day before the parties sought to withdraw. *Id.* at 17.

---

[13] Mayrun also argues that Commerce unreasonably denied its withdrawal request because it only reviewed one respondent, *see* Mayrun's Mem. at 21–23, and that respondent's rate was not representative, *see id.* at 23–24. The court has previously addressed the substance of these arguments. Moreover, they bear no logical connection to Mayrun's arguments against Commerce's denial of Mayrun's untimely withdrawal request.

According to the Government, Commerce was not required to quantify the resources allocated to individual respondents to support its conclusion that the agency had expended significant time and resources in this review.  *Id.* at 18–19.  In the Government's view, the separate rate respondents had sufficient information to decide whether to withdraw in December 2017 (after Commerce had placed CBP data "for respondent selection on the record") or in April 2018 (when Commerce "published its respondent selection memorandum") such that Commerce's delay in selecting mandatory respondents did not prejudice Mayrun's decision to request withdrawal.  *Id.* at 20–21.

Finally, the Government contends that, in *Glycine*, the Federal Circuit affirmed that Commerce has "wide discretion" in determining whether to extend the 90-day deadline.  *Id.* at 14.  The Government argues that the Federal Circuit did not truncate Commerce's discretion to assess the reasonableness of an untimely withdrawal request.  *Id.*

**C. Commerce's Denial of the Untimely Withdrawal Requests was Reasonable**

The regulations provide that Commerce may extend the time limit to request the withdrawal of a review request beyond 90 days if "it is reasonable to do so."  19 C.F.R. § 351.213(d)(1).  Here, Commerce explained why it determined that it was not reasonable to grant an extension of approximately nine months.

First, Commerce considered the relationship of the withdrawal requests to the timing of the final results in AR1 and concluded that, because those final results preceded the requests by six months, they were too attenuated to weigh in favor of

granting the requests.  *See* I&D Mem. at 9.  Indeed, Plaintiffs and Mayrun do not

address how the AR1 final results, published in March 2018, support the

reasonableness of extending the withdrawal deadline by an additional six months

beyond the issuance of those results.  *Cf. id.* (noting that "the withdrawal requests were

filed . . . approximately six months after publication of the final results for [AR1]").

Second, Commerce's delay in selecting mandatory respondents similarly fails to

support Mayrun's argument for extending the time for it to withdraw its review request.

*See* Mayrun's Mem. at 20–21.  As with the previous argument, Mayrun has not

articulated how Commerce's delayed selection of mandatory respondents, which

occurred on April 12, 2018, supports granting Mayrun an extension until October 2018

to withdraw its review request.

Third, Commerce noted that USW objected to the withdrawal requests favored

denying the requests.  *See* I&D Mem. at 9.  While Plaintiffs are correct that USW did not

request that these respondents be reviewed in the first instance, *see* Pls.' Mem. at 39–

40, Commerce simply noted USW's objection at the end of a list of reasons for rejecting

the late request and nothing suggests that USW's objection was decisive in the matter.

Fourth, Plaintiffs argue that Commerce was required to identify the resources

expended for each respondent to support rejecting a particular withdrawal request, *see*

Pls.' Mem. at 38, and Mayrun argues that all investigative efforts with respect to Mayrun

took place prior to the 90-day deadline, *see* Mayrun's Mem. at 18–19.  Nothing in the

statute or regulations requires Commerce to measure the reasonableness of a

withdrawal request against the resources spent investigating the individual requesting

respondent, particularly over the course of that respondent's lengthy delay prior to submitting the withdrawal request.  *Cf. GODACO Seafood Joint Stock Co. v. United States*, 44 CIT ___, ___, 435 F. Supp. 3d 1342, 1358 (2020) ("Reasonableness, as set out in 19 C.F.R. § 351.213(d)(1), is the only legally applicable standard that Commerce may apply in determining whether to extend the time limit for parties to file withdrawal requests of administrative reviews.") (citation omitted).

