A-570-016
Remand
CAFC 21-1489
POR:  8/01/2016 – 7/31/2017
**Public Document**
E&C/OVII:  JJZ/JS

*YC Rubber Co. (North America) LLC., et al v. United States*,
**Consol. Court No. 19-000069, Slip Op. 21-1489 (CIT February 2, 2023)**
**Passenger Vehicle and Light Truck Vehicle Tires from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the CIT)

issued in *YC Rubber Co. (North America) LLC., et al v. United State*s, Consol. Court No. 19-

000069 (CIT Feb. 2, 2023) (*Remand Order*).  This action arises out of the antidumping duty

(AD) administrative review of passenger vehicle and light truck tires from the People's Republic

of China (China) for the period of review (POR) August 1, 2016, through July 31, 2017.[1]

The CIT remanded to Commerce to issue a determination consistent with U.S. Court of

Appeals for the Federal Circuit (Federal Circuit) decision in *YC Rubber Co. (N. Am.) LLC v.*

*United States*, Court No. 21-1489 (Fed. Cir. Aug. 29, 2022) (*YC Rubber*).  In *YC Rubber*, the

Federal Circuit vacated the CIT's decision in *YC Rubber Co., (N. Am.) LLC v. United States,* 487

F. Supp. 3d 1367 (CIT 2020).  Specifically, the Federal Circuit remanded Commerce's decision

to review a single mandatory respondent and its use of a single mandatory respondent's rate as

the separate rate in this proceeding.  The Federal Circuit held that Commerce's interpretation of

---

[1] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 17781, (April 26, 2019) (*Final Results*).

the statute to not require review of more than one respondent was contrary to the statute's unambiguous language.  Specifically, the Federal Circuit stated that "we conclude that a 'reasonable number' is generally more than one" with respect to the respondents reviewed for determining the weighted-average dumping margin under section 777A(c)(2) of the Tariff Act of 1930, as amended (the Act).  Further, the Federal Circuit held that Commerce did not provide an explanation of why it would be reasonable to "average" a single respondent's rate under section 735(c)(5) of the Act.  Thus, the Federal Circuit held that Commerce erred in restricting its examination to a single mandatory respondent and in applying the single mandatory respondent's rate to the other separate rate respondents.[2]

## II.    BACKGROUND

Commerce published the *Final Results* on April 26, 2019.  As discussed in the *Final Results*, Commerce calculated a rate of 64.57 percent for Junhong and relied on that rate to establish the rate for the separate rate respondents.[3]  In its August 29, 2022, opinion, the Federal Circuit remanded the *Final Results*, concluding that Commerce erred in restricting its examination to a single mandatory respondent and in applying the single mandatory respondent's rate to the separate rate respondents.  Therefore, on remand, Commerce sought to select an additional mandatory respondent to review.  Entries from the following exporters remain suspended in this review, and thus, these companies were eligible to be selected as a second mandatory respondent:  (1) Kenda Rubber (China) Co., Ltd. (Kenda); (2) Mayrun Tyre (Hong

---

[2] In the underlying review, Commerce selected two mandatory respondents:  Shandong Haohua Tire Co. (Haohua); and Zhaoqing Junhong Co., Ltd. (Junhong).  After respondent selection, Haohua informed Commerce that it was withdrawing from participation.  Commerce issued its preliminary results without selecting an additional respondent, and no parties requested to be a voluntary respondent or objected before the preliminary results to Commerce's review of one mandatory respondent.  *See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2016–2017*, 83 FR 45893 (September 11, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[3] *See Final Results*.

Kong) Limited (Mayrun); (3) Shandong Hengyu Science & Technology Co., Ltd. (Hengyu); (4) Winrun Tyre Co., Ltd. (Winrun); (5) Shandong Wanda Boto Tyre Co., Ltd (Wanda Boto); and (6) Shandong Linglong Tyre Co., Ltd. (Linglong). Entries from these companies remain suspended pursuant to properly-issued injunctions stemming from the instant litigation.

On February 8, 2023, Commerce selected Wanda Boto as an additional mandatory respondent for purposes of these final results of redetermination[4] and issued it the standard questionnaire on the same date.[5] On February 16, 2023, Wanda Boto notified Commerce that it was unable to respond to the questionnaire.[6] On February 17, 2023, Commerce selected Hengyu as an additional mandatory respondent for the purposes of this remand[7] and issued it the standard questionnaire.[8] On February 24, 2023, Hengyu notified Commerce that it would not participate in the ongoing remand.[9] On February 24, 2023, Commerce selected Mayrun as an additional mandatory respondent in this remand[10] and issued it the standard questionnaire.[11] On March 3, 2023, Mayrun notified Commerce that it would not participate as a mandatory respondent in this remand.[12] On March 3, 2023, Commerce selected Winrun as an additional mandatory

---

[4] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated February 8, 2023.
[5] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Hengyu," dated February 17, 2018.
[6] *See* Wanda Boto's Letter, "Passenger Vehicle and Light Truck Tires from People's Republic of China: Response to the Department's Request to Notify," dated February 16, 2023.
[7] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," dated February 17, 2023.
[8] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Hengyu," dated February 17, 2023.
[9] *See* Hengyu's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Response to the Department's Request to Notify," dated February 24, 2023.
[10] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," date February 24, 2023.
[11] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Mayrun," dated February 24, 2023.
[12] *See* Mayrun's Letter, "Mayrun Tire (H.K.) Ltd.: Request to Notification of Participation and to Initial Questionnaire," dated March 3, 2023. On February 16, 2023, Mayrun renewed its request to withdraw from the review. *See* Mayrun's Letter, "Mayrun Tire (H.K.) Ltd.: Renewed Request to Withdraw from Review," dated February 16, 2023.

respondent in this remand[13] and issued it an initial questionnaire.[14]  On March 10, 2023, Winrun

notified Commerce that it would not participate as a mandatory respondent in this remand.[15]

On March 10, 2023, Commerce selected Kenda as an additional mandatory respondent in

this remand[16] and issued it an initial questionnaire.[17]  On April 17, 2023, Kenda submitted its

responses to section A of Commerce's initial questionnaire and the double remedies

questionnaire.[18]  On May 2, 2023, Kenda submitted its response to section C of the initial

questionnaire.[19]  On May 9, 2023, Kenda submitted its response to section D of the initial

questionnaire.[20]  On May 24, 2023, the petitioner[21] submitted comments on Kenda's

questionnaire response.  On June 6, 2023, Commerce issued a supplemental questionnaire to

Kenda.[22]  Also on June 6, 2023, Commerce notified parties that it intended to use surrogate value

(SV) information developed in the underlying 2016-2017 administrative review to apply to the

factors of production (FOPs) that Kenda reported in its section D questionnaire response and

allowed parties the opportunity to comment on the proposed SVs and/or submit alternative SV

---

[13] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," dated March 3, 2023.
[14] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Winrun," dated March 3, 2023.
[15] *See* Winrun's Letter, "Winrun Response to Department Letter of March 3, 2023 Passenger Vehicle and Light Truck Tires from China," dated March 10, 2023.
[16] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," dated March 10, 2023.
[17] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Winrun," dated March 10, 2023.
[18] *See* Kenda's Letter, "Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Kenda's Response to Section A and Double Remedy Questionnaire," dated April 17, 2023 (Kenda's Double Remedy QR).
[19] *See* Kenda's Letter, "Certain Passenger Vehicle and Light Truck Tires from China:  Kenda Section C Questionnaire Response," date May 2, 2023 (Kenda's CQR).
[20] *See* Kenda's Letter, "Certain Passenger Vehicle and Light Truck Tires from China:  Kenda Section D Questionnaire Response," dated May 9, 2023 (Kenda's DQR).
[21] The petitioner is the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.
[22] *See* Commerce's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: First Supplemental Questionnaire," dated June 6, 2023.

information.[23]  On June 10, 2023, the petitioner and Kenda each submitted SV comments and data.[24]  On June 22 and 27, 2023, Kenda responded to Commerce's supplemental questionnaire.[25]

On July 25, 2023, Commerce issued Draft Remand Results addressing the issue from the *Final Results* described above.[26]  On August 17, 2023, YC Rubber and Sutong Tire Resources Inc, Wanda Boto and ITG Voma Corporation, and Mayrun submitted comments.[27]  All comments are addressed below after the final analysis section.

