Slip Op. 24-74

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YC RUBBER CO. (NORTH AMERICA) LLC AND SUTONG TIRE RESOURCES, INC., <br><br> Plaintiffs, <br><br> KENDA RUBBER (CHINA) CO., LTD., <br><br> Plaintiff-Intervenor, <br><br> and <br><br> MAYRUN TYRE (HONG KONG) LIMITED AND ITG VOMA CORPORATION, <br><br> Consolidated-Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Mark A. Barnett, Chief Judge <br> Consol. Court No. 19-00069 <br><br> **PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's Remand Results regarding the second administrative review of the antidumping duty order on certain passenger vehicle and light truck tires from the People's Republic of China.]

Dated: June 18, 2024

<u>Jordan C. Kahn</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for Plaintiffs YC Rubber Co. (North America) LLC and Sutong Tire Resources, Inc. Also on the brief was <u>Ned H. Marshak</u>.

<u>Patrick B. Klein</u>, Neville Peterson LLP, of New York, NY, argued for Consolidated Plaintiff Mayrun Tyre (Hong Kong) Limited. Also on the brief were <u>John M. Peterson</u> and <u>Richard F. O'Neill</u>.

Consol. Court No. 19-00069                                              Page 2

Jonathan T. Stoel, Hogan Lovells US LLP, of Washington, DC, argued for Consolidated Plaintiff ITG Voma Corporation.  Also on the brief were Craig Lewis and Nicholas R. Sparks.

Lizbeth R. Levinson, Fox Rothschild LLP, of Washington, DC, for Plaintiff-Intervenor Kenda Rubber (China) Co., Ltd.

Ashley Akers, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  Also on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was Ayat Mujais, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Barnett, Chief Judge:  Before the court is the redetermination upon remand from the U.S. Department of Commerce ("Commerce" or "the agency") for the second administrative review of the antidumping duty order on passenger tires from the People's Republic of China ("China").  *See* Final Results of Redetermination Pursuant to Ct. Remand, A-570-016 (Oct. 31, 2023) ("Remand Results"), ECF No. 78-1; *see also Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China*, 84 Fed. Reg. 17,781 (Dep't Commerce Apr. 26, 2019) (final results of antidumping duty admin. rev. and final determination of no shipments; 2016–2017) ("*Final Results*"), ECF No. 24-4, and accompanying Issues and Decision Mem., A-570-016 (Apr. 19, 2019) ("I&D Mem."), ECF No. 24-5.[1]  After remand from the U.S. Court of Appeals for the

---

[1] The administrative record for the Remand Results is contained in a Public Remand Record ("PRR"), ECF No. 81-2, and a Confidential Remand Record ("CRR"), ECF No. at 81-3.  The administrative record for the *Final Results* is contained in a Public Administrative Record ("PR"), ECF No. 24-2, and a Confidential Administrative Record ("CR"), ECF No. 24-3.  The parties submitted joint appendices containing record documents cited in their comments.  [Confid.] Remand J.A. ("RCJA"), ECF No. 93; [Public] Remand J.A., ECF No. 94.  Upon request from the court, the parties

Federal Circuit ("Federal Circuit") and this court, Commerce selected a second

mandatory respondent, recalculated the separate rate, denied certain non-investigated

companies' separate rate status, denied requests to withdraw from the review, and

made no changes to its surrogate value selections.  For the following reasons, the court

sustains in part and remands in part the Remand Results.

BACKGROUND

**I.    Agency Proceedings Prior to the *Final Results***

In October 2017, Commerce initiated the second administrative review of the

antidumping duty order on passenger tires from China for the period of review August 1,

2016, through July 31, 2017.  *See Initiation of Antidumping and Countervailing Duty*

*Admin. Revs.*, 82 Fed. Reg. 48,051, 48,055 (Dep't Commerce Oct. 16, 2017).  In its

initiation notice for this administrative review, Commerce explained that "[f]or exporters

and producers who submit a separate-rate status application or certification and

subsequently are selected as mandatory respondents, these exporters and producers

will no longer be eligible for separate rate status unless they respond to all parts of the

questionnaire as mandatory respondents."  *Id.* at 48,053; *Initiation of Antidumping and*

*Countervailing Duty Admin. Revs.*, 82 Fed. Reg. 57,705, 57,707 & n.4 (Dep't Commerce

Dec. 7, 2017) (correcting misspellings from the October 16, 2017, notice) (collectively

---

supplemented the joint appendices.  [Confid.] Suppl. J.A. ("Suppl. RCJA"), ECF No. 98;
[Public] Suppl. J.A., ECF No. 99.  When necessary, the court cites to confidential record
documents contained in the previously filed joint appendices.  [Confid.] J.A. to Opening,
Resp., and Reply Brs. Regarding Pls.' and Consol. Pls.' Mot. for J. on the Agency R.
Pursuant to Rule 56.2 ("CJA"), ECF No. 46.

referred to as "*Initiation Notice*").  Commerce initially selected two mandatory

respondents: Shandong Haohua Tire Co., Ltd. ("Haohua") and Zhaoqing Junhong Co.,

Ltd. ("Junhong").  Resp't Selection Mem. (Apr. 12, 2018) ("Original Resp't Selection

Mem.") at 1, CR 47, PR 140, CJA Tab 24.  Haohua later withdrew from participating in

the review and Commerce did not select a replacement respondent.  I&D Mem. at 14–

15.

      Commerce preliminarily relied on Junhong's rate of 73.63 percent to establish the

rate for certain non-investigated companies found to be eligible for a separate rate.  *See*

Decision Mem. for the Prelim. Results (Sept. 4, 2018) at 11–12, PR 224, CJA Tab 32;

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China*,

83 Fed. Reg. 45,893, 45,895 (Dep't Commerce Sept. 11, 2018) (prelim. results of

antidumping duty admin. rev., prelim. determination of no shipments, and rescission, in

part; 2016-2017), PR 225, RCJA Tab 8.  Commerce identified Kenda Rubber (China)

Co., Ltd. ("Kenda"), Mayrun Tyre (Hong Kong) Limited ("Mayrun"), Shandong Hengyu

Science & Technology Co., Ltd ("Hengyu"), Shandong Linglong Tyre Co., Ltd

("Linglong"), Shandong Wanda Boto Tyre Co., Ltd ("Wanda Boto"), and Winrun Tyre

Co., Ltd ("Winrun") as companies eligible for a separate rate.  *See Certain Passenger

Vehicle and Light Truck Tires From the People's Republic of China*, 83 Fed. Reg. at

45,895.

      Commerce then issued the *Final Results*.  Among other things, Commerce

rejected the requests of Winrun, Linglong, Mayrun, and Hengyu to withdraw their

requests for review, explaining that the withdrawal requests were untimely.  I&D Mem.

at 2 & n.3, 8–9.  Commerce calculated a rate of 64.57 percent for Junhong, the one

participating respondent, and assigned that margin to the non-investigated companies

eligible for a separate rate.  *See Final Results*, 84 Fed. Reg. at 17,782.