Finally, Plaintiffs contend that Commerce effectively applied the "extraordinary circumstances" standard that the Federal Circuit found unlawful in *Glycine*.  Pls.' Reply at 16, 18.  To the contrary, Commerce acknowledged the inapplicability of that higher standard and provided a reasoned basis for declining to extend the time period to withdraw.  *See* I&D Mem. at 9.  The agency also articulated its policy concern, that being the same concern it articulated when adopting the regulation: Commerce must have the ability to prevent a party from requesting a review and then withdrawing the request "once it ascertains that the results of that review are not likely to be in its favor." *Id.; see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,317 (Dep't Commerce May 19, 1997) (final rule).  Having waited not only for the final results of the immediately preceding review, but also for the preliminary results of the instant review, the separate rate respondents in this case were in a much different position than the respondents at issue in *Glycine*.

For all of these reasons, the court sustains Commerce's denials of the untimely withdrawal requests as reasonable.

### III. Commerce's Decision to Exclude Certain Data in Determining Surrogate Values

#### A. Legal Framework

The statute provides that, in valuing factors of production, Commerce may "disregard price or cost values without further investigation if the [agency] has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order."  19 U.S.C. § 1677b(c)(5).

#### B. Additional Background

Commerce preliminarily selected Thailand as the primary surrogate country.  *See* Prelim. Decision Mem. at 15.  However, "in calculating the import-based [surrogate values]," Commerce disregarded import prices from India, Indonesia, and South Korea because the agency had previously determined that these countries maintain "broadly available, non-industry specific export subsidies."  *Id.* at 20 & n.71 (citations omitted).

For the *Final Results*, Commerce continued to exclude import prices from India, Indonesia, and Korea in determining surrogate values.  I&D Mem. at 18.  Citing 19 U.S.C. § 1677b(c)(5) and *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016), Commerce explained that it may disregard import values from certain countries "without further investigation if [the agency] has determined that broadly available export subsidies existed."  *Id.* at 19 & n.92.  Commerce stated that the court has previously found its "presumption-based approach" is not unreasonable.  *Id.* at 18 & n.94 (citation omitted).  Commerce inferred "that all exporters from these countries may have benefitted from these subsides."  *Id.* at 18

### C.  Parties' Contentions

Plaintiffs contend that substantial evidence does not support Commerce's determination that India, Indonesia, and South Korea maintain broadly available, non-industry specific export subsidy programs.  Pls.' Mem. at 42.  Plaintiffs also contend that "*CS Wind* . . . only stands for the proposition that Commerce can presume (rebuttably) benefits received under subsidies if the existence of these subsidies has otherwise been established by substantial evidence."  *Id.* at 45.  To that end, Plaintiffs contend, evidence does not support "Commerce's finding that export subsidies were generally available in the countries at issue during AR2."  *Id.*

The Government contends that "Commerce adhered to its long-standing practice of disregarding import prices" if the agency has reason to believe they are subsidized.  Gov't Resp. at 30.  The Government contends that "Plaintiffs misunderstand the statute," which permits "Commerce [to] disregard price or cost values *without further investigation* if the [agency] has determined that broadly available export subsidies existed."  *Id.*  Thus, according to the Government, the agency was not required to provide additional evidence of export subsidies.  *Id.*

### D.  Substantial Evidence Supports Commerce's Exclusion of Certain Import Values in Determining Junhong's Surrogate Values

Here, Commerce cited four prior administrative determinations in which the agency found non-industry specific export subsidies to exist in the three countries at issue.  *See* Prelim. Decision Mem. at 20 n.71.  While Plaintiffs correctly note that the determinations in question occurred several years ago, Pls.' Mem. at 43, they have not presented any evidence indicating that the non-industry specific subsidies are no longer

available or have been discontinued.  Section 1677b(c)(5) expressly provides that,

"without further investigation," Commerce may disregard such import prices if it "has

determined that broadly available export subsidies existed."  Plaintiffs' mere speculation

regarding the passage of time does not obligate Commerce to further investigate the

export subsidies in question absent any evidence of change during that period.

Accordingly, Commerce reasonably determined to disregard the import prices from

India, Indonesia, and South Korea "without further investigation."  19 U.S.C.

§ 1677b(c)(5).

**CONCLUSION**

In accordance with the foregoing, Commerce's *Final Results* will be sustained.

Judgment will enter accordingly.

/s/     Mark A. Barnett____
Mark A. Barnett, Judge

Dated: December 22, 2020
       New York, New York