## III.   FINAL ANALYSIS

We have determined that Wanda Boto, Mayrun, Hengyu, and Winrun each failed to establish its entitlement to a separate rate in these final results of redetermination and we have applied to each company the China-wide rate of 87.99 percent.  In addition, we have determined an estimated weighted-average dumping margin of 18.15 percent for Kenda based on its reported data.  Finally, we have recalculated the separate rate and applied it to Linglong.

---

[23] *See* Memorandum, "Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Surrogate Country and Surrogate Values," dated June 6, 2023.

[24] *See* Petitioner's Letter, "Passenger Vehicle and Light Truck Tires from China 2016-2017:  Petitioner's Surrogate Value Submission," dated June 20, 2023; and Kenda's Letter, "Certain Passenger Vehicle and Light Truck Tires from China:  Kenda Surrogate Value Comments," dated June 20, 2023.

[25] *See* Kenda's Letters, "Certain Passenger Vehicle and Light Truck Tires from China:  Kenda First Supplemental Questionnaire Response:  Question 2, 3 and 5-12," dated June 22, 2023; and "Certain Passenger Vehicle and Light Truck Tires from China:  Kenda First Supplemental Questionnaire Response:  Question 1, 4, and 13-15," dated June 27, 2023.

[26] *See* Memorandum, "Draft Results of Redetermination Pursuant to Court Remand," dated July 25, 2023 (Draft Remand Results).

[27] *See* YC Rubber's and Sutong Tire Resources, Inc.'s Letter, "Comments on Draft Remand:  Second (2016-2017) Administrative Review of the Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated August 17, 2023 (YC Rubber/STR's Comments); Wanda Boto's and ITG Voma Corporation's Letter, "Passenger Vehicle and Light Truck Tires from People's Republic of China:  Comments Regarding Draft Results of Redetermination," dated August 17, 2023 (Wanda Boto's Comments); and Mayrun's Letter, "Comments of Mayrun Tire (Hong Kong) Ltd. on Draft Remand Results (*Y.C. Rubber (North America) LLC v. United States*, Appeal No. 2021-1489 (U.S. Court of Appeals for the Federal Circuit)," dated August 17, 2023 (Mayrun's Comments).

*Companies Not Receiving a Separate Rate*

Our *Initiation Notice* states the following:  "{f}or exporters and producers who submit a separate-rate status application or certification and subsequently are selected as mandatory respondents, these exporters and producers will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents."[28]  Wanda Boto, Mayrun, Hengyu, and Winrun each submitted a separate rate certification (SRC).[29]  However, as noted above, Wanda Boto, Mayrun, Hengyu, and Winrun were each, in turn, selected as mandatory respondents, and each did not respond to any sections of Commerce's AD questionnaire.  Therefore, we are unable to confirm, clarify, or verify the SRCs submitted by Wanda Boto, Mayrun, Hengyu, or Winrun.  Thus, we continue to determine that Wanda Boto, Mayrun, Hengyu, and Winrun each failed to rebut the presumption of government control and are ineligible for a separate rate.  Accordingly, we continue to determine that Wanda Boto, Mayrun, Hengyu, and Winrun are each part of the China-wide entity.

## IV.    DISCUSSION OF THE METHODOLOGY

In the underlying review, Commerce selected Thailand as the surrogate country and used Thai data on the record as SVs for Junhong.  However, Kenda's FOPs in these final results of redetermination were not identical to Junhong's FOPs in the underlying administrative review and, thus, Commerce allowed parties the opportunity to submit additional SV information to match Kenda's FOPs to appropriate SV information.[30]  The petitioner and Kenda each submitted

---

[28] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 48051, 48055 (October 16, 2017); *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 57705, 57707 (December 7, 2017) (collectively, *Initiation Notice*).
[29] *See* Mayrun Tyre (Hong Kong) Limited's November 14, 2017 SRC; Kenda Rubber (China) Co., Ltd.'s November 15, 2017 SRC; Shandong Wanda Boto Tyre Co., Ltd.'s November 15, 2017 SRC; and Winrun Tyre Co., Ltd.'s November 10, 2017 SRC.
[30] *See* Kenda's DQR.

additional Thai SV information on the record of this remand, which Commerce then applied to Kenda's FOP information, where appropriate.

### A. Date of Sale

In identifying the date of sale of subject merchandise, in accordance with 19 CFR 351.401(i), Commerce will normally "use the date of invoice, as recorded in the exporter or producer's records kept in the normal course of business" unless a different date better reflects the date on which the material terms of sale (*e.g.*, price and quantity) are established.[31] Furthermore, we have a long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[32] Kenda reported the earlier of shipment date or invoice date as the date of sale.[33] Commerce found no evidence contrary to Kenda's claim that the invoice date reflected the date on which the material terms of sale were established. Thus, because record evidence does not demonstrate that the material terms of sale were established on another date, Commerce used the invoice date as the date of sale for these final remand results, in accordance with 19 CFR 351.401(i).[34]

---

[31] *See, e.g.*, *Notice of Final Determinations of Sales at Less Than Fair Value; Certain Cold-Rolled Flat-Rolled Carbon Quality Steel Products from Turkey*, 65 FR 15123 (March 21, 2000), and accompanying Issues and Decision Memorandum (IDM) at Comment 1.

[32] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 10670 (March 12, 2018), and accompanying PDM at 6-7, unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 32629 (July 13, 2018).

[33] *See* Kenda's CQR at 19.

[34] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 10; *see also Allied Tube and Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090-92 (CIT 2001) (upholding Commerce's rebuttable presumption that invoice date is the appropriate date of sale).

### B.  Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), to determine whether Kenda's sales of subject merchandise from China to the United States were made at less than normal value (NV), we compared net U.S. sales prices to NV as described in the "Export Price," "Constructed Export Price," and "Normal Value" sections of these final results of redetermination.

### 1.  Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates dumping margins by comparing weighted-average NVs to weighted-average export prices (EP) or constructed export prices (CEP) (the average-to-average comparison method) unless Commerce determines that another method is appropriate in a particular situation.  In AD investigations, Commerce examines whether to compare weighted-average NVs to the prices of individual export transactions (the average-to-transaction comparison method) as an alternative comparison method using an analysis consistent with section 777A(d)(l)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of administrative reviews, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in AD investigations.[35]

In numerous investigations and reviews, Commerce applied a "differential pricing" analysis to determine whether the application of average-to-transaction comparisons is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section

---

[35] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286 (CIT 2014), *aff'd* 862 F.3d 1322 (Fed. Cir. 2017); *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363-65 (Fed. Cir. 2015) ("{T}the fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties.") (citation omitted).

777A(d)(1)(B) of the Act.[36]  Commerce finds the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this remand. Commerce will continue to develop its approach in this area based on comments received in this remand and the application of the differential pricing analysis of a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margins.

The differential pricing analysis that we used in these draft results of redetermination requires a finding of a pattern of prices (*i.e.*, EPs or CEPs) for comparable merchandise that differs significantly among purchasers, regions, or time periods.  If such a pattern is found, then the differential pricing analysis evaluated whether such differences can be taken into account when using the average-to-average comparison method to calculate the weighted-average dumping margin.  In the differential pricing analysis used here, we evaluated all purchasers, regions, and time periods to determine whether a pattern of prices that differ significantly exists. In our analysis, we incorporated default group definitions for purchasers, regions, time periods, and comparable merchandise.  We based purchasers on the reported customer names.  We defined regions using the reported destination code (*i.e.*, city name, ZIP code, *etc.*) and they were grouped based upon standard definitions published by the U.S. Census Bureau.  We defined time periods by the quarter within the POR being examined based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable

---

[36] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

merchandise is considered using the product control number and any characteristics of the sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, we applied the "Cohen's *d* test." The Cohen's *d* test is a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group. First, for comparable merchandise, we applied the Cohen's *d* test when the test and comparison groups of data each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, we calculated the Cohen's *d* coefficient to evaluate the extent to which the net prices to a particular purchaser, region, or in a time period differ significantly from the net prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test: small, medium, or large. Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the means of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, we considered the difference significant, and the sales in the test group were found to have passed the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, we used the "ratio test" to assess the extent of the significant price differences for all sales, as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction comparison method to all sales as an alternative to the

average-to-average comparison method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction comparison method to those sales identified as passing the Cohen's $d$ test as an alternative to the average-to-average comparison method, and application of the average-to-average comparison method to those sales identified as not passing the Cohen's $d$ test.  If 33 percent or less of the value of total sales passes the Cohen's $d$ test, then the results of the Cohen's $d$ test do not support consideration of an alternative to the average-to-average comparison method.