## II.    Initial Challenge to the *Final Results*

In this consolidated case, YC Rubber Co. (N. Am.) LLC and Sutong Tire

Resources, Inc. (collectively, "YC Rubber"), Mayrun, and ITG Voma Corp. ("ITG

Voma")[2] challenged the *Final Results.*  Following briefing here at the U.S. Court of

International Trade ("CIT"), this court sustained Commerce's *Final Results.  YC Rubber*

*Co. (N. Am.) LLC v. United States (YC Rubber I)*, 44 CIT __, 487 F. Supp. 3d 1367

(2020).[3]  First, the court concluded that Commerce did not err in relying on a single

mandatory respondent, noting that no party requested that Commerce select another

respondent until after Commerce's preliminary determinations.  *Id.* at 1375–79.  The

court also rejected the argument that Junhong's rate was not representative and

therefore should not have been used as the basis for the rate assigned to the non-

investigated separate rate companies.  *Id.* at 1379–82.  Next, the court sustained

Commerce's decision to deny the untimely withdrawal requests, concluding that

Commerce's reasons for not granting an extension to withdraw were reasonable.  *Id.* at

1384–85.  Finally, the court concluded that substantial evidence supported Commerce's

decision to exclude certain import values from the surrogate values used to calculate

---

[2] These parties are referred to collectively as "Plaintiffs."  Kenda intervened on Plaintiffs' side but did not file comments on the Remand Results.
[3] *YC Rubber I* provides additional background information, familiarity with which is presumed.

Junhong's antidumping duty margin because Commerce relied on prior administrative

determinations that export subsidies existed in the countries at issue.  *Id.* at 1386.

Plaintiffs appealed *YC Rubber I* to the Federal Circuit, which vacated this court's

decision.  *YC Rubber Co. (N. Am.) LLC v. United States (YC Rubber II)*, Appeal No. 21-

1489, 2022 WL 3711377, at *5 (Fed. Cir. Aug. 29, 2022).[4]  The Federal Circuit

"conclude[d] that a 'reasonable number' [of respondents] is generally more than one."

*Id.* at *4.  The Federal Circuit explained that Commerce thus "erred in relying on a single

entity for calculation of a dumping margin for all respondents."  *Id*.  As for the other

arguments, the Federal Circuit declined to consider whether Commerce erred in

denying the withdrawal requests or in excluding certain import data.  *Id.* at *4–5.  The

Federal Circuit closed by "remand[ing] for further proceedings in conformity with th[e]

opinion."  *Id.* at *5.

This court subsequently remanded the *Final Results* "to Commerce to issue a

determination consistent with [*YC Rubber II*]."  Order (Feb. 2, 2023) at 1, ECF No. 72.

**III.    Remand Pursuant to *YC Rubber II***

Based on *YC Rubber II*, Commerce reconsidered the *Final Results* of the review.

On remand, Commerce sought an additional mandatory respondent, identifying eligible

---

[4] *YC Rubber II* provides additional discussion, familiarity with which is presumed.  The court notes that *YC Rubber II* was not published in the Federal Reporter, but the decision is precedential.  *See* FED. CIR. R. 32.1(a) (providing that decisions are precedential unless designated otherwise).  The court also notes that *YC Rubber II* contains incorrect citations that may confuse the reader.  On pages *1 (3 times), *2, and *3 (3 times), the references to section 1677, regardless of the subsection, refer to the equivalent subsection of section 1677f-1.

companies and selecting a second respondent from them in the order of their volume of imports.  Remand Results at 2–3.[5]  Each of the first four mandatory respondents selected in the remand proceeding (Wanda Boto, Hengyu, Mayrun, and Winrun) declined to provide a complete questionnaire response or further participate.  *Id.* at 3–4.  Commerce then selected Kenda, which agreed to participate and for which Commerce calculated a weighted average dumping margin of 18.15 percent.  *Id.* at 4–5.  Because Wanda Boto, Hengyu, Mayrun, and Winrun declined to respond to the questionnaires as mandatory respondents, Commerce, citing language in its *Initiation Notice*, determined that they were ineligible for a separate rate and thus were subject to the China-wide rate of 87.99 percent.  *Id.* at 5–6, 36.  Commerce averaged Junhong's 64.57 percent rate and Kenda's 18.15 percent rate to calculate a rate for non-investigated separate rate companies of 41.36 percent.  *Id.* at 36–37.  Commerce applied the 41.36 percent rate only to Linglong.  *Id.* at 37.  During the remand proceeding, Mayrun, Winrun, and Hengyu also renewed their withdrawal requests, which Commerce denied on the basis that the original withdrawal requests had been untimely and the subsequent litigation did not alter the agency's analysis.  *Id.* at 36.

---

[5] Commerce, in its Remand Results, stated that Wanda Boto, Hengyu, Mayrun, Winrun, Kenda, and Linglong had been potential mandatory respondents.  Remand Results at 2–3.  Throughout the remand proceeding, however, Commerce omitted Linglong from each of its respondent selection memoranda.  *See, e.g.*, [Wanda Boto] Resp. Selection Mem. (Feb. 8, 2023) ("Wanda Boto Resp't Selection Mem.") at 1, PRR 1, RCJA Tab 18; Draft Results of Redetermination Pursuant to Court Remand (July 25, 2023) at 3, PRR 103, RCJA Tab 29.  After parties raised this issue in their comments on the draft remand results, Commerce declared that Linglong would be subject to the rate for non-investigated separate rate respondents.  *See* Remand Results at 34–35.

Plaintiffs YC Rubber, Mayrun, and ITG Voma oppose Commerce's Remand Results.  Cmts. of Consol. Pl., [Mayrun], in Opp'n to the Commerce Dep't's First Remand Redetermination ("Mayrun's Cmts."), ECF No. 88; Confid. Pls.' Cmts. Opposing Remand Redetermination ("YC Rubber's Cmts."), ECF No. 89; Cmts. of ITG Voma Corp. Opposing Remand Redetermination ("ITG Voma's Cmts."), ECF No. 91.[6] Defendant United States ("the Government") supports Commerce's Remand Results. Def.'s Resp. to Cmts. on Remand Results ("Def.'s Cmts."), ECF 92.  Plaintiffs' arguments are addressed in turn.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[7] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

### I.   Decision to Select a Second Mandatory Respondent

#### a.   Parties Contentions

Plaintiffs argue that, on remand, Commerce should not have selected a second mandatory respondent.  YC Rubber's Cmts. at 7–11; ITG Voma's Cmts. at 3–12; *see*

---

[6] YC Rubber and ITG Voma are importers of the subject merchandise.  *See* YC Rubber's Cmts. at 18 n.2; ITG Voma's Cmts. at 1.
[7] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise stated.