If both tests in the first stage (*i.e.*, the Cohen's $d$ test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, we examine whether using only the average-to-average comparison method can appropriately account for such differences.  In considering this question, we test whether using an alternative method, based on the results of the Cohen's $d$ and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average comparison method only.  If the difference between the two calculations is meaningful, this demonstrates that the average-to-average comparison method cannot account for differences such as those observed in this analysis, and, therefore, an alternative method would be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margin between the average-to-average comparison method and the

appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margin moves across the *de minimis* threshold.

Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in these draft results of redetermination.

2.  Results of the Differential Pricing Analysis

For Kenda, based on the results of the differential pricing analysis, Commerce finds that 48.8 percent of the value of U.S. sales pass the Cohen's *d* test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that there is no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test.  Thus, for these draft results of redetermination, Commerce is applying the average-to-average method for all U.S. sales to calculate the weighted-average dumping margin for Kenda.

**C.  U.S. Price**

*Export Price*

In accordance with section 772(a) of the Act, "the term 'export price' (EP) is the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c))."  Commerce defined the U.S. price of merchandise under consideration based on the EP for Kenda's U.S. sales as reported by Kenda.

Commerce calculated the EP based on the prices at which merchandise under consideration was sold to unaffiliated purchasers in the United States.  Kenda reported that some of its U.S. sales were EP sales. [37]

For Kenda's EP sales, Commerce made deductions, as appropriate, from the reported U.S. price for movement expenses (*i.e.*, domestic freight and domestic brokerage and handling).  Commerce based movement expenses on SVs.

*Constructed Export Price*

In accordance with section 772(b) of the Act, CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)."  Kenda reported that it made some of its U.S. sales on a CEP basis.[38]

Where appropriate, we made deductions from the starting price (gross unit price) for billing adjustments, rebates, discounts, foreign, international, and U.S. movement expenses section 772(c)(2)(A) of the Act.  We also made adjustments for direct and indirect selling expenses, credit expenses, advertising expenses, warranty expenses, and inventory carrying costs, all of which relate to commercial activity in the United States, in accordance with section 772(d)(1) of the Act.  In addition, we made adjustments for CEP profit, in accordance with sections 772(d)(3) and 772(f) of the Act.

---

[37] *See* Kenda's CQR at 19.
[38] *Id.*

*Value-Added Tax (VAT)*

Commerce's practice, in calculating EP and CEP in non-market economy (NME) cases, is to subtract the amount of any un-refunded (irrecoverable) VAT, in accordance with section 772(c)(2)(B) of the Act.[39]  Where the irrecoverable VAT is a fixed percentage of the U.S. price, Commerce performs a tax-neutral dumping calculation by reducing the U.S. price by this percentage.[40]  Thus, Commerce's methodology essentially amounts to performing two basic steps:  (1) determining the amount (or rate) of the irrecoverable VAT tax on subject merchandise; and (2) reducing U.S. price by the amount (or rate) determined in step one.

The Chinese VAT schedule on the record demonstrates that the VAT rate and the rate for rebating VAT on subject merchandise upon exportation were the same throughout the POR.[41]  Thus, the record indicates that there is no irrecoverable VAT associated with the exportation of subject merchandise.  For purposes of these draft results of redetermination, therefore, we have not reduced U.S. prices for VAT.

### D.  Normal Value

Section 773(c)(1) of the Act provides that Commerce shall determine the NV using an FOP methodology if the merchandise is exported from an NME and the information does not permit the calculation of NV using home market prices, third country prices, or constructed value under section 773(a) of the Act.  Commerce bases NV in an NME case on FOPs, because the presence of government controls on various aspects of NME countries renders price comparisons

---

[39] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481, 36483-84 (June 19, 2012).
[40] *Id.*
[41] *See* Kenda's CQR at C-51.

and the calculation of production costs invalid under Commerce's normal methodologies.[42] Under section 773(c)(3) of the Act, FOPs include, but are not limited to:  (1) hours of labor required; (2) quantities of raw materials employed; (3) amounts of energy and other utilities consumed; and (4) representative capital costs.[43]  We used quantities/distances (as appropriate) reported by Kenda for materials, labor, by-products, packing, and freight in our NV calculations. In accordance with section 773(c) of the Act and 19 CFR 351.408(c)(1), we calculated the cost of FOPs by multiplying each of the reported per-unit FOP consumption quantities by the relevant publicly available SV.  We summed the surrogate input cost and surrogate freight cost for transporting the input to Kenda to derive the total cost of each input used by Kenda to produce subject merchandise.

*Factor Valuations*

We used the FOPs reported by Kenda for materials, labor, by-products, packing, and freight.  In accordance with section 773(c) of the Act and 19 CFR 351.408(c)(1), we calculated the cost of FOPs by multiplying the reported per-unit FOP consumption rates by publicly available SVs.[44]  We summed the FOP and freight costs to derive NV.  When selecting from among the available information for valuing FOPs, we considered, among other criteria, whether the SVs are publicly available, and contemporaneous with the POR or closest in time to the

---

[42] *See, e.g.*, *Preliminary Determination of Sales at Less Than Fair Value, Affirmative Critical Circumstances, in Part, and Postponement of Final Determination:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 19695, 19703 (April 17, 2006), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, in Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006).
[43] *See* section 773(c)(3)(A)-(D) of the Act.
[44] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Draft Remand Analysis Memorandum for Kenda Rubber (China) Co., Ltd. for the 2016-2017 Administrative Review," dated concurrently with these draft results of redetermination (Draft Remand SV Memorandum) (unchanged in these final results of remand).

POR.[45]  As appropriate, we adjusted FOP costs by including freight costs to make them delivered values.  Specifically, we added a surrogate freight cost, where appropriate, to surrogate input values using the shorter of the reported distance from the domestic supplier to the respondent's factory or the distance from the nearest seaport to the respondent's factory.[46]  An overview of the SVs used to calculate weighted-average dumping margins for the mandatory respondent is described below.  For a detailed description of all SVs used to calculate the weighted-average dumping margins, *see* the Draft Remand SV Memorandum.

   *a.  Direct and Packing Materials*

   We based SVs for Kenda's direct materials, packing materials, and by-products on these import values and, where appropriate, valued other items, such as certain movement expenses, using publicly available Thai import data on the record.[47]

   We disregarded certain import values when calculating SVs.  We applied Commerce's long-standing practice of disregarding import prices that we have reason to believe or suspect are subsidized or dumped.[48]  In this regard, Commerce previously found that it is appropriate to disregard prices of imports from India, Indonesia, and the Republic of Korea (Korea) because it determined that these countries maintain broadly available, non-industry specific export

---

[45] *See, e.g.*, *Notice of Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 42672, 42682 (July 16, 2004), unchanged in *Final Determination of Sales at Less Than Fair Value:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 71005 (December 8, 2004).
[46] *See Sigma Corp. v. United States*, 117 F.3d 1401, 1407-08 (Fed. Cir. 1997).
[47] *Id.*
[48] *See* section 773(c)(5) of the Act permits Commerce to disregard price or cost values without further investigation if it has determined that certain subsidies existed with respect to those values; *see also Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 FR 46793, 46795 (August 6, 2015); Omnibus Trade and Competitiveness Act of 1988, Conf. Report to Accompany H.R. 3, H.R. Rep. No. 576, 100th Cong., 2nd Sess. (1988), at 590.

subsidies.[49]  Based on the existence of these subsidy programs that were generally available to all exporters and producers in these countries at the time of the POR, Commerce finds that it is reasonable to infer that all exporters in India, Indonesia, and Korea may have benefitted from these subsidies.  Therefore, we have not used the prices of Thai imports of goods from India, Indonesia, and Korea in calculating the import-based SVs.