*also* Mayrun's Cmts. at 7.[8]  Selecting a second mandatory respondent, Plaintiffs argue, was not reasonable because that action came several years after the initial administrative review, when potential respondents no longer have the pertinent information available.  *See* Mayrun's Cmts. at 7; YC Rubber's Cmts. at 8–9; ITG Voma's Cmts. at 5–6.  In Plaintiffs' view, Commerce should have pulled forward a rate from a prior segment for the non-investigated separate rate respondents.  ITG Voma's Cmts. at 12; YC Rubber's Cmts. at 8; *see also* Mayrun's Cmts. at 5.

The Government contends that Commerce's decision to select a second mandatory respondent complied with *YC Rubber II* given that the Federal Circuit found Commerce erred in using a single entity to calculate the non-investigated separate rate companies' dumping margin.  Def.'s Cmts. at 7.  The Government further reasons that the remand order did not require Commerce to take any other action now suggested by Plaintiffs.  *Id.* at 8–11.

---

[8] At times, Plaintiffs make arguments inconsistent with this position.  For instance, Mayrun acknowledges that, "[h]ad Commerce set the separate rate respondents' rates by creating an average of the Junhong and Kenda rates, this likely would have been in conformity with the Federal Circuit's Remand Order."  Mayrun's Cmts. at 8.  While this is what Commerce, in fact, did, Commerce also concluded that Mayrun was no longer eligible for that separate rate.  Likewise, ITG Voma and YC Rubber argue that Commerce should have based the non-investigated separate rate companies' rate solely on Kenda's rate, ITG Voma's Cmts. at 12; YC Rubber's Cmts. at 21–22, implicitly accepting that Commerce's selection of Kenda as a second mandatory respondent was lawful while ignoring the holding of *YC Rubber II* that "a 'reasonable number'" for averaging the rates used to determine the non-investigated separate rate companies' rate "is generally more than one," 2022 WL 3711377, at *4.

### b. Analysis

Commerce's decision to select a second mandatory respondent is supported by substantial evidence on the record and is in accordance with law. After "conclud[ing] that Commerce erred in restricting its examination to only one exporter/producer," the Federal Circuit "remand[ed] for further proceedings in conformity with th[e] opinion." *YC Rubber II*, 2022 WL 3711377, at *5. Commerce considered the content of the Federal Circuit's decision, noting the appellate court's conclusions "that a 'reasonable number' is generally more than one" and that "Commerce erred in restricting its examination to a single mandatory respondent." Remand Results at 2 (quoting *YC Rubber II*, 2022 WL 3711377, at *4). Based on that language, Commerce concluded that "selecting additional mandatory respondents was a reasonable method for addressing the Federal Circuit's concerns." *Id.* at 25. Commerce acknowledged the parties' proposal to pull forward a rate from a prior segment and explained that the Federal Circuit did not require such an approach. *Id.* at 26.

The Federal Circuit held that Commerce's decision to examine only one respondent in this case was unreasonable, but a wider context shapes this court's understanding of that decision. Over the last 25 years, the number of respondents Commerce examines in a typical investigation or review has declined to one or two. Whether this is a result of increased demands on the agency, decreased resources available to the agency, or a combination of the two, the cause is beyond the power of the courts to address. However, this decline has resulted in litigation by parties objecting to their inability to obtain an individual examination. *Cf. Viet I-Mei Frozen*

*Foods Co. v. United States*, 39 CIT 1054, 1058–60, 83 F. Supp. 3d 1345, 1349–50 (2015) (describing company's challenge to Commerce's decision to deny it an individual dumping margin).  Similarly, both this court and the appellate court have, on multiple occasions, considered cases regarding the rate to be applied to non-individually examined companies (the "all-others" in a market economy proceeding or the "separate rate companies" in a non-market economy proceeding), particularly when the individually examined companies (i.e., the so-called "mandatory respondents") all have zero or *de minimis* rates or rates based entirely on adverse facts available.  *See, e.g.*, *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1348–50 (Fed. Cir. 2016); *Pro-Team Coil Nail Enter., Inc. v. United States*, 46 CIT __, __, 587 F. Supp. 3d 1364, 1372–74 (2022), *appeal docketed*, No. 2022-2241 (Fed. Cir. Sept. 22, 2022). Litigation regarding the reasonableness of such rates, whether too high or too low, is more likely when there are fewer respondents selected for examination, if only because a greater number of examined respondents increases the possibility of having calculated margins that are not zero or *de minimis* upon which to base the non-investigated companies' rate.  Additional indirect issues abound (the representativeness of a small number of the largest producers/exporters; the low odds of smaller producers being examined; self-selection or abuse of requests for review and withdrawal thereof). All of these issues can be tied in one way or another to the agency's examination of fewer respondents.

While it may be uncontroversial among domestic and foreign parties, the agency, and reviewing courts that Commerce could reduce these issues by examining more

respondents, the role of the courts is to review Commerce's determinations – ensuring that those decisions are supported by substantial evidence and otherwise in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021) ("That highly deferential review standard recognizes Commerce's special expertise in antidumping duty investigations.").  Commerce makes the policy decisions regarding its allocation of resources and the number of respondents that may be examined based on those resources, whereas the courts determine if such decisions are consistent with statutory requirements.

The central issue here was Commerce's reliance on one mandatory respondent's rate for the rate to be assigned to the non-investigated separate rate respondents.  The Federal Circuit identified three statutory provisions as relevant to its holding: (1) 19 U.S.C. § 1677f-1(c)(1)[9] – a general rule requiring Commerce to determine individual dumping margins for each known exporter and producer; (2) 19 U.S.C. § 1677f-1(c)(2)[10]

---

[9] According to that provision, "[i]n determining weighted average dumping margins under section 1673b(d), 1673d(c), or 1675(a) of this title, the [agency] shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1).

[10] Section 1677f-1(c)(2) provides:

> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the [agency] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to – (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or (B) exporters and producers

– an exception to the above rule allowing Commerce to examine a reasonable number of exporters or producers when it is not practicable to make individual determinations "because of the large number of exporters or producers"; and (3) 19 U.S.C. § 1673d(c)(5)[11] – providing the methodology for determining the estimated all-others rate.

While 19 U.S.C. § 1677f-1(c)(1) and (2) are applicable to both investigations and reviews, 19 U.S.C. § 1673d(c)(5), on its face, applies only in investigations. To be clear, Commerce regularly draws on the methodology of 19 U.S.C. § 1673d(c)(5) in administrative reviews involving both market and non-market economies when the agency finds that it is not practicable to individually determine dumping margins for all respondents. *See Albemarle*, 821 F.3d at 1352 & n.6 (recognizing that Commerce may rely on 19 U.S.C. § 1673d in administrative reviews and in non-market economy

---

accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

[11] Section 1673d(c)(5)(A) provides, as a general rule, that
[f]or purposes of this subsection and section 1673b(d) of this title, the estimated all-others rather shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined [on the basis of adverse facts available].