Additionally, in selecting import data for SVs, we disregarded prices from NME countries.[50]  Finally, we excluded from our calculation of the average import value any imports that were labeled as originating from an "unspecified" country, because we could not be certain that they were not from either an NME country or a country with generally available export subsidies.[51]

Pursuant to 19 CFR 351.408(c)(1), when a respondent sources inputs produced in market economy (ME) countries, from ME suppliers in meaningful quantities, and pays for the inputs in ME currencies, Commerce uses the actual price paid by the respondent to value those inputs.

b.  *Labor*

We have continued to value labor using contemporaneous Thai data from the Thailand National Statistical Office for all manufacturing sectors.[52]

---

[49] *See, e.g., Carbazole Violet Pigment 23 from India:  Final Results of the Expedited Five-year (Sunset) Review of the Countervailing Duty Order*, 75 FR 13257 (March 19, 2010), and accompanying IDM at 4-5; *Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia:  Final Results of Expedited Sunset Review,* 70 FR 45692 (August 8, 2005), and accompanying IDM at 4; *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review,* 74 FR 2512 (January 15, 2009), and accompanying IDM at 17 and 19-20; *Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand,* 66 FR 50410 (October 3, 2001), and accompanying IDM at 23.
[50] *See, e.g., Certain Kitchen Appliance Shelving and Racks From the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 74 FR 9591, 9600 (March 5, 2009), unchanged in *Certain Kitchen Appliance Shelving and Racks From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 74 FR 36656 (July 24, 2009); and *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Notice of Antidumping Duty Order*, 74 FR 46971 (September 14, 2009).
[51] *Id.*
[52] *See Preliminary Results* PDM at 22 ( unchanged in *Final Results*).

*c.  Movement Services*

We have continued to value inland truck freight expenses using charges for domestic truck freight for transporting cargo domestically within Thailand as published in the World Bank's *Doing Business in Thailand* 2017 and 2018 editions as well as information from the Board of Investment of Thailand's "Petroleum and Petrochemical Policy Bureau, Energy Policy and Planning Office 2017" report.  We did not inflate or deflate the truck rate reported in these sources because they covered a period contemporaneous with the POR.[53]

We have continued to value inland train freight using rates from the Board of Investment of Thailand.  There are no rates for inland water freight services on the record.  Therefore, as a substitute, we valued inland water freight expenses using the inland truck freight rate identified above.[54]

We have continued to value brokerage and handling expenses using charges for exporting a standardized cargo of goods from Thailand as published in the World Bank's *Doing Business in Thailand* 2017 and 2018 editions.  We did not inflate or deflate the brokerage and handling charge in this publication because the survey used to obtain the charge requested data from a period contemporaneous with the POR.[55]

*d.  Financial Ratios*

Pursuant to 19 CFR 351.408(c)(4), Commerce values overhead, selling, general and administrative (SG&A) expenses, and profit using publicly available information gathered from producers of identical or comparable merchandise in the surrogate country.

---

[53] *Id.*
[54] *Id*.
[55] *Id*.

We have continued to use the 2017 financial statement of Goodyear (Thailand) Company Limited (Goodyear) to calculate financial ratios.  We note that the company manufactures comparable merchandise (*e.g.*, motor vehicle tires) and its 2017 financials are contemporaneous with the POR.  Therefore, we have continued to use the 2017 financial statements of Goodyear to value factory overhead, SG&A expenses, and profit.[56]

e.    *Adjustments Under Section 777A(f) of the Act*

In applying section 777A(f) of the Act, the Commerce examines:  (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[57]  For a subsidy meeting these criteria, the statute requires Commerce to reduce the AD cash deposit rate by the estimated amount of the increase in the weighted-average dumping margin subject to a specified cap.[58]  In conducting this analysis, Commerce has not concluded that concurrent application of NME ADs and countervailing duties (CVD) necessarily and automatically results in overlapping remedies.  Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.

---

[56] *Id.*
[57] *See* section 777A(f)(1)(A)-(C) of the Act.
[58] *See* section 777A(f)(1)-(2) of the Act.

For purposes of our analysis under sections 777A(f)(1)(A) and (f)(1)(C) of the Act, we requested firm-specific information from Kenda.[59]  We sought information regarding whether countervailed subsidies were received during the relevant period, information on costs, and information regarding the respondent's pricing policies and practices.  Additionally, we required Kenda to provide documents supporting the information provided.  On April 17, 2023, Kenda submitted its response to Commerce's double remedies questionnaire.[60]  The responses included information concerning countervailable subsidies received during the relevant period, as well as information regarding Kenda's costs and pricing policies and practices.

*Analysis*

Although Kenda was not a mandatory respondent in the completed companion CVD administrative review,[61] it purchased carbon black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity.[62]  Kenda also provided monthly POR costs for its purchases of carbon black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity.[63]

In accordance with section 777A(f)(1)(A) of the Act, Commerce examined whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise.  Kenda provided information regarding its monthly costs for the POR associated with its purchases of carbon black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity.[64]  Because Commerce found the provision of carbon black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity for less than adequate remuneration

---

[59] *See* Commerce's Letter, "Administrative Review of the Antidumping Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Double Remedy Questionnaire," dated December 7, 2020.
[60] *See* Kenda's Double Remedy QR.
[61] *See Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Amended Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 28011 (June 17, 2019) (*PVLT Tires from China CVD 2016*).
[62] *See* Kenda's Double Remedy QR at Exhibit DR-3a.
[63] *Id.* at Exhibit DR-6.
[64] *Id.* at Exhibits DR-5 and DR-6.

(LTAR) to be countervailable with respect to the class or kind of merchandise under consideration in the most recently completed companion CVD administrative review, Commerce finds that the requirement of section 777A(f)(1)(A) of the Act has been met.[65]

While countervailable subsidies have been provided with respect to passenger tires,[66] we have not found a general decrease in the U.S. average import price during the relevant period. Section 777A(f)(1)(B) of the Act requires Commerce to determine whether such countervailable subsidies have been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period.  To make this determination, we examined U.S. International Trade Commission import data for the POR.  Based on this information, Commerce continues to find that import prices of the class or kind of merchandise at issue during that relevant period increased.[67]  As there was no general decrease in the U.S. average import price during the relevant period, we continue to find that the requirement under section 777A(f)(1)(B) of the Act has not been met, and hence we did not make an adjustment under section 777A(f) of the Act.

Additionally, in accordance with section 777A(f)(1)(C) of the Act, Commerce examined whether Kenda demonstrated:  (1) a subsidies-to-cost link, *i.e.*, a subsidy effect on the cost of manufacturing (COM) the merchandise under consideration; and (2) a cost-to-price link, *i.e.*, respondent's prices were dependent on changes in the COM.  With respect to the subsidies-to-cost link, in its double remedies questionnaire response, Kenda reported that it consumed carbon

---

[65] *See PVLT Tires from China CVD 2016.*
[66] *See* Kenda Double Remedy QR; and Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Draft Remand Analysis Memorandum for Kenda Rubber (China) Co., Ltd. for the 2016-2017 Administrative Review," dated July 25, 2023 (Draft Remand Analysis Memorandum), at Attachment III (unchanged in these final results of remand).
[67] *Id.*

black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity in the production of subject merchandise and that it received subsidies for these inputs.[68]

Kenda provided no documentation that demonstrates a discernable link between the subsidies and COM. Therefore, Commerce continues to conclude that Kenda did not establish a subsidies-to-cost link, because it did not demonstrate how the subsidies for the provision of carbon black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity for LTAR impact Kenda's costs for producing subject merchandise.