But as an exception, section 1673d(c)(5)(B) provides that
[i]f the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or *de minimis* margins, or are determined entirely under section 1677e of this title, the [agency] may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

proceedings).  *YC Rubber II*, however, marks a shift by using the agency's discretionary reliance on a provision governing final determinations in investigations to support and define the existence of an unambiguous statutory obligation in administrative reviews. *See* 2022 WL 3711377, at *3–4 (reasoning that Commerce's interpretation of 19 U.S.C. § 1677f-1(c)(2)(B) to allow the agency to individually examine a single mandatory respondent "is contrary to the statute's unambiguous language" requiring Commerce to examine a "reasonable number" of companies because, pursuant to the averaging required by 19 U.S.C. § 1673d(c)(5), "a 'reasonable number' is generally more than one").

The challenge in appreciating the general rule of *YC Rubber II* is that the statutory provisions relied upon by the court have temporal limitations and applications. Section 1677f-1(c)(2), allowing Commerce to engage in selecting fewer than all respondents when it is not practicable to examine all of them, applies early in the segment of the administrative proceeding.  By referring to what is practical for Commerce to do, Congress provided the agency with discretion to allocate its resources in the examination.  Moreover, Congress recognized that the agency would have to make certain respondent selection decisions with less than perfect data.  *See* 19 U.S.C. § 1677f-1(c)(2)(A) (whereby Commerce selects a statistically valid sample of respondents "based on the information available to [Commerce] at the time of selection").  Section 1673d(c)(5), meanwhile, speaks to the methodology for determining the all-others rate at the end of an investigation.  The temporal aspect of this provision is clear because it calls for determining a rate to apply to non-examined

companies based on the results (i.e., the "estimated weighted average dumping margin") determined for the examined companies.

Because a statute must be read as a whole, *Delverde, SrL v. United States*, 202 F.3d 1360, 1364 (Fed. Cir. 2000), and the provisions in question read "with a view to their place in the overall statutory scheme," *Nucor Corp. v. United States*, 927 F.3d 1243, 1250 (Fed. Cir. 2019), provisions such as section 1673d(c)(5) that apply at the end of an investigation may aide in understanding what Congress meant when it permitted Commerce to select the number of respondents "that can be reasonably examined," 19 U.S.C. § 1677f-1(c)(2)(B).  Thus, even accepting that section 1673d(c)(5) does not apply to administrative reviews on its face, it may be appropriate to take account of its requirements when the agency applies section 1677f-1(c)(2), even in administrative reviews.

Reading these provisions together, as the Federal Circuit did, leads to the conclusion that when Commerce engages in respondent selection at the beginning of a segment, the agency "generally" must select more than one respondent for examination.[12]  This interpretive analysis, however, is incomplete because, in this case, Commerce selected two respondents for individual examination, and one of those two withdrew from participation.  *YC Rubber II*, 2022 WL 3711377, at *2.  Nevertheless, the Federal Circuit vacated and remanded the court's decision in *YC Rubber I*.

---

[12] The court interprets the Federal Circuit's inclusion of the modifier "generally" as a recognition that there may be unusual cases in which Commerce establishes, from the outset, that it cannot "reasonably examine" more than one respondent.

To understand the ruling in *YC Rubber II*, it is necessary to recognize the implied

question that the opinion addresses: does Commerce have an ongoing obligation to

maintain more than one respondent for individual examination after the initial selection?

*YC Rubber II* suggests that the answer to that question is—or in this case at

least, was—yes.  2022 WL 3711377, at *4 (stating that "Commerce provide[d] no

reason why it would be reasonable to 'average' a single rate").  Put differently, the

appellate court indicated that the end-of-segment requirement for Commerce to use a

mathematical average to determine the "all-others" rate required Commerce to both

select and maintain multiple mandatory respondents.[13]  *Id.* (concluding that Commerce

"unlawfully restricted its examination to a single mandatory respondent" and "erred in

relying on a single entity for calculation of a dumping margin for all respondents").

As the *YC Rubber II* court indicated with its use of the modifier "generally,"

answering that question in any particular situation will require the agency to balance

---

[13] Here again, *YC Rubber II* must be understood within the context of its facts and the statutory provisions understood within their temporal limitations.  The Federal Circuit concluded that "Commerce provides no reason why it would be reasonable to 'average' a single rate" when determining the non-investigated company rate when Commerce only examined one respondent from the time Haohua ceased participation in the early weeks of the review.  2022 WL 3711377, at *4.  Nevertheless, it is much less clear that it would also be unreasonable for Commerce to "average" a single rate if the agency had examined five respondents and two were found to have *de minimis* rates, two received rates based on adverse facts available, and only one respondent received an individually calculated rate above *de minimis*.  Section 1673d(c)(5)(A) would still provide that Commerce is to determine the weighted average of the results of the individual examinations, excluding the proscribed results.  In this scenario, there would only be a single rate available to "average" within the provision's parameters.  Such scenarios were, however, beyond the scope of *YC Rubber II.*

considerations such as the resources available to it, the speed with which it can identify

another respondent, and the agency's deadlines for completing the segment.

For purposes of this case, however, the answer is clear.  Commerce reasonably

determined that it could examine two respondents.  When one of those two respondents

indicated that it would cease participation in the review just two weeks after receiving

the questionnaire, it remained practicable for Commerce to examine a second

respondent and a replacement second respondent should have been selected in this

review.[14]  Because Commerce did not do so, its further decision to base the rate for

non-investigated separate rate companies on only one respondent was not in

accordance with law.  On remand, Commerce's correction of this error by selecting a

second respondent was in accordance with law (however, the manner in which

Commerce made this selection will be considered separately, below).

Plaintiffs' arguments now opposing Commerce's selection of a second

respondent (that they previously sought) are unpersuasive.  To begin, Plaintiffs'

suggestion of other options for complying with *YC Rubber II*, such as pulling forward a

rate from a prior segment, YC Rubber's Cmts. at 8; ITG Voma's Cmts. at 12–13; *see

also* Mayrun's Cmts. at 5, ignores the statutory requirements.  Commerce may use

---

[14] As the "'master' of the antidumping laws," *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995), Commerce must, in the first instance, determine at what point in a segment it is no longer practicable, within the applicable statutory deadlines, to identify a replacement respondent for individual examination; however, as in this case, that decision would be reviewable by the courts.  In this case, Commerce erred in waiting until the non-investigated separate rate respondents requested the agency to select another mandatory respondent to decide whether it was feasible to do so.  *See* I&D Mem. at 14.

other reasonable methods (like pulling forward a rate) when *all* the individually

investigated companies' rates are zero, *de minimis*, or determined based on adverse

facts available.  19 U.S.C. § 1673d(c)(5)(B).  That is not the case here.