For the cost-to-price link, Commerce examined whether Kenda demonstrated that changes in costs affected, or are taken into consideration when setting, prices. Kenda stated that "{d}uring the POR there was no price reduction."[69] Therefore, Commerce continues to conclude that Kenda did not establish a cost-to-price link because it did not demonstrate how it adjusted its prices to customers in relation to its COM.

Based on the above, Commerce continues to find that Kenda did not provide adequate information to establish a link between subsidies (the provision of carbon black, nylon cord, synthetic rubber/butadiene, natural rubber, and electricity for LTAR), costs, and prices. In addition, as there was no general decrease in the U.S. average import price during the relevant period, we continue to find that the requirements under sections 777A(f)(1)(B) and (C) of the Act have not been met, and hence we are not making an adjustment under section 777A(f) of the Act.

*Export Subsidies*

Pursuant to section 772(c)(1)(C) of the Act, when calculating EP or CEP, Commerce increases the reported U.S. price by the amount of any CVD imposed to offset an export subsidy. Because Kenda was not a mandatory respondent in the completed companion CVD review, we

---

[68] *See* Kenda's Double Remedy QR at Exhibit DR-6.
[69] *Id.* at 31.

adjusted its U.S. prices using the simple average of the export subsidy rates determined for the mandatory respondents in the completed companion CVD review that was not based on adverse facts available (AFA).[70]

*Currency Conversions*

Where appropriate, we made currency conversions into U.S. dollars, in accordance with section 773A(a) of the Act, based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

## V.   COMMENTS ON DRAFT REMAND

### 1.   Commerce Should Not Have Selected Another Mandatory Respondent on Remand

*Parties Argue:*

- Commerce conducted this remand proceeding under the mistaken premise that it was compelled by Federal Circuit instruction to individually review an additional mandatory respondent.[71]
- The Federal Circuit did not instruct Commerce to select an additional mandatory respondent years after the underlying review was completed.[72]  The Federal Circuit merely ordered "remand for further proceedings in conformity with this opinion."[73]
- Likewise, the CIT did not instruct Commerce to select an additional mandatory respondent.  Rather, the CIT ordered "Commerce to issue a determination consistent with *YC Rubber*." [74]
- In *Changzhou Hawd Flooring Co., Ltd. v. United States*, 44 F. Supp. 3d 1376, 1388-91 (CIT 2015) (*Changzhou Hawd v. United States*) the CIT rejected Commerce's attempts to select a new mandatory respondent three and a half years after the initial investigation. The CIT found that while Commerce has the "discretion to reasonably reopen the record, its decision to conduct a full investigation of Changzhou Hawd at such a late date is arbitrary and capricious."[75]  The age of the data that Commerce sought in the instant remand is even older than in *Changzhou Hawd v. United States* and it was an abuse of

---

[70] *See* Draft Remand Analysis Memorandum (unchanged in these final results of remand).

[71] *See* YC Rubber/STR's Comments at 3 and 7; *see also* Mayrun's Comments at 7; and Wanda Boto's Comments at 3.

[72] *See* YC Rubber/STR's Comments at 3; *see also* Mayrun's Comments at 6-7; and Wanda Boto's Comments at 2.

[73] *See* YC Rubber/STR's Comments at 3; *see also* Mayrun's Comments at 4; and Wanda Boto's Comments at 2 (citing *YC Rubber* at 11).

[74] *See* YC Rubber/STR's Comments at 3 and 15; *see also* Mayrun's Comments at 4; and Wanda Boto's Comments at 2 (citing *Remand Order* at 1).

[75] *See* YC Rubber/STR's Comments at 4 and 6; *see also* Mayrun's Comments at 4; and Wanda Boto's Comments at 2.

discretion for Commerce to penalize the parties for failing to maintain and submit information.[76]

- Commerce recently found that *YC Rubber* does not mandate that Commerce reopen the record to select a second respondent.  In its voluntary remand of the 2017 administrative review of the countervailing duty order on MLWF from China, Commerce reasoned that it did not have to select a second mandatory respondent.[77]
- Commerce should have complied with *YC Rubber* by assigning a "carry-forward" rate to the remand respondents as it has done in similar circumstances[78] rather than rely on Junhong's calculated 64.57 percent weighted-average margin which is aberrational when compared to other weighted-average rates calculated since the *Order* was established.[79]

**Commerce Position:**  Commerce's selection of additional mandatory respondents in this remand proceeding fully complies with the Federal Circuit's ruling in *YC Rubber*, as well as the CIT's *Remand Order*.  The Federal Circuit held that "Commerce unlawfully restricted its examination to a single mandatory respondent"[80] and the CIT ordered that Commerce issue a determination "consistent with *YC Rubber*."[81]  Accordingly, continuing to individually examine only one respondent one remand would not result in a determination "consistent with *YC Rubber*." Therefore, to comply with the Federal Circuit's ruling, Commerce selected an additional respondent on remand for individual examination.  The Federal Circuit did not instruct Commerce to simply pull an AD rate forward from a prior proceeding or otherwise ignore Junhong's calculated weighted-average rate from the underlying review.  Instead, the Federal Circuit remanded the matter "for further proceedings in conformity with this opinion."[82]  As

---

[76] *See* Mayrun's Comments at 9-11.

[77] *See* YC Rubber/STR's Comments at 4-7 (citing Final Results of Redetermination Pursuant to Court Remand, Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States, Consol. Court No. 20-03885, ECF 119).

[78] *See* YC Rubber/STR's Comments at 2, 3, and 21; *see also* Mayrun's Comments at 4; and Wanda Boto's Comments at 2 and 6 (citing *e.g.*, *Certain Quartz Surface Products From India:  Final Administrative Review; 2019-2021, 88 FR 1188* (January. 9, 2023)).

[79] *See* YC Rubber/STR's Comments at 19-21.

[80] *See YC Rubber* at 10.

[81] *See Remand Order* at 1.

[82] *See YC Rubber* at 11; *see also Remand Order* at 1 (ordering "Commerce to issue a determination consistent with *YC Rubber Co. (North America) LLC v. United States,* Appeal No. 2021-1489 (Fed. Cir. Aug. 29, 2022)).

discussed below, selecting additional mandatory respondents was a reasonable method for addressing the Federal Circuit's concerns in this matter.

The Federal Circuit concluded that it was not reasonable for Commerce to have calculated the rate applied to the separate rate companies based on the weighted-average rate of one respondent.[83]  Moreover, the Federal Circuit held Commerce unlawfully only examined one respondent and that "substantial evidence does not support Commerce's application of Junhong's rate to the other separate rate respondents."[84]  Finally, the Federal Circuit's reasoning for vacating the CIT's ruling that Commerce's examination of a single mandatory (*i.e.*, Junhong) and its use of Junhong's rate for the separate rate respondents was reasonable, hinges on the interpretation of the Act that Commerce must determine "the weighted-average" rate for a reasonable number of companies and concluded that a "reasonable number" is generally more than one company.[85]  Therefore, in this remand proceeding, Commerce selected, reviewed, and calculated a weighted-average rate of 18.15 percent for Kenda, as laid out in detail above.  As discussed below, Commerce has averaged Kenda's rate and Junhong's rate to calculate an average rate for the companies eligible for a separate rate and subject to the instant litigation. The calculation of an average rate from both Kenda and Junhong's individual rates complies with the Federal Circuit's ruling, and the CIT's remand.

In addition, we disagree with the parties' contention that Junhong's rate is aberrational. First, the Federal Circuit did not disqualify Commerce's use of Junhong's weighted-average rate of 64.57 percent or indicate that Junhong's rate was aberrational and therefore unusable.[86] Moreover, the CIT has already rejected YC Rubber/STR's argument that Junhong's rate should

---

[83] *See YC Rubber* at 8.
[84] *See YC Rubber* at 10.
[85] *See YC Rubber* at 9.
[86] *See generally, YC Rubber.*

be disregarded because it is higher than rates calculated in other segments of this proceeding.[87]

Therefore, we continued to use Junhong's weighted-average rate in our calculations.