        The passage of time does not detract from Commerce's decision to select a

second mandatory respondent.  Plaintiffs cite *Changzhou Hawd Flooring Co. v. United

States*, 39 CIT 64, 74–78, 44 F. Supp. 3d 1376, 1388–91 (2015), in which the CIT

concluded that Commerce's decision to conduct an individual investigation of a

respondent approximately three and a half years after the initial investigation, was

arbitrary and capricious.  *See* YC Rubber's Cmts. at 8–10; ITG Voma's Cmts. at 5–8.

That case, however, is inapposite.  First, it is a non-precedential CIT decision which pre-

dates *YC Rubber II*, a binding Federal Circuit opinion.  Second, the *Changzhou* court

reached its conclusion based on the specific facts of that case, explaining that

"Commerce cannot have it both ways" by previously asserting a lack of resources to

examine an additional respondent and then, much later, performing the examination.

*Changzhou*, 39 CIT at 77, 44 F. Supp. 3d at 1389–90.  Here, Commerce acknowledged

at the time of the *Final Results* that it "had the resources to examine two mandatory

respondents," I&D Mem. at 14, however, the second respondent had declined to

participate.  As the *Changzhou* court pointedly recognized, "the decision to reopen the

record is generally within the agency's discretion," 39 CIT at 76, 44 F. Supp. 3d at 1389

(citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277–78 (Fed. Cir. 2012)), and

here Commerce reasonably exercised that discretion consistent with *YC Rubber II*.

Although several years have passed since Commerce conducted the administrative

review, the exporters and producers subject to review are either parties to this litigation or export to parties to this litigation and should have been aware of the ongoing litigation, which centered, in no small part, around the selection of a second mandatory respondent.  Thus, the passage of time does not compel Commerce to refrain from selecting a second mandatory respondent.

Commerce's decision not to select a second mandatory respondent in other proceedings does not, as Plaintiffs argue, suggest that doing so here is arbitrary and capricious.  *See* YC Rubber's Cmts. at 10–11; ITG Voma's Cmts. at 10–11.  Here, the Federal Circuit found that, on the facts of this case, it was not sufficient for Commerce to examine only one respondent, and, upon remand, Commerce chose a second mandatory respondent.  As noted, the appellate court recognized that its holding would not be universally applicable.  *Supra* note 12.  Thus, while Commerce may seek to distinguish the facts of *YC Rubber II* in another case to justify the use of one respondent, the agency cannot distinguish this case from itself.

In sum, because Commerce reasonably selected a second mandatory respondent to comply with the Federal Circuit's remand, the court sustains that part of the Remand Results.

## II. Methodology for Selecting a Second Mandatory Respondent

### a. Parties Contentions

YC Rubber contends that Commerce's method of selecting a second mandatory respondent was flawed.  YC Rubber's Cmts. at 11–13.  YC Rubber argues that Commerce erred by providing each selected party with only one week to respond to the

selection.  *See id.* at 11–12.  YC Rubber further argues that Commerce failed to explain why its selection pool was limited to entities with suspended entries, while basing the order of selection on overall volumes of exports.  *Id.* at 11.  Even assuming Commerce properly considered the entire volume of entries, YC Rubber further argues that Kenda had a higher overall volume than Hengyu, Winrun, and Mayrun and that Commerce failed to explain its omission of Linglong from the selection process.  *Id.* at 12–13.

On this issue, the court takes each argument in turn. The Government responds that the one-week deadline only required the company to inform Commerce if the company intended to respond, not to fully respond. Def.'s Cmts at 27.  The Government further explains that, "[c]onsistent with its standard practice," Commerce selected the second mandatory respondent based on "the largest volume of imports."  *Id.* at 26 (citing 19 U.S.C. § 1677f-1(c)(2)).  Regarding the order of selection, the Government did not address the omission of Linglong but noted that YC Rubber's belated contention that Kenda should have been selected second "does not demonstrate that Commerce erred in following its practice."  *Id.*

### b.  Analysis

On this issue, the court takes each argument in turn.  To begin, YC Rubber's contention that Commerce erred by allowing a one-week response is, at best, misguided.  Commerce provided each selected respondent, in turn, one week to indicate whether it "*intends* to respond to this questionnaire."  *See, e.g.*, Initial Questionnaire (Feb. 8, 2023) at Cover Letter, PRR 2, RCJA Tab 19 (emphasis added).  In each case, the potential second respondent was notified that it had 28 days to respond to the questionnaire in full.  *See id.* at 3.  To the extent that YC Rubber argues

that Commerce should have responded more fully to its argument, the company

overstates the value of its own position.  *See Husteel Co. v. United States*, 39 CIT 1382,

1432, 98 F. Supp. 3d 1315, 1359 (2015) ("Because this argument and accompanying

evidence were not significant, Commerce did not err in failing to specifically address

them.").

      Similarly, Commerce's decisions to limit its selection of mandatory respondents

to those with suspended entries and look at the largest overall volume of imports are

supported by substantial evidence and otherwise in accordance with law.  Although the

Remand Results provide limited explanation, Commerce's reasoning is plain based on

the law.  As for limiting selection to only those companies with suspended entries, any

liquidated entries are already final, so no further challenge to the antidumping duty rate

applied to them would be possible.  *See Zenith Radio Corp. v. United States*, 710 F.2d

806, 809–11 (Fed. Cir. 1983) (explaining the consequence of liquidation on judicial

review).  As for Commerce's use of the total volume of entries (rather than the

suspended volume of entries) for the order of selection, such a basis is consistent with

19 U.S.C. § 1677f-1(c)(2), which instructs Commerce to select the exporters or

producers to examine on the basis of those "accounting for the largest volume of the

subject merchandise from the exporting country."  Again, to the extent that Commerce

did not specifically address this argument, the agency did not err because the argument

was otherwise baseless.  *See Husteel*, 39 CIT at 1432, 98 F. Supp. 3d at 1359.

      The court, however, struggles to discern the basis for Commerce's order of

selection.  Although Commerce explained that it based its selection on the volume of

entries after narrowing the list to companies with suspended entries, the record does not appear to support Commerce's purported actions.  To begin, the exclusion of Linglong from the list of potential second mandatory respondents is glaring.  While Commerce identified Kenda, Mayrun, Hengyu, Winrun, Wanda Boto, and Linglong as possible respondents in the Remand Results, Remand Results at 2–3, throughout the selection process, Commerce never included Linglong as a possible mandatory respondent, *see, e.g.*, Wanda Boto Resp't Selection Mem. at 1 (listing only Kenda, Mayrun, Hengyu, Wanda Boto, and Winrun).  Even now, the Government does not offer a basis in the record for this discrepancy.  *See* Def.'s Cmts. at 26–27.  At best, Commerce appears to have considered any issue regarding the omission of Linglong as resolved when it assigned a separate rate to Linglong.  But because the order in which the second mandatory respondent was selected had consequences for the respondents that refused to participate, namely the denial of separate rate eligibility, this treatment of Linglong does not address adequately the parties' concerns.