Moreover, parties have not demonstrated how simply pulling forward an AD rate from a prior proceeding would allow Commerce to establish a weighted-average rate derived from the weighted-average rate of more than one company, as required by the Federal Circuit. Simply pulling forward an AD rate from a previous proceeding and assigning it to the remand respondents would require Commerce to disregard the weighted-average rate calculated for Junhong in the underlying review. Parties have not pointed to a statutory basis for disregarding Junhong's rate when calculating the rate to be applied to the separate rate companies subject to the instant remand, or pursuant to section 735(c)(5)(A) of the Act. Indeed, Commerce generally only considers pulling forward a rate from a prior review when, for example, Commerce only has rates that are zero, AFA, or *de minimis*.[88]

Further, parties' reliance on *Changzhou Hawd* is misplaced. The relevant CIT rulings related to *Changzhou Hawd* and the instant proceeding are distinguishable. In *Changzhou Hawd,* the CIT ordered Commerce to redetermine the separate rate it applied to Changzhou Hawd approximately three and half years after the underlying investigation was completed.[89] Commerce initially attempted to conduct a full investigation of Changzhou Hawd, reasoning that "with the very limited information currently on the record, {it} is unable to calculate a dumping rate based on Changzhou Hawd's own economic reality" without a full individual investigation.[90] The CIT found Commerce's decision to individually examine Changzhou Hawd

---

[87] *See YC Rubber Co. (N. Am.) LLC v. United States,* 487 F. Supp. 3d 1367, 1379-82 (finding that parties have not identified any legal authority requiring Commerce to evaluate the representativeness of a calculate rate determined pursuant to section 735(c)(5)(A) of the Act).
[88] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreement, H.R. Doc. No. 301-316, at 873 (1994) (SAA).
[89] *See Changzhou Hawd Flooring Co., Ltd. v. U.S.,* 44 F.Supp.3d 1376 (CIT 2015) (*Changzhou Hawd*).
[90] *Id.* at 1389.

at such a late date to be "arbitrary and capricious" because Commerce was internally inconsistent in that case with respect to its availability of administrative resources to individually examine respondents. [91]  In the instant case, the Federal Circuit found that Commerce must determine "the weighted-average" rate for a reasonable number of companies and concluded that a "reasonable number" is generally more than one company more than six years after the completion of the underlying administrative review.[92]  Given the Federal Circuit's focus on the number of rates (*i.e.*, more than one) needed to *calculate* a weighted-average rate to be assigned to any separate rate companies, Commerce's selection of additional mandatory respondents on remand to weight-average with Junhong's rate is a logical and reasonable method to comply with the Federal Circuit ruling.

Finally, we note that the underlying facts and circumstances of the instant case and the *Second MLWF Remand Results*[93] are different.  In the underlying MLWF review, Commerce selected Baroque Timber and Jiangsu Guyu as mandatory respondents as the CBP data showed them to be the largest exporters during the relevant POR.[94]  During the underlying review, parties argued that Jiangsu Guyu should not have been selected as a mandatory respondent because it was not one of the largest exporters and/or that it was not representative of the MLWF industry during the POR.  Each company received an individually calculated weighted-average margin (*i.e.*, 14.09 percent and 122.92 percent for Baroque Timber and Jiangsu Guyu, respectively).[95] The CIT determined that Commerce unlawfully rejected information showing that Jiangsu Guyu

---

[91] *See* YC Rubber/STR's Comments at 4 and 6; *see also* Mayrun's Comments at 4; and Wanda Boto's Comments at 2.
[92] *See* YC Rubber/STR's Comments at 9.
[93] *See* Final Results of Redetermination Pursuant to Court Remand, *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. et. al. v. United States,* Consol. Court No. 20-03885, Slip op. 22-93 (CIT 2022), dated March 30, 2023 (*Second MLWF Remand Results*).
[94] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 FR 76011 (November 27, 2020), and accompanying IDM.
[95] *Id.*

was not one of the largest exporters during the POR.[96]  On remand, Commerce deselected

Jiangsu Guyu as a mandatory respondent and applied Baroque Timber's rate to the non-selected

companies.[97]  In *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. et. al. v. United States,*

Consol. Court No. 20-03885 (February 14, 2023) (*Second MLWF Remand Order*), the CIT

granted Commerce's request for a voluntary remand to consider whether there were any

implications from the *YC Rubber* decision on Commerce's respondent selection and non-

examined company rate determinations in the *First MLWF Remand Results*.  The CIT issued the

voluntary remand on August 11, 2022, with a due date of December 7, 2022 (*i.e.*, 90 days).

During *Second MLWF Remand Results*, parties argued that Commerce should select an

additional mandatory respondent.  However, Commerce found that due to the unique

circumstances of that segment of the proceeding, it was reasonable under *YC Rubber* for

Commerce to not select an additional mandatory respondent to replace Jiangsu Guyu which it

had deselected.[98]  In the instant remand, the CIT initially granted Commerce 180-days to

complete the remand.  The CIT subsequently granted Commerce an additional 90-days to

complete the remand.  The 270-days granted by the CIT in the instant remand afforded

Commerce the time needed to select and individually examine an additional mandatory

respondent.  The total time granted here contrasts with the accelerated 90-day deadline for the

*Second MLWF Remand Results*.  Moreover, in contrast with the *Second MLWF Remand Results*,

here Commerce has argued before the Federal Circuit, that based on the circumstances of the

underlying review, it was reasonable for the agency to calculate the rate applied to separate rate

---

[96] *See* Final Results of Redetermination Pursuant to Court Remand, *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. et. al. v. United States*, Consol. Court No. 20-03885, Slip op. 22-93 *(*CIT 2022), dated October 17, 2022 (*First MLWF Remand Results*).
[97] *Id*.
[98] *See Second MLWF Remand Results* at 11.

companies based on the weighted-average rate of a single company, *i.e.*, Junhong.  In contrast

with the *Second MLWF Remand Results*, which are still pending before the CIT, here the Federal

Circuit has already examined the circumstances of this case and has ruled that "Commerce has

not demonstrated that it was otherwise reasonable to calculate the all-others rate based on only

one respondent."

       **2.**   **Commerce Should Not Have Found Wanda Boto, Mayrun, Hengyu, and Winrun To Be Part Of the China-Wide Entity And There is No Legal Basis To Find That These Respondents Did Not Cooperate To The Best Of Their Ability**

*Parties Argue:*

- Wanda Boto, Mayrun, Hengyu, and Winrun were each granted separate status in the underlying final results and these findings were not subject to the instant litigation. Moreover, the Federal Circuit did not direct, invite, or allow Commerce to revisit these companies' separate rate status.[99]
- On remand, a lower court cannot re-adjudicate matters that have already been decided, but it can rule on matters left open by the appellate court's mandate.[100]  Moreover the district court cannot give relief beyond the scope of that mandate.[101]
- Agencies and lower courts are bound by the scope of the appellate court's mandate, and a district court's actions on remand should not be inconsistent with either the letter or spirit of the mandate.[102]  Moreover, on remand, a lower court or agency may only take those actions required to comply with the mandate.[103]
- A "legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time."[104]
- An agency's deviation from remand instructions is "itself a legal error, subject to reversal on further judicial review."[105]
- It is unreasonable to rely on language in the *Initiation Notice* to subject Mayrun to the China-wide rate.[106]

---

[99] *See* Mayrun's Comments at 7; *see also* YC Rubber/STR's Comments at 15; and Wanda Boto's Comments at 3-4.
[100] *See* Mayrun's Comments at 7 (citing *Messenger v. Anderson,* 225 U.S. 436, 444 (1912)).
[101] *Id.* (citing *Laitram v. NEC Corp.,* 115 F.3d 947, 951 (Fed. Cir. 1997)).
[102] *See* Mayrun's Comments at 8 (citing *Quern v. Jordan.* 440 U.S. 332, 347 (1979)).
[103] *Id.* (citing *Amentum Servs. v. United States*, 2021 U.S. Claims LEXIS 2741 (Fed. Cl. 2021)).
[104] *See* Mayrun's Comments at 8 (citing *Roberts v. Geren*, 530 F. Supp. 2d 24, 35-36 (D.D.C. 2007)).
[105] *Id* at 9 (citing *Sullivan v. Hudson.* 490 U.S. 877, 886 (1989); and *Ellwood City Forge Co. v. United States,* Slip Op. 23-113 (CIT 2023)).
[106] *Id.* at 10.