In an effort to discern Commerce's reasoning, the court examined the underlying data Commerce cited for the companies' import volumes.  *See* [Winrun] Resp't Selection Mem. (Mar. 3, 2023) at 1 n.4, CRR 3, PRR 34, RCJA Tab 26 (citing U.S. Customs Entries (Nov. 30, 2017), Excel attachment, CR 44–45, PR 119, CJA Tab 22 (on file with the court)).  The data in that Excel attachment appears to support YC Rubber's argument that Kenda should have been selected second.  *See* U.S. Customs Entries, Excel attachment; *see also* YC Rubber's Cmts. at 12–13.  It appears to the court that Commerce failed to aggregate certain data entries with slightly different

names.  *See* U.S. Customs Entries, Excel attachment.  While Commerce stated that it would "combine[ ] the export quantities of companies with minor variations in the spelling of their names," it is unclear which entries were combined, which were not, and how Commerce drew the line between minor and non-minor variations in names.[15] Original Resp't Selection Mem. at 7.  At Oral Argument, the Government suggested that minor variations were limited to issues like the omission of periods in abbreviations or the omission of corporate abbreviations (like "Co.") but was unable to confirm whether the distinct data entries actually represented distinct companies (that might ultimately be entitled to different rates).  Confid. Oral Arg. (May 16, 2024) at 11:50–13:45 (on file with the court); Docket Entry, ECF No. 101.

Even if the court accepts Commerce's import quantity for Kenda, questions remain as to whether Linglong had a higher volume of entries for the relevant period. *Compare* U.S. Customs Entries, Excel attachment (showing Linglong's entries), *with* [Kenda's] Resp't Selection Mem. (Mar. 10, 2023) at 1, PR 34, CRR 4, Suppl. RCJA Tab 3 (identifying the volume of Kenda's entries).  Alternatively, if Kenda should have been selected second, then Linglong's omission would be harmless error but the selections of Winrun, Mayrun, and Hengyu before Kenda would be erroneous.  The Government all

---

[15] In the case of [[          ]], Commerce apparently distinguished between [[                                                      ]].  *See* U.S. Customs Entries, Excel attachment.  But Commerce appears to have also considered the relevance of differences between [[                                                                                            ]] combining the first three and distinguishing the final one.  *Id.*  While Commerce may have reasons for these distinctions, they are not clear from the record.

but ignores these nuances by simply stating, without supporting data, that "[c]onsistent with its standard practice of respondent selection, Commerce initially selected the company with the largest volume of imports as a potential mandatory respondent and went down the list from there as needed." Def.'s Cmts. at 26. This statement assumes the list was accurately compiled and followed; however, the record evidence does not support that assumption.[16] In this instance, it is not the practice that is the problem; it is the execution.

Because the court cannot discern Commerce's reason for omitting Linglong from the respondent selection process or any explanation, based on the data available, for the order in which Commerce sought to select the second mandatory respondent, the court remands this issue for Commerce to reconsider or further explain its respondent selection methodology for the second mandatory respondent.

## III.    Junhong's Data as a Basis for the Non-Investigated Separate Rate

### a.    Parties Contentions

YC Rubber argues that the rate applied to non-investigated separate rate companies should not be based on Junhong's data. YC Rubber's Cmts. at 19–22. YC Rubber asserts that Junhong's calculated antidumping margin is aberrational and not

---

[16] The court acknowledges that YC Rubber did not raise this argument before the agency. *See* [YC Rubber's] Cmts. on Draft Remand (Aug. 17, 2023) at 7–9, PRR 109, RCJA Tab 30. YC Rubber also appears to concede as much. *See* YC Rubber's Cmts. at 12 n.1. While the Government characterizes this argument as "after-the-fact," it did not argue that YC Rubber failed to exhaust its administrative remedies. Def.'s Cmts. at 26. Non-jurisdictional exhaustion claims are "subject to waiver and forfeiture." *Santos-Zacarias v. Garland*, 598 U.S. 411, 423 (2023). Here, the Government has waived any failure-to-exhaust claim, so YC Rubber's argument is properly before the court now.

representative of the market.  *Id.* at 19.  YC Rubber points to various rates, including

from subsequent administrative reviews, to support its assertion of aberration, *id.* at 20,

and contends that Commerce should have either carried forward the rate from the first

administrative review or used Kenda's calculated rate,[17] *id.* at 21–22.

The Government counters that the Federal Circuit did not identify any issues with

Junhong's rate, so Commerce did not err in not revisiting the use of Junhong's rate in

the Remand Results.  Def.'s Cmts. at 25.

### b.  Analysis

In *YC Rubber I*, the court rejected Plaintiffs' contention that Junhong's rate was

unrepresentative and therefore should not have been used to determine the rate applied

to non-investigated separate rate companies because the parties failed to "identify any

legal authority that requires Commerce to evaluate the representativeness of a

calculated rate determined pursuant to the general rule provided in 19 U.S.C.

§ 1673d(c)(5)(A)."  *YC Rubber I*, 487 F. Supp. at 1379–82.  To support its argument, YC

Rubber now relies on the same cases that the court has already distinguished.  *See id.*

at 1381–82 (discussing *Diamond Sawblades Mfrs.' Coal. v. United States*, 43 CIT __,

359 F. Supp. 3d 1374 (2019), and *Baoding Mantong Fine Chem. Co. v. United States*,

39 CIT 1664, 113 F. Supp. 3d 1332 (2015)).  As to the addition of new data points from

---

[17] The court notes that this second alternative requires YC Rubber to accept 1) that
Kenda was properly selected as a second mandatory respondent (which YC Rubber
otherwise contests) and 2) that only one respondent (now Kenda, rather than Junhong)
is an appropriate basis for Commerce to establish the non-investigated separate rate,
notwithstanding *YC Rubber II*.

subsequent administrative reviews, *see* YC Rubber's Cmts. at 20; Notice of Suppl.

Authorities, Attachs. 1–3, ECF No. 100, that data is unresponsive to the absence of

legal authority the court highlighted in *YC Rubber I*.  Thus, the court continues to find

that Commerce's reliance on Junhong's rate to determine the rate applied to non-

investigated separate rate companies is in accordance with law and supported by

substantial evidence.

### IV.    Denial of Separate Rate Status

#### a.  Parties Contentions

Commerce's decision to select a second mandatory respondent during the

remand proceeding had consequences for certain respondents that Commerce

previously found eligible for a separate rate.  Commerce found that those companies

that were selected to be the second mandatory respondent and declined to participate

were no longer eligible for a separate rate.  Remand Results at 6.