- Judicial precedent establishes that Commerce may not deny separate rates to respondents who submit valid SRCs at the outset of the review, even if they subsequently are unable to participate as a mandatory respondent.[107]
- It is unreasonable for Commerce to require a respondent to submit detailed questionnaire responses six years after the POR.[108]  In finding Wanda Boto, Mayrun, Hengyu, and Winrun to be part of the China-wide entity, Commerce effectively applied AFA to these companies even though each fully cooperated during the underlying review.[109]
- Wanda Boto, Mayrun, Hengyu, and Winrun were unable, not unwilling, to respond to Commerce's questionnaires because each no longer had the necessary records. Moreover, these companies did not have the obligation to maintain these records many years later.[110]
- Commerce cannot reasonably assess the same punitive rate on a company who is asked to provide data six years after the fact as it did on a company selected as a mandatory respondent in a normal administrative review, initiated immediately after the POR ended.[111]
- The fact that Kenda was able to participate does not detract from the problems experienced by the other respondents.  Kenda is the outlier, since it retained necessary records to respond to Commerce's questionnaire for a greater period of time than would normally be expected from a company.[112]

**Commerce Position:**  As we noted in the Draft Remand Results, our *Initiation Notice* states the following:  "{f}or exporters and producers who submit a separate-rate status application or certification and subsequently are selected as mandatory respondents, these exporters and producers will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents."[113]  Wanda Boto, Mayrun, Hengyu, and Winrun each submitted a SRC during the underlying administrative review.[114]  However, as noted above, Wanda Boto, Mayrun, Hengyu, and Winrun were each, in turn, selected as mandatory

---

[107] *See* YC Rubber/STR's Comments at 13-16 (citing *Hubbell Power Sys., Inc. v. United States,* 365 F. Supp. 3d 1302, 1309 (CIT 2019) (*Hubbell Power*)).
[108] *See* Wanda Boto's Comments at 3-4; *see also* Mayrun's Comments at 9-10; and YC Rubber/STR's Comments at 2-4 and 8-9.
[109] *See* Wanda Boto's Comments at 3-4.
[110] *See* Wanda Boto's Comments at 10-11; *see also* Mayrun's Comments at 6.
[111] *See* YC Rubber/STR's Comments at 17-18.
[112] *Id.* at 12.
[113] *See Initiation Notice.*
[114] *See* Mayrun Tyre (Hong Kong) Limited's November 14, 2017, SRC; *see also* Kenda Rubber (China) Co., Ltd.'s November 15, 2017, SRC; Shandong Wanda Boto Tyre Co., Ltd.'s November 15, 2017, SRC; and Winrun Tyre Co., Ltd.'s November 10, 2017, SRC.

respondents in the instant remand determination, and each did not respond to any sections of Commerce's AD questionnaire. Therefore, we are unable to confirm, clarify, or verify the SRCs submitted by Wanda Boto, Mayrun, Hengyu, or Winrun. Further, in line with our *Initiation Notice,* Wanda Boto, Mayrun, Hengyu, and Winrun, upon selection as mandatory respondents, were required to respond to all parts of the questionnaire to be granted separate rate status.[115] Thus, we continue to determine that Wanda Boto, Mayrun, Hengyu, and Winrun each failed to rebut the presumption of government control and are ineligible for a separate rate. Accordingly, we continue to determine that Wanda Boto, Mayrun, Hengyu, and Winrun are each part of the China-wide entity.

Parties' reliance on *Hubbell Power* as precedent establishing that Commerce may not deny separate rates to respondents who submit valid SRCs at the outset of the review, even if they subsequently are unable to participate as a mandatory respondent is unpersuasive. In addition, Mayrun's reliance on numerous cases[116] which stand for the proposition that an agency is bound by the letter, scope, and spirit of the appellate court's mandate and that it can only take actions required to comply with the mandate, are unpersuasive because Commerce's actions here comply with the Federal Circuit's decision in *YC Rubber.* In the instant the case, the Federal Circuit found that Commerce unlawfully only examined one respondent and applied the rate from a single company (*i.e.*, Junhong) to the separate rate companies. Thus, because Commerce was required to select more than one mandatory respondent to comply with *YC Rubber*, the matter of how the rate applied to the separate rate companies was calculated and which

---

[115] *See Shenzhen Xinboda Indus. Co. v. United States,* 2017 Ct. Int'l Trade LEXIS 166 at *57-58 (CIT 2017).
[116] *See Messenger v. Anderson,* 225 U.S. 436, 444 (1912); *Laitram v. NEC Corp*, 115 F.3d 947, 951 (Fed. Cir. 1997); *Quern v. Jordan,* 440 U.S. 332, 347 (1979); *Amentum Servs. v. United States*, 2021 U.S. Claims LEXIS 2741 (Fed. Cl. 2021); *Roberts v. Geren,* 530 F. Supp. 2d 24, 35-36 (D.D.C. 2007); *Sullivan v. Hudson,* 490 U.S. 877, 886 (1989); and *Ellwood City Forge Co. v. United States,* Slip Op. 23-113 (CIT 2023).

companies that rate was applied to was left open by the Federal Circuit's mandate in *YC Rubber*. Thus, *Messenger v. Anderson*, *Laitram v. NEC Corp* and *Quern v. Jordan* do not support parties' argument that Commerce unlawfully exceeded the scope of the remand here because Commerce's actions in this remand fully address the Federal Circuit's finding that Commerce unlawfully relied on a single calculated rate as the separate rate in the underlying review and, thereby, are within the scope, letter, and spirit of the Federal Circuit's decision in *YC Rubber*. Moreover, parties' reliance on *Amentum Servs. v. United States, Sullivan v. Hudson*, and *Ellwood City Forge Co. v. United States* is similarly not useful here, because Commerce has only taken those actions required to comply with the Federal Circuit's mandate and did not deviate from the Federal Circuit's remand instructions.  Finally, parties' reliance on *Roberts v. Geren* is misplaced because here parties[117] did not waive their right of appeal with respect to the separate rate applied to them.  Rather, they challenged how the rate applied to the separate rate companies was calculated.[118]  The Federal Circuit agreed with those parties arguments that Commerce unlawfully restricted its examination to a single mandatory respondent and unlawfully applied the single mandatory respondent's rate to the other separate rate respondents.[119]

As discussed above, how the rate applied to the separate companies was calculated was central to the instant litigation.  In the instant case, the Federal Circuit found that Commerce must determine "the weighted-average" rate for a reasonable number of companies and concluded that a "reasonable number" is generally more than one company.[120]  Commerce's

---

[117] The litigants are: 1) ITG Voma, 2) Kenda; 3) Mayrun, 4) Sutong, and 5) YC Rubber.
[118] *See YC Rubber*.
[119] In the underlying review, Commerce selected two mandatory respondents:  Shandong Haohua Tire Co. (Haohua); and Zhaoqing Junhong Co., Ltd. (Junhong).  After respondent selection, Haohua informed Commerce that it was withdrawing from participation.  Commerce issued its preliminary results without selecting an additional respondent, and no parties requested to be a voluntary respondent or objected before the preliminary results to Commerce's review of one mandatory respondent.  *See Preliminary Results* PDM.
[120] *See YC Rubber* at 9-10.

selection of additional mandatory respondents on remand to weight-average with Junhong's rate is a reasonable method to comply with the Federal Circuit's ruling. The Federal Circuit's ruling also did not require Commerce to disregard the practice of treating companies that do not respond to its questionnaire to be part of China-wide entity even if the company has previously filed a SRC. Determining how the rate applied to the separate rate companies was calculated and to which companies the separate rate was applied are actions required to comply with the Federal Circuit's mandate in *YC Rubber*.