Plaintiffs argue that Commerce should not have reconsidered and denied the

separate rate status of Wanda Boto, Mayrun, Hengyu, and Winrun based on the

companies' decisions not to participate as mandatory respondents.  Mayrun's Cmts. at

7–15; YC Rubber's Cmts. at 13–22; ITG Voma's Cmts. at 13–17.  Plaintiffs further

argue that assigning these companies the China-wide rate is arbitrary and capricious

because the determination comes at a late stage of the administrative proceeding when

they only had one week to respond to the agency.  *See* YC Rubber's Cmts. at 17–18;

Mayrun's Cmts. at 11–12.  Plaintiffs also aver that altering their separate rate status was

beyond the scope of the remand and is settled "law of the case."  Mayrun's Cmts. at 7;

*see also* YC Rubber's Cmts. at 18 (arguing that nothing in the Federal Circuit opinion "suggests that Commerce could on remand reassess separate rate eligibility for exporters granted such status in [the administrative review]").[18]

The Government responds that Commerce's decision to deny separate rates to companies that declined to participate as mandatory respondents is supported by the agency's practice. Def.'s Cmts. at 15–23. The Government points out that "Commerce made clear at the outset . . . that the refusal of a company to participate as a mandatory respondent results in their loss of separate rate eligibility." *Id.* at 18. The Government maintains that the decision to alter separate rate status was within the bounds of the remand proceeding because *YC Rubber II* focused on the selection of a second mandatory respondent, which involved reconsideration of issues such as separate rates, and nothing in the opinion barred Commerce from reconsidering separate rate status. *Id.* at 16, 19–20.

---

[18] Plaintiffs also contend that Commerce applied adverse facts available by rescinding the companies' separate rate status. *See* YC Rubber's Cmts. at 13, 16–17; ITG Voma's Cmts. at 13; Mayrun's Cmts. at 12–13. Nothing in the Remand Results suggests that Commerce did, in fact, apply adverse facts available. *See* Def.'s Cmts. at 25. To the extent Plaintiffs are attempting to analogize adverse facts available with the rescission of separate rate status, the inquiries are distinct. In a non-market economy country, the basic notion is that the means of production, prices, etc., are centrally controlled, *see* 19 U.S.C. § 1677(18) (definition of non-market economy country), and a party is eligible for a rate separate from that non-market economy only when it meets the *de jure* and *de facto* criteria Commerce has established. *See generally Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't Commerce May 6, 1991) (final determination of sales at less than fair value); *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't Commerce May 2, 1994) (notice of final determination of sales at less than fair value).

### b.  Analysis

To begin, Commerce has the authority to reconsider the separate rate status.

Neither the passage of time since the original administrative review nor the purported

one-week response time are persuasive reasons to limit Commerce's ability to

reconsider the separate rate eligibility.  In light of *YC Rubber II*, Commerce acted

reasonably in reopening the record and, as discussed above, the one-week response

time was simply for an indication of participation, not a full questionnaire response.

Likewise, Mayrun's contention that the companies' eligibility for a separate rate

"was settled 'law of the case,'" Mayrun's Cmts. at 10, is inapposite.  The law of the case

applies only to issues that were "actually decided, either explicitly or by necessary

implication, in the earlier litigation."  *Ford Motor Co. v. United States*, 809 F.3d 1320,

1324 (Fed. Cir. 2016) (citation omitted).  Here, the Federal Circuit had no occasion to

consider the separate rate eligibility of any of the respondents, either explicitly or

implicitly.  Similarly, Mayrun's contention that "[a]n agency's deviation from remand

instructions is 'itself legal error, subject to reversal on further judicial review,'" must also

fail.  Mayrun's Cmts. at 10 (quoting *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989)); *see

also* YC Rubber's Cmts. at 18.  The types of remands discussed in *Sullivan* "often

include[d] detailed instructions concerning the scope of the remand, the evidence to be

adduced, and the legal or factual issues to be addressed."  490 U.S. at 885.  In contrast,

the remand order here did not include any instructions regarding separate rate eligibility;

thus, there was nothing for Commerce to deviate from.  The agency was free to

reconsider the separate rate status of various respondents, as necessary and

appropriate, in the context of the agency's actions to comply with the holding of *YC Rubber II*.  Indeed, under certain circumstances, the refusal to participate as a mandatory respondent may support Commerce's decision to rescind a party's separate rate status.

But that does not resolve the issue before the court.  While Commerce may reconsider the separate rate eligibility of respondents in the course of the remand proceeding, the results of that reconsideration must be supported by substantial evidence.  Here, Commerce did not adequately support its decision.

Commerce's reference back to the language of the *Initiation Notice*, by itself, is unpersuasive.  Therein, Commerce stated that "exporters and producers who submit a separate-rate status application or certification and subsequently are selected as mandatory respondents . . . will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents."  Remand Results at 30 & n.113 (quoting *Initiation Notice*).  That statement does not constitute an adequate explanation of why these respondents, at this stage of the process, are not eligible for separate rate status.  Although exporters and producers may have been notified that failure to participate as a mandatory respondent would result in a denial of a separate rate, the *Initiation Notice* does not explain *why* the failure to participate as a mandatory respondent alters the separate rate analysis or *why* the questionnaire response was needed to confirm a previously approved separate rate status.  This rote citation, particularly given the facts of this case, is insufficient to support Commerce's finding.  Commerce must support its decisions with substantial evidence.

Similarly, Commerce's statement that it was "unable to confirm, clarify, or verify" the separate rate certifications, *id.* at 31, does not explain why the failure to participate as a mandatory respondent on remand altered Commerce's previous determination that the companies were eligible for a separate rate, *see Final Results*, 84 Fed. Reg. at 17,782–83.  While the information (or lack thereof) could be relevant, "a company's failure to provide information unrelated to establishing entitlement to a separate rate does not necessarily undermine submissions demonstrating an absence of government control."  *Hubbell Power Sys., Inc. v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1302, 1309 (2019) (collecting cases); *cf. Green Farms Seafood Joint Stock Co. v. United States*, Slip Op. 24-46, 2024 WL 1653791, at *4–5 (CIT Apr. 17, 2024) (rejecting the argument that Commerce erred in granting separate rate status when the grant was based on the submission of a separate rate certification *and* a section A questionnaire response while remanding for Commerce to further explain its determination under the relevant criteria).  Here, Commerce failed to explain *why* the lack of a complete mandatory respondent questionnaire response rendered the agency unable to confirm, clarify, or verify information that it had previously accepted as sufficient to grant separate rate eligibility.  Thus, the court remands for Commerce to reconsider its rescission of separate rate status for Wanda Boto, Hengyu, Mayrun, and Winrun.[19]

---

[19] The court notes that Commerce's reconsideration of the order of selection of the second mandatory respondent may moot some of these issues.