### 3. Commerce Should Recalculate the Separate Rate

*Parties Argue:*

- Should Commerce not carry-forward a rate to apply to Wanda Boto, Mayrun, Hengyu, and Winrun, it should apply the rate calculated for Kenda upon remand, or at an absolute maximum, a weighted-average of the rates assigned to Kenda and Junhong.[121]
- Applying a weighted-average of Junhong and Kenda's rates to the separate rate respondents would be in conformity with *YC Rubber*.[122]

**Commerce Position:** We have recalculated the separate rate in accordance with section 735(c)(5) of the Act. The statute and Commerce's regulations do not address the establishment of a dumping margin for respondents not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when determining the dumping margin for respondents which Commerce did not examine individually in an administrative review. Section 735(c)(5)(A) of the Act articulates a preference not to calculate an all-others rate using dumping margins which are zero, *de minimis*, or based entirely on facts available (FA). Accordingly, Commerce's usual practice in determining the dumping margin for separate rate

---

[121] *See* YC Rubber/STR's Comments at 2.
[122] *See* Mayrun's Comments at 5.

respondents not selected for individual examination has been to average the weighted-average dumping margins for the individually examined respondents, excluding dumping margins that are zero, *de minimis*, or based entirely on FA.[123]  In the instant administrative review and remand redetermination, Commerce calculated above-*de minimis* rates that are not entirely based on FA. Accordingly, it is not necessary to rely upon an alternative method, as defined under section 735(c)(5)(B) of the Act, or to otherwise depart from our long-standing practice.  Our established practice in such circumstances is consistent among numerous proceedings[124] and Court affirmed.[125]  Thus, the separate rate calculated in this Final Results of Remand is the simple average of Junhong's and Kenda's rates, which is 41.36 percent.[126]

### 4. A Separate Rate Should Be Assigned To Linglong

*Parties Argue:*

- The Draft Remand did not apply a revised rate to Linglong which was granted a separate rate in the underlying administrative review; has suspended entries in this appeal; and was not selected as a mandatory respondent on remand.[127]

---

[123] *See Longkou Haimeng Mach. Co. v. United States, 581 F. Supp. 2d 1344, 1357-60 (CIT 2008)* (affirming Commerce's determination to assign a 4.22 percent dumping margin to the separate rate respondents in a segment where the three mandatory respondents received dumping margins of 4.22 percent, 0.03 percent, and zero percent, respectively); *see also Certain Kitchen Appliance Shelving and Racks from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 74 FR 36656, 36660 (July 24, 2009).

[124] *See, e.g.*, *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review, 2014-2015*, 81 FR 62717, 62718 (September 12, 2016); *Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314, 42316 (June 29, 2016); *Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 80 FR 51779, 51780-81 (August 26, 2015); *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012-2013*, 80 FR 41476 (July 15, 2015), and accompanying IDM at Comment 17; *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 74 FR 36656, 36660 (July 24, 2009).

[125] *See, e.g.*, *Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329, 1347-1348 (CIT 2018) (*Soc Trang*) (affirming Commerce's determination to base the all-others rate on the rate of the only remaining respondent in the review); *Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344, 1357-60 (CIT 2008) (affirming Commerce's determination to exclude zero and *de minimis* AD margins in the calculation of the margins assigned to non-selected respondents).

[126] As we do not have Kenda's public ranged sales data on the record, we could only rely on the simple average of Kenda and Junhong's final AD rate as the separate rate, therefore, the separate rate here is a simple average of Junhong's and Kenda's rate, (64.57% + 18.15%)/2 = 41.36%.

[127] *See* YC Rubber/STR's Comments at 18.

**Commerce Position:**  As a respondent not selected for individual examination which qualifies for a separate rate,[128] we have applied the separate rate to Linglong in this Final Results of Remand.  This rate is 41.36 percent.

###    5.    Commerce Must Correct Its Exclusion Of Surrogate Value Import Data From Countries Alleged To Receive Generally Available Subsidies.

*Parties Argue:*

- Commerce unlawfully and without substantial evidence disregarded Thai imports of goods from India, Indonesia, and Korea in calculating the import-based surrogate values used to value the FOPs of Junhong and Kenda based on a presumption of the existence of generally available subsidies in those countries.[129]
- The Federal Circuit did not address this issue on appeal, instead remanding to Commerce on separate grounds.[130]
- Commerce only offered a simple citation to previous determinations in selecting its SVs and provided no explanation of what support within those determinations Commerce was relying on, or why Commerce credits that information as valid or applicable. Commerce's cited determinations are also stale.[131]
- To calculate Junhong's and Kenda's margins, Commerce's citation to previous determinations offered no explanation of the programs on which it was relying or whether those programs could even feasibly continue to be in place now.  Lack of contemporaneous information is unlawful and unsupported by the evidence.[132]

**Commerce Position:**  We continue to find that it is appropriate to disregard prices of imports from India, Indonesia, and Korea because these countries maintain broadly available, non-industry specific export subsidies.[133]  We note that the CIT determined that "Commerce reasonably determined to disregard the import prices from India, Indonesia, and Korea 'without

---

[128] *See Final Results*.
[129] *See* Wanda Boto's Comments at 7-8.
[130] *Id*.
[131] *Id*.
[132] *Id*.

[133] *See, e.g.*, *Carbazole Violet Pigment 23 from India:  Final Results of the Expedited Five-year (Sunset) Review of the Countervailing Duty Order*, 75 FR 13257 (March 19, 2010), and accompanying IDM at 4-5; *Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia:  Final Results of Expedited Sunset Review,* 70 FR 45692 (August 8, 2005), and accompanying IDM at 4; *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review,* 74 FR 2512 (January 15, 2009), and accompanying IDM at 17 and 19-20; and *Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand,* 66 FR 50410 (October 3, 2001), and accompanying IDM at 23.

Case 1:19-cv-00069-MAB   Document 78-1   Filed 11/03/23   Page 36 of 37

further investigation'"[134] and that, as the parties point out in their comments, that the Federal Circuit did not issue a ruling on this issue.[135]

### 6. Commerce Should Grant Parties' Review Withdrawal Requests

*Parties Argue:*

- The review request withdrawals submitted by Mayrun, Winrun, Linglong, and Hengyu should be accepted, in accordance with Federal Circuit precedent and in recognition of the unique circumstances presented.[136]

**Commerce Position:**  We continue to find that it is inappropriate to accept the untimely review withdrawal requests filed by Mayrun, Winrun, Linglong, and Hengyu.  The CIT ruled that Commerce's denial of the untimely withdrawal requests filed by Mayrun, Winrun, Linglong, and Hengyu was reasonable,[137] and that the Federal Circuit did not issue a ruling on this issue.[138]

## VI.   FINAL RESULTS OF REDETERMINATION

We have recalculated Kenda's' estimated weighted-average dumping margin according to the analysis described above.  As a result, Kenda's estimated weighted-average dumping margin is 18.15 percent.[139]  In addition, we have recalculated the separate rate and applied it to Linglong.  Finally, we continue to find Wanda Boto, Mayrun, Hengyu, and Winrun to be part of the China-wide entity.

| Producer/Exporter | Weighted-Average Dumping Margin (percent) |
|---|---|
| Kenda Rubber (China) Co., Ltd. | 18.15 |

---

[134] *See YC Rubber Co. (N. Am.) LLC,* 487 F. Supp. 3d at 1384-6.
[135] *See YC Rubber* at 10.
[136] *See* Mayrun's Comments at 4; *see also* Wanda Boto's Comments at 2-3; and YC Rubber/STR's Comments at 22-25.
[137] *See YC Rubber Co. (N. Am.) LLC,* 487 F. Supp. 3d at 1384-6.
[138] *See YC Rubber* at 10-11.
[139] *See* Draft Remand Analysis Memorandum (unchanged in these final results of remand).

| Shandong Linglong Tyre Co., Ltd. | 41.36 |
| China-wide Entity[140] | 87.99 |

10/31/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

---

[140] The China-wide entity includes:  Mayrun Tyre (Hong Kong) Limited; Shandong Hengyu Science & Technology Co., Ltd.; Shandong Wanda Boto Tyre Co., Ltd.; and Winrun Tyre Co., Ltd.