**V.    Denial of Withdrawal Requests**

    **a.  Parties Contentions**

Plaintiffs next argue that Commerce should have allowed certain respondents to withdraw their requests for administrative review during the remand proceeding.  YC Rubber's Cmts at 22–25; Mayrun's Cmts at 15–17.  YC Rubber argues that the respondents' initial withdrawal requests were reasonable because the final results of the first administrative review and the respondent selection process for the second administrative review did not occur until after the 90-day deadline to withdraw.  YC Rubber's Cmts. at 22–23.  YC Rubber further argues that the renewed withdrawal requests made during the remand proceeding are "especially compelling given the unique circumstances surrounding litigation."  *Id*. at 24.  Mayrun similarly argues that Commerce's decision to select a second mandatory respondent constituted an "extraordinary circumstance" that entitled it to withdraw its request for review.  Mayrun's Cmts. at 15–16.

The Government contends that these withdrawal requests (both initial and renewed) are outside the scope of the remand because the Federal Circuit declined to rule on the issue.  Def.'s Cmts. at 24–25.

    **b.  Analysis**

Commerce "will rescind an administrative review . . . if a party that requested a review withdraws the request within 90 days of the publication of notice of initiation of the requested review."  19 C.F.R. § 351.213(d)(1).  Commerce "may extend this time limit if [the agency] decides that it is reasonable to do so."  *Id*.; *see also Glycine & More,*

*Inc. v. United States*, 880 F.3d 1335, 1344–45 (Fed. Cir. 2018) (confirming the

reasonableness test).

With respect to the initial requests to withdraw the review requests, this court

previously reviewed and affirmed Commerce's denial of the withdrawal requests and

that holding was unaltered by the Federal Circuit. *See YC Rubber II*, 2022 WL

3711377, at *5 ("We also do not reach Appellants' challenge to Commerce's decision to

deny Appellants' withdrawal requests."). To the extent that Plaintiffs continue to

challenge Commerce's original denials, those challenges fail for the reasons previously

articulated. *See YC Rubber I*, 487 F. Supp. 3d at 1384–85.

The renewed requests of respondents to withdraw their review requests during

the remand proceedings, however, present a fresh question for the agency and now this

court. Although the renewed requests contain similar arguments to the original

withdrawal requests, they also raise new arguments. Mayrun argued before Commerce

that the decision to "re-start the review[ ] and return to the stage of mandatory

respondent selection" makes "[t]he instant remand unique" because the "prior timeline"

has been "effectively swept away." [Mayrun's] Renewed Req. to Withdraw from Rev.

(Feb. 16, 2023) at 4, PRR 8, RCJA Tab 21. Hengyu renewed its request when it

notified Commerce that it could not participate as a mandatory respondent and

explained that it was in bankruptcy proceedings and without any personnel. [Hengyu]

Resp. to Dep't's Req. to Notify (Feb. 24, 2023) at 2, PRR 16, RCJA Tab 23. Winrun

renewed its request when it indicated that it would not participate as a mandatory

respondent because Commerce requested data that was six or seven years old and

Winrun, "pursuant to normal business practices," only maintained data for three years. Winrun Resp. to Dep't Letter of Mar. 3, 2023 (Mar. 10, 2023) at 2, PRR 29, RCJA Tab 25.  Despite these additional bases for their requests, Commerce did not distinguish between the initial requests to withdraw and the renewed requests, stating simply that it "continue[s] to find that it is inappropriate to accept the untimely review withdrawal requests."  *See* Remand Results at 36.  Commerce's failure to distinguish the requests and clearly address the new arguments amounts to legal error.

The court reaches no conclusion regarding how Commerce should decide those requests.  While some of the respondents offered rationales for why they were no longer capable of participating in the administrative review in an effort to justify their belated withdrawal requests, the court also recognizes that the respondents did not attempt to provide "suggested alternative forms" in which they might have responded. 19 U.S.C. 1677m(c)(1); *see also Viet I-Mei Frozen Foods*, 39 CIT at 1073–74, 83 F. Supp. 3d at 1361 (concluding that Commerce permissibly declined a belated withdrawal request when that party failed to provide "suggested alternatives" for responding). Moreover, Commerce may decide that the new arguments and absence of alternatives are insufficient to establish reasonableness given that the parties were (or should have been) aware of the ongoing and unsettled nature of this administrative review.  "A continuing obligation to maintain records and institutional information during subsequent judicial review of the administrative proceeding is an unremarkable condition of the antidumping statute and of litigation generally."  *Abitibi-Consol. Inc. v. United States*, 30 CIT 714, 723, 437 F. Supp. 2d 1352, 1361 (2006) (discussing in the context of whether

a remedy is manifestly inadequate such that it may establish residual jurisdiction).

Nonetheless, the Remand Results do not suggest, and the court is unable to discern,

that Commerce even considered the renewed requests with their corresponding new

arguments.  Therefore, the court remands for further agency consideration of the

renewed withdrawal requests.

### VI.    Exclusion of Surrogate Value Import Data

#### a.  Parties Contentions

ITG Voma revives its argument that Commerce erroneously excluded Thai

imports from India, Indonesia, and South Korea in selecting surrogate values for

Junhong based on its reasoning that there were generally available subsidies in those

countries.  ITG Voma's Cmts. at 17.  ITG Voma contends that Commerce's "simple

citation to previous determinations" is insufficient to support its decision.  *Id.*

The Government argues that Commerce was not required to reconsider this

issue on remand and therefore did not err in maintaining its decision to exclude that

data.  Def.'s Cmts. at 24.

#### b.  Analysis

The court previously explained that "[s]ection 1677b(c)(5) expressly provides

that, 'without further investigation,' Commerce may disregard such imports if it 'has

determined that broadly available export subsidies existed.'"  *YC Rubber I*, 487 F. Supp.

3d at 1386.  Consistent therewith, this court affirmed Commerce's exclusion of the

import data from India, Indonesia, and South Korea.  While this challenge goes to the

distinct issue of the calculation of Junhong's rate, on appeal, the Federal Circuit did not

reach this issue, stating that "[s]uch a decision is premature."  *YC Rubber II*, 2022 WL 3711377, at *5.  In its comments on the Remand Results, ITG Voma raises no arguments that this court did not previously consider and reject.  Therefore, the court continues to find that Commerce's decision to exclude certain import values is supported by substantial evidence and otherwise in accordance with law.  *See YC Rubber I*, 487 F. Supp. 3d at 1386.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are sustained in part and remanded in part; it is further

**ORDERED** that, on remand, Commerce shall reconsider its method of selecting the second mandatory respondent; it is further

**ORDERED** that, on remand, Commerce shall reconsider its decision to rescind the separate rate status of Wanda Boto, Mayrun, Hengyu, and Winrun; it is further

**ORDERED** that, on remand Commerce shall reconsider the denial of the renewed requests to withdraw from review; it is further

**ORDERED** that Commerce shall filed its remand redetermination on or before September 16, 2024; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

Consol. Court No. 19-00069                                                     Page 36

      **ORDERED** that any comments or responsive comments must not exceed 6,000

words.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: June 18, 2024
       New York, New York