A-570-016
Remand
Slip Op. 24-74
POR: 8/01/2016 – 7/31/2017
**Public Version**
E&C/OVII: JS

**YC Rubber Co. (North America) LLC., et al v. United States,**
**Consol. Court No. 19-00069, Slip Op. 24-74 (CIT June 18, 2024)**
**Passenger Vehicle and Light Truck Vehicle Tires from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

issued in *YC Rubber Co. (North America) LLC., et al v. United State*s, Consol. Court No. 19-

00069 (CIT June 18, 2024) (*Second Remand Order*).  This action arises out of the final results of

redetermination pursuant to the Court remand dated October 31, 2023 (*First Remand Results*)

with respect to antidumping duty (AD) administrative review of passenger vehicle and light

truck tires from the People's Republic of China (China) for the period of review (POR) August

1, 2016, through July 31, 2017.[1]

The Court questioned the order in which Commerce selected another mandatory

respondent in the *First Remand Results*, where Commerce neglected to include Shandong

Linglong Tyre Co., Ltd. (Linglong) in its list of possible respondents, and which entries

Commerce aggregated when combining export quantities of companies with slight name

---

[1] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 17781
(April 26, 2019) (*Final Results*); *see also Final Results of Redetermination Pursuant to Court Remand, YC Rubber
Co. (North America) LLC., et al. v. United States*, Consol. Court No. 19-000069, Slip Op. 21-1489 (CIT February 2,
2023), dated November 1, 2023 (*First Remand Results*), available at
https://access.trade.gov/public/FinalRemandRedetermination.aspx.

variations for purposes of selecting mandatory respondents.[2]  Thus, the Court remanded for Commerce to reconsider or further explain its respondent selection methodology for the second mandatory respondent.  The Court also remanded Commerce's denial of separate rate status for Mayrun Tyre (Hong Kong) Limited (Mayrun), Shandong Hengyu Science & Technology Co., Ltd. (Hengyu), Winrun Tyre Co., Ltd. (Winrun), and Shandong Wanda Boto Tyre Co., Ltd. (Wanda Boto) after each declined to participate as a mandatory respondent in the first remand. The Court held that Commerce did not adequately support its decision.[3]  The Court further remanded Commerce's denial of the new withdrawal requests submitted during the first remand. Although the Court sustained Commerce's denial of untimely withdrawal requests in the underlying review, the Court held that the new withdrawal requests, submitted during the first remand, raise new arguments before Commerce, which Commerce did not address in the *First Remand Results*.  Thus, the Court remanded for Commerce to reconsider its denial of the new withdrawal requests.[4]

## II.    BACKGROUND

Commerce issued its *First Remand Results* on October 31, 2023.  In its June 18, 2024, opinion, the Court remanded the *First Remand Results*, concluding that Commerce:  (1)  may have erred in the order in which it selected a second respondent; (2) did not support with substantial evidence its denial of separate rate status for Mayrun, Hengyu, Winrun, and Wanda Boto; and (3) did not sufficiently explain its denial of the new withdrawal requests submitted during the first remand.

On August 6, 2024, Commerce selected Linglong as an additional mandatory respondent for purposes of these draft results of redetermination.[5]  Commerce issued Linglong the standard

---

[2] *See Second Remand Order* at 23.
[3] *Id.* at 29-30.
[4] *Id.* at 32-34.
[5] *See* Memorandum, "Respondent Selection," dated August 6, 2024 (Linglong RSM).

questionnaire on August 7, 2024.[6]  On August 13, 2024, YC Rubber Co. (North America) LLC (YC Rubber), Sutong Tire Resources, Inc. (Sutong), and ITG Voma Corporation (ITG Voma) submitted respondent selection comments requesting that Commerce rescind its request for review of Linglong.[7]  On August 15, 2024, Linglong challenged Commerce's selection of it as an additional respondent selection and, in the event Commerce continued to select it as an additional mandatory respondent, notified Commerce that it would not respond to the questionnaire.[8]

On September 6, 2024, we released the Draft Remand Results to interested parties for comment.[9]  On October 3, 2024 we received comments from YC Rubber, Sutong, and ITG Voma and Mayrun.[10]

## III.    ANALYSIS

After careful analysis of the *Second Remand Order* and comments received from interested parties, Commerce continues to determine that Wanda Boto, Mayrun, Hengyu, Winrun, and Linglong each failed to establish their entitlement to a separate rate in these draft results of redetermination and we have applied to each company the China-wide rate of 87.99 percent.

### A.  *Order of Companies Selected as An Additional Mandatory Respondent*

The Court remanded Commerce's methodology surrounding its selection of another mandatory respondent, stating that it was unable to discern the basis for Commerce's order of

---

[6] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Linglong," dated August 7, 2024.
[7] *See* YC Rubber, Sutong, and ITG Voma's Letter, "Comments on Respondent Selection in Second Remand," dated August 13, 2024 (YC Rubber Respondent Selection Comments).
[8] *See* Linglong's Letter, "Linglong's Response to Questionnaire Issuance," dated August 15, 2024 (Linglong Response to Questionnaire).
[9] *See* Draft Results of Redetermination Pursuant to Court Remand, *YC Rubber Co. (North America) LLC., et al v. United States,* Consol. Court No. 19-00069, Slip Op. 24-74 (CIT June 18, 2024) (Draft Remand Results).
[10] *See* YC Rubber, Sutong, and ITG Voma's Letter, "Comments on Draft Second Remand," dated October 3, 2024 (YC Rubber Comments) and Mayrun Letter, "Comments of Mayrun Tire (Hong Kong) Ltd. on Draft Remand Results (Y.C. Rubber (North America) LLC v. United States, Slip Op. 24-74 (U.S. Ct. Int'l Tr.)," dated October 3, 2024 (Mayrun Comments).

respondent selection.[11]  Commerce offers the explanation of its respondent selection

methodology in the attachment to these draft results of redetermination.

      In the *First Remand Results*, Commerce selected an additional mandatory respondent in

the following order:  (1) Wanda Boto;[12] (2) Hengyu;[13] (3) Mayrun;[14] (4) Winrun;[15] and (5)

Kenda.[16]  As noted by the Court, the order in which we selected the second mandatory

respondent had consequences for the companies that refused to cooperate, namely the denial of

separate rate eligibility.[17]  Our analysis of U.S. Customs and Border Protection (CBP) data (*see*

attachment) continues to show that the four largest exporters by volume with enjoined entries

subject to the instant litigation were (highest volume to lowest volume) Wanda Boto, Hengyu,

Mayrun, and Winrun.  Our analysis of CBP data in the attachment also shows that Commerce

missed small volumes for Hengyu and Winrun in its analyses for the *First Remand Results*, but

these small volumes would not have changed our selection order for the first four companies

selected.  Finally, our analysis of CBP data shows that Linglong had a larger volume of entries

during the POR than did Kenda.[18]  As such, Commerce should have selected Linglong as another

mandatory respondent prior to selecting Kenda in the *First Remand Results*.  Commerce's

inadvertent failure to select Linglong prior to Kenda in the *First Remand Results* did not have

consequences for Wanda Boto, Hengyu, Mayrun, and Winrun, as each of these companies had

larger volumes than Linglong and Kenda and were, thus, correctly selected as mandatory

---

[11] *See Second Remand Order* at 21.
[12] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated February 8, 2023 (Wanda Boto RSM).
[13] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," dated February 17, 2023 (Hengyu RSM).
[14] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," date February 24, 2023 (Mayrun RSM).
[15] S*ee* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," dated March 3, 2023 (Winrun RSM).
[16] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Respondent Selection," dated March 10, 2023 (Kenda RSM).
[17] *See Second Remand Order* at 22.
[18] *See* Linglong RSM.

respondents prior to Linglong and Kenda.  Our treatment of Linglong in this remand redetermination is discussed below.

Moreover, Commerce continues to find that Kenda properly was not selected as a mandatory respondent prior to Wanda Boto, Hengyu, Mayrun, and Winrun.[19]  Generally, during respondent selection, Commerce considers minor variations to be limited to issues like the omission of periods in abbreviations or the omission of corporate abbreviations (like "Co."). Commerce did not aggregate entries for [              ] with Kenda Rubber (China) Co., Ltd. We did not do so because we did not consider the lack of the word "[      ]" to be a minor variation as described above.[20]  At the time of respondent selection, there is limited information on the record with respect to whether companies with distinct data entries in the CBP data are distinct entities.  Here, at the time of respondent selection in the *First Remand Results*, the record showed that Kenda Rubber (China) Co., Ltd. rather than [              ] was the name of the company subject to the underlying review and the relevant injunction.  Another illustration of our practice regarding minor name variations concerns Shandong Wanda Boto Tyre Co. Ltd. Commerce did not include volumes for [

                                    ] when aggregating entries as we did not consider the words [                                    ] to be minor name variations.  On this basis, Commerce continues to find that each had volumes of entered tires that exceeded that of Kenda or Linglong and that Commerce selected Wanda Boto, Hengyu, Mayrun, and Winrun as mandatory respondents in the correct order.

---

[19] *See Second Remand Order* at 22-23.
[20] *See*, *e.g.*, *Certain Frozen Warmwater Shrimp from Thailand:  Final Negative Countervailing Duty Determination*, 78 FR 50379 (August 19, 2013) (*Shrimp from Thailand*), and accompanying Issues and Decision Memorandum (IDM) at 61-62.

Ultimately, Commerce determined that Kenda Rubber (China) Co., Ltd. sold [     ] tires during the POR,[21] a volume significantly higher than that shown in the CBP data used for respondent selection. However, respondent selection decisions are made early in a segment prior to developing a fulsome record and Commerce's practice is to rely on CBP data for respondent selection.[22] Further, parties did not comment on the CBP data with respect to Kenda in the underlying administrative review or the first remand. Commerce does not normally reconsider the order of our respondent selection after respondents submit their questionnaire responses.

*Linglong*

The Court found that Commerce neglected to include Linglong in its list of possible respondents.[23] As reflected in the attachment, CBP data shows Linglong with a larger volume of entered subject merchandise tires than Kenda.[24] Accordingly, we should have selected Linglong prior to selecting Kenda in the *First Remand Results*.[25] Thus, Commerce has selected Linglong as an additional mandatory respondent for purposes of these draft results of redetermination.[26] Commerce issued Linglong the standard questionnaire on August 7, 2024.[27] On August 15, 2024, Linglong notified Commerce that it would not respond to the questionnaire.[28]

B. *Companies Not Receiving a Separate Rate*

In non-market economy (NME) cases, Commerce maintains a rebuttable presumption that all companies within the NME country are subject to government control and, therefore,

---

[21] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Draft Remand Analysis Memorandum for Kenda Rubber (China) Co., Ltd. for the 2016-2017 Administrative Review," dated July 25, 2023 (unchanged in *First Remand Results*).
[22] *See, e.g., Shrimp from Thailand* IDM at 61-62.
[23] *See Second Remand Order* at 22-24.
[24] *See* Memorandum, "U.S. Customs Entries," dated November 30, 2017 (CBP Data Memorandum).
[25] *See* Kenda RSM.
[26] *See* Linglong RSM.
[27] *See* Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Linglong," dated August 7, 2024.
[28] *See* Linglong's Letter, "Linglong's Response to Questionnaire Issuance: Second (2016-2017) Administrative Review of the Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated August 15, 2024.

should be assessed a single AD margin unless the company can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to exports.[29]  Companies not selected as mandatory respondents have two options for doing so:  an initial separate rate application (SRA), or in later reviews, if a company has previously been granted separate rate status in a prior segment, a separate rate certification (SRC).  The SRC is limited to companies that have previously been granted separate rate status.  In the SRC, companies attest that the information relied upon to grant them separate rate status has not changed since the granting period.  The only documentation submitted to support an SRC is company/counsel certifications (discussed below) and copies of the company's business license and export license.[30]

The process for gaining initial separate rate status via an SRA is more involved.  To support their SRA, companies submit documentation with respect to their ownership, affiliation, and export practices.[31]  Section A of our initial questionnaire asks even more detailed questions beyond the SRA, specifically about corporate structure.  It asks for an organizational chart on affiliation and corporate structure, and has more comprehensive questions about manufacturing facilities, locations, legal structure, third parties, narrative history, capital verification reports,

---

[29] *See Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China,* 71 FR 53079, 53082 (September 8, 2006); *see also Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006)

[30]  *See, e.g.*, Wanda Boto's Letter, "Separate Rate Certification Second Administrative Review of the Antidumping Order on Certain Passenger Vehicle," dated November 15, 2017 (Wanda Boto SRC).

[31] The typical SRA is supported with documentation like a company's:  (1) Documents for the First Sale to an Unaffiliated U.S. Customer; (2) Business License; (3) Export License; (4) Shareholder Entities' Business Licenses; (5) Capital Verification Report; (6) Articles of Association and its Revisions; (7) Price Negotiation Documents; (8) Appointment Letters of Managers; (9) Bank Account Information; (10) Financial Statements; and (11) Shareholder Agreements.  This type of documentation is used to support an applicant's claims with respect to the absence of *de facto* control.

*etc.* in addition to ownership and affiliation questions.[32]  This information is used to determine the absence of *de jure* and *de facto* government control.

Wanda Boto, Hengyu, Mayrun, and Winrun were each initially granted separate rate status in the underlying investigation on August 10, 2015, based on their submitted SRAs.[33] Each company submitted an SRC in the underlying review.[34]  When completing the SRCs in this underlying review, Wanda Boto, Hengyu, Mayrun, and Winrun each certified the information Commerce relied upon to grant their initial separate status had not changed and each company certified that it had relevant supporting documents and would submit them to Commerce upon request.[35]  The standard company certification which is part of the SRC notes that if a firm that has completed this form is not able to furnish supporting documents as requested by Commerce, Commerce may conclude the firm is not eligible for a separate rate.[36]  The company certification also notes that information in the SRC may be subject to verification or corroboration.[37] Commerce often issues supplemental questions to corroborate a company's separate rate claims.

Commerce also issues a full questionnaire to companies which may have already submitted SRAs/SRCs if those companies are selected as mandatory respondents.  In those instances, Commerce gives weight to the verifiable information submitted in the questionnaire responses, which responds to more detailed questions (or gives weight to the failure to submit the

---

[32] *See, e.g.*, Commerce's Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Linglong," dated August 7, 2024, at A-5 and A-6.
[33] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 80 FR 47902 (August 15, 2014).
[34] *See* Wanda Boto SRC at Exhibit 1; *see also* Hengyu's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China - Separate Rate Certification," dated November 12, 2017 (Hengyu SRC), at 7; Mayrun's Letter, "Passenger Vehicle and Light Truck Tires from the People's Republic of China Separate Rate Certification," dated November 14, 2017 (Mayrun SRC), at 5; and Winrun's Letter, "Winrun's Separate Rate Certification Certain Passenger Vehicle and Light Truck Tires from China," dated November 10, 2017 (Winrun SRC), at 3.
[35] *See* Wanda Boto SRC at Exhibit 1; *see also* Hengyu SRC at 7; Mayrun SRC at 5; and Winrun SRC at 3.
[36] *See, e.g.*, Wanda Boto SRC at Exhibit 1.
[37] *Id.*

requested, more detailed information) to determine whether to grant separate rate status to the company.

As noted above, our initial questionnaire section A asks for more detailed questions specifically about corporate structure. It asks for an organizational chart on affiliation and corporate structure, and has more comprehensive questions about manufacturing facilities, locations, legal structure, third parties, narrative history, capital verification reports, *etc*. in addition to ownership and affiliation questions. In the *First Remand Results*, Commerce issued initial questionnaires to Wanda Boto, Hengyu, Mayrun and Winrun after each was selected as a mandatory respondent which asked for an organizational chart on affiliation and corporate structure, and more comprehensive questions about manufacturing facilities, locations, legal structure, third parties, narrative history, capital verification reports, *etc*. in addition to ownership and affiliation questions.[38] This information, had it been submitted, could have been used to corroborate claims made by Wanda Boto, Hengyu, Mayrun, and Winrun in their respective SRCs with respect to the absence of *de facto* government control.[39]

*Absence of De Facto Control*

Typically, Commerce considers four factors in evaluating whether a company is subject to *de facto* government control of its export activities: (1) whether the company's export sales prices are set by, or are subject to the approval of, a government agency; (2) whether the company has the authority to negotiate and sign contracts and other agreements; (3) whether the company has autonomy from the government in making decisions regarding selection of management; and (4) whether the company retains the proceeds of its export sales and makes

---

[38] *See* Commerce's Letters, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Wanda Boto," dated February 8, 2023; "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Hengyu," dated February 17, 2023; "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Mayrun," dated February 24, 2023; and "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Winrun," dated March 3, 2023.
[39] *See, e.g.*, Wanda Boto SRC at 5-6.

independent decisions regarding the disposition of profits or financing of losses.[40]  Commerce has determined that an analysis of *de facto* control is critical in determining whether a company is, in fact, subject to a degree of government control which would preclude Commerce from assigning the company a separate rate.

In the underlying administrative review, Wanda Boto, Hengyu, Mayrun, and Winrun each submitted an SRC attesting that the information in their respective initial SRA, which Commerce relied upon to grant them separate rate status in a prior segment (in this case the initial investigation), has not changed since the granting period.  Beyond these claims, the only documentation submitted to support an SRC is company/counsel certifications and copies of their company's business license and export license.[41]  In its SRC instructions, Commerce explains that companies which do not currently hold separate rate status cannot submit an SRC but must instead submit a SRA.[42]  Moreover, companies must identify the final determination/results in which it was granted separate rate status and that its separate rate status remains applicable.[43]  Thus, without a previously established separate rate status, the claims, certifications, and documentation contained in SRCs submitted by Wanda Boto, Hengyu, Mayrun, and Winrun would not be sufficient to demonstrate the absence of government control. Further, at the time each company submitted its SRC, officials at Wanda Boto, Hengyu, Mayrun, and Winrun committed to provide any and all documents requested by Commerce in support of their separate rate status claims.[44]  Commerce subsequently requested that Wanda Boto, Hengyu, Mayrun, and Winrun each provide information relevant to support its separate rate status claims in Section A of the initial questionnaire.

---

[40] *See Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22586-87 (May 2, 1994); *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995).
[41] *See* Wanda Boto SRC; *see also* Hengyu SRC; Mayrun SRC; and Winrun SRC.
[42] *See*, *e.g.*, Wanda Boto SRC at 1.
[43] *Id.* at Exhibit 1.
[44] *Id.*; *see also* Hengyu SRC at 7; Mayrun SRC at 5; and Winrun SRC at 3.

In NME AD reviews, when Commerce is not individually examining a particular company, we may rely on that company's SRA as the basis for initially granting a separate rate. In cases where Commerce is not individually examining a particular company which has been granted separate rate status in a prior segment of the proceeding, the company can submit an SRC.  As discussed above, Wanda Boto, Hengyu, Mayrun, and Winrun each submitted an SRC. Commerce may, or may not, ask supplemental questions.  When it does, Commerce requires a response to its supplemental questions to parties requesting separate rate status.  If Commerce does not seek additional information about the party's claims, then it takes the claims as submitted.

However, when Commerce individually examines a company in an NME AD review, some questions in the section A questionnaire are akin to supplemental questions on the SRC/SRA for further examination, to corroborate the claim for separate rate status.  Where Commerce asks supplemental or more detailed questions the responses to which might support, or detract from, information submitted, and does not receive responses, we need not rely on the originally submitted information because the information requested to support the claims has not been provided as requested.  Furthermore, where additional information was requested and not provided, it would not be appropriate to try to verify the information reported in the SRC, because verification would entail examining information along the lines of the information requested and not provided.

The record of the first remand shows that Wanda Boto, Hengyu, Mayrun, and Winrun each did not respond to any sections of Commerce's AD questionnaire, including those relevant to each company's separate rate status.  Therefore, we were unable to confirm, clarify, or verify the claims made in the SRCs submitted by Wanda Boto, Hengyu, Mayrun, or Winrun.  For instance, although our questionnaires asked for information to support claims that its shareholders do not have relationships with:  (1) Chinese state asset management companies

11

(government-owned and/or private chartered); (2) the Chinese national government and/or its ministries/agencies; (3) Chinese provincial governments; or (4) Chinese local/municipal/village government(s)/agency(ies), the companies did not provide this information.  Further, Wanda Boto, Hengyu, Mayrun, and Winrun each failed to provide requested information demonstrating that during the POR each company's export prices were not set by, subject to the approval of, or in any way controlled by a government entity at any level (*e.g.*, national, provincial, local) or that it had autonomy from all levels of the government (*e.g.*, national, provincial, local) and from any government entities in making decisions regarding the selection of management.  Finally, Wanda Boto, Hengyu, Mayrun, or Winrun each did not provide information requested to support each of their claims that they retained the proceeds of their export sales and made independent decisions regarding the disposition of profits or financing of losses.[45]

Based on the foregoing, Commerce continues to deny separate rate status to Wanda Boto, Hengyu, Mayrun and Winrun.

*Linglong*

To support their SRAs, companies submit documentation with respect to their ownership, affiliation, and export practices.[46]  In its SRA, Linglong submitted various documents.[47] However, as noted above, when Commerce individually examines a company in an NME AD review, some questions in the section A questionnaire are akin to supplemental questions on the

---

[45] *See* Wanda Boto SRC at Exhibit 1; *see also* Hengyu SRC at 7; Mayrun' SRC at 5; and Winrun SRC at 3.
[46] The typical SRA is supported with documentation like a company's:  (1) Documents for the First Sale to an Unaffiliated U.S. Customer; (2) Business License; (3) Export License; (4) Shareholder Entities' Business Licenses; (5) Capital Verification Report; (6) Articles of Association and its Revisions; (7) Price Negotiation Documents; (8) Appointment Letters of Managers; (9) Bank Account Information; (10) Financial Statements; and (11) Shareholder Agreements.  This type of documentation is used to support an applicant's claims with respect to the absence of *de facto* control.
[47] *See* Linglong's Letter, "Separate Rate Application in the Administrative Review of the Antidumping Duty Order on Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated November 13, 2017.  In this submission, Linglong provided:  (1) sales documents; (2) business license; (3) export certificate of approval; (4) detailed information of shareholders; (5) license of shareholder entity; (6) capital verification report; (7) financial statements; (8) articles of association; (9) price negotiation documents; (10) management selection documents; (11) list of senior management and board of directors; and (12) bank account information.

SRA for further examination, to corroborate the claim for separate rate status. Where Commerce asks supplemental or more detailed questions, the responses which might support, or detract from, information submitted, and does not receive responses, we need not rely on the originally submitted information because the information requested to support the claims has not been provided as requested. Furthermore, where additional information was requested and not provided, it would not be appropriate to try to verify the information reported in the SRC, because verification would entail examining information along the lines of the information requested and not provided. In failing to submit a response to Commerce's initial questionnaire, Linglong did not provide responses to comprehensive questions about its manufacturing facilities, locations, legal structure, third parties, and narrative history contained in Commerce's initial questionnaire.[48] This additional information could have been used to corroborate Linglong's claims with respect to the absence of *de facto* government control.

As such, we need not rely on the information on the record to evaluate whether Linglong: (1) sets its own export prices rather than being subject to the approval of, a government agency; (2) has the authority to negotiate and sign contracts and other agreements; (3) has autonomy from the government in making decisions regarding selection of management; and (4) retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.

Based on the foregoing, Commerce determines that Linglong has not rebutted the presumption of *de facto* government control and is part of the China-wide entity.[49]

---

[48] *See* Linglong RSM.

[49] As we have determined Wanda Boto, Mayrun, Hengyu, Winrun, and Linglong to be part of the China-wide entity, Commerce is not applying the separate rate calculated in the *First Remand Results* to any company in these draft results of redetermination.

C.  *Denial of Withdrawal Requests*

The Court found that the renewed requests of certain respondents to withdraw their review requests during this remand proceeding contained new arguments to be considered by Commerce and that Commerce erred in not considering these arguments in the *First Remand Results*.[50]  Specifically, the Court stated that "{t}he renewed requests of respondents to withdraw their review requests during the remand proceedings … present a fresh question for the agency and now this court" and remanded Commerce's denial of the renewed requests for further consideration.[51]

Characterizing the posture of the remand as unique, Mayrun argues that Commerce should accept its renewed withdrawal request because Commerce was restarting the respondent-selection process during this remand proceeding, which is outside of the timeframe in which Commerce typically selects mandatory respondents, and that the decision of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) "effectively swept away the prior timeline of the review."[52]  After having been selected for individual examination during the first remand, Hengyu informed Commerce that it could not participate in the review because it was in bankruptcy proceedings and without any personnel and, for these reasons, withdrew its request "to be included as an interested party in this review."[53]  Further, after having been selected for individual examination during the first remand, Winrun stated that due to the "very lengthy passage of time and the unexpected nature of {Commerce's} request," it was not feasible for Winrun to prepare the sales and cost information Commerce requested and, also at that time, renewed its request to withdraw its review request.[54]  In addition, Linglong renewed its request

---

[50] *See Second Remand Order* at 32-34.
[51] *Id.* at 32.
[52] *See* Mayrun's Letter, "Mayrun Tire (H.K.) Ltd.:  Renewed Request to Withdraw from Review," dated February 16, 2023, at 4.
[53] *See* Hengyu's Letter, "Response to the Department's Request to Notify," dated February 24, 2023, at 2.
[54] *See* Winrun's Letter, "Winrun Response to Department Letter of March 3, 2023 Passenger Vehicle and Light Truck Tires from China," dated March 10, 2023, at 2.

to withdraw its request for review for this POR, similarly asserting that "the intervening years and ensuing litigation provides a compelling bases for reconsideration of this issue and granting the requested withdrawal."[55]

We have considered the arguments Mayrun, Hengyu, and Winrun advanced to renew their withdrawal requests and continue to decline to accept their untimely review withdrawal requests. We also have considered Linglong's renewed withdrawal request and deny this untimely request. As an initial matter, Hengyu, Winrun, and Linglong each renewed their request for withdrawal after being selected for individual examination and stating that they would not or could not participate as mandatory respondents. Commerce does not find it appropriate to accept an untimely withdrawal request on the basis that parties for which a review was requested are unwilling or unable to participate in the review due to the passage of time during ongoing litigation. With respect to Mayrun, it renewed its request for review before its selection as a mandatory respondent and informed Commerce that it would not participate as a mandatory respondent, citing the posture of this remand. For all four respondents' withdrawal requests, Commerce does not find it appropriate to accept these untimely withdrawal requests where the parties based their renewed requests on, among other things, the passage of time and new selection of an additional mandatory respondent as a result of litigation. The separate rate Commerce assigned in the underlying administrative review was challenged before the Court; when the case reached the Federal Circuit, the appellate court considered the question before it to be "whether the statute permits Commerce to review a single exporter or producer when multiple have requested review and Commerce has not demonstrated that it was otherwise reasonable to calculate the all-others rate based on only one respondent,"[56] found that "Commerce erred in

---

[55] *See* Linglong Response to Questionnaire at 4.
[56] *See YC Rubber Co. (N. Am.) LLC v. United States*, Court No. 2021-1418, 8 (Fed. Cir. 2022)

restricting its examination to only one exporter/producer"[57] in this case, and vacated

Commerce's decision for the Court to remand to Commerce. On remand, Commerce selected an

additional respondent[58] and the Court held that Commerce's "selecting a second respondent was

in accordance with law,"[59] considering and addressing the manner of the selection elsewhere in

its opinion. In light of the above activities in this case and court findings, Commerce does not

find parties' arguments about the passage of time to be persuasive bases for accepting untimely

withdrawals of requests for review. The passage of time between a court challenge and

resolution of the challenge is foreseeable and typical. Accordingly, Commerce continues to find

it appropriate to decline to accept the untimely withdrawal requests.

## IV.    INTERESTED PARTY COMMENTS

### Comment 1:  Respondent Selection

The following is a verbatim summary of argument submitted by YC Rubber, Sutong and ITG Voma. For further details *see* YC Rubber comments at 4-19.

> As a threshold matter, the Draft Second Remand inexplicably continues to rely on total POR import volume to rank respondents. This reliance is contrary to recognition by both {Commerce} and the CIT that only the volume of POR entries with respect to which liquidation has been suspended due to this appeal should be used. Additionally, {Commerce's} methodology fails to combine Kenda Rubber (Rubber) China Co., Ltd ("Kenda Rubber") entries that plainly are from the same entity. This failure conflicts with {Commerce} practice wherein differences in names reflected in the U.S. Customs and Border Protection (CBP) dataset are minor and there is compelling evidence that two names refer to the same entity. Moreover, {Commerce's} failures ignore the CIT remand order mandating that {Commerce} support its respondent ranking and selection with affirmative record evidence. On the one hand, {Commerce} acknowledges the undisputed evidence establishing that all Kenda Rubber entries should be combined, but then, on the other hand, disregards that same information for respondent selection purposes. Finally, the Draft Second Remand improperly faults the parties for not having raised this issue earlier, ignoring the fact that the CIT expressly addressed issue and found that {Commerce} waived any exhaustion defense.

---

[57] *Id.* at 11.
[58] In fact, Commerce selected four additional respondents, one at a time until one indicated that it would participate and also submitted questionnaire responses.
[59] *See Second Remand Order* at 17.

The following is a verbatim summary of argument submitted by Mayrun.  For further details *see* Mayrun Comments at 6-11.

> Mayrun asserts that Commerce wrongly excluded Kenda Rubber as the second mandatory respondent. Kenda Rubber had the second-highest import volume, but Commerce improperly treated "Kenda Rubber (China) Co." and "Kenda Rubber Co." as separate entities based on a minor variation in name.  As a result, Commerce demanded that other separate rate respondents, including Mayrun, serve as mandatory respondents.  This decision was not supported by substantial evidence and was not in accordance with the law.

**Commerce Position:**  We continue to find that the four largest exporters by volume with enjoined entries subject to the instant litigation were (highest volume to lowest volume) Wanda Boto, Hengyu, Mayrun, and Winrun.  As an initial matter, YC Rubber's contention that Commerce's reliance on POR import volume to rank respondents is somehow contrary to the law or the Court's findings is inaccurate.  The Court found that "Commerce's decisions to limit its selection of mandatory respondents to those with suspended entries and look at the largest overall volume of imports are supported by substantial evidence and otherwise in accordance with law."[60]  The Court also found that "Commerce's use of the total volume of entries (rather than the suspended volume of entries) for the order of selection, such a basis is consistent with section 777A(c)(2) of the Tariff Act of 1930, as amended (the Act), which instructs Commerce to select the exporters or producers to examine on the basis of those accounting for the largest volume of the subject merchandise from the exporting country."[61]

In its *Second Remand Order*, the Court noted that Commerce did not adequately explain its decision to distinguish between Kenda Rubber (China) Co., Ltd. and [                    ].[62]  In the Draft Remand Results,[63] we explained our methodology.  Generally, during respondent selection, Commerce considers minor variations in names to be limited to issues like the

---

[60] *See Second Remand Order* at 4.
[61] *Id.* at 4.
[62] *Id.* at 23.
[63] *See* Draft Remand Results at 5-6.

omission of periods in abbreviations or the omission of corporate abbreviations (like "Co.").[64]

Commerce did not aggregate entries for [          ] with Kenda Rubber (China) Co., Ltd.

because we did not consider the lack of the word "[      ]" to be a minor variation as described

above.[65]  At the time of respondent selection, there was limited information on the record with

respect to whether companies with distinct data entries in the CBP data were distinct entities.

Here, at the time of respondent selection in the *First Remand Results*, the record showed that

Kenda Rubber (China) Co., Ltd. rather than [              ] was the official name of the

company subject to the underlying review and covered by the relevant injunction.[66]  Specifically,

Kenda Rubber (China) Co., Ltd. self-requested an administrative review.[67]  In addition, Kenda

Rubber (China) Co., Ltd. submitted an SRC.[68]  Further, the company official certification

attached to Kenda's SRC was signed by Kenda Rubber (China) Co., Ltd.'s chairman.[69]  The SRC

document indicates that Kenda Rubber (China) Co., Ltd. is the company's official name shown

in its business license.[70]  Finally, as noted in the Draft Remand Results, Kenda Rubber (China)

Co., Ltd. sought an injunction on entries from Kenda Rubber (China) Co., Ltd.[71]

---

[64] *See, e.g., Sugar from Mexico: Final Determination of Sales at Less Than Fair Value*, 80 FR 57341 (September 23, 2015) (*Sugar from Mexico*), and accompanying IDM at fn 53 ("We note that the Department does routinely accounts for minor variations in company names and aggregates CBP entry data related to the same company (*e.g., Company X versus Company X Ltd.*) ….") (emphasis added).
[65] *See, e.g., Shrimp from Thailand* IDM at 61-62. ("However, we did not combine export quantities with respect to Thai Royal because the differences in the names in the CBP data were not a minor punctuation or spelling difference but the significant difference of the omission of a substantive word.  We found this significant difference in the names to be a determinative factor in our decision, and we did not proceed to combine such entries based on the other details attached to these specific entries.  It is important to note that respondent selection decisions must be made early in an investigation and prior to developing a fulsome record.  In this regard, the Department did not have time to investigate the significant differences in the names for Thai Royal but instead had to make a decision about which export quantities to combine based on the limited record before it.").
[66] *See, e.g.*, Kenda SRC.
[67] *See* Kenda Letter, "Requests for Administrative Review," dated August 31, 2017 (Kenda Review Request).
[68] *See* Kenda Letter, "Separate Rate Certification of Kenda Rubber (China) Co., Ltd.," dated November 15, 2017 (Kenda SRC).
[69] *See* Kenda SRC at 3.
[70] *Id.* at attachment 1.  We note that in its SRC, Kenda Rubber (China) Co., Ltd. shortened its name to "Kenda China" rather than "Kenda Rubber," for example.
[71] *See* Draft Remand Results at Attachment (citing CBP Message 9184306, "Statutory Injunction," dated July 3, 2019 (CBP Message 9184306)).

YC Rubber and Mayrun argue that Commerce should not have based respondent selection solely on Kenda Rubber (China) Co., Ltd.'s entries, as doing so fails to comply with the Court order. Finally, YC Rubber argues that Commerce's failure to follow its established practice for respondent selection (*i.e.*, aggregate entries for [          ] with Kenda Rubber (China) Co., Ltd.) at the time of respondent selection is an unacceptable agency practice.[72]

As an initial matter, Commerce selected four companies (*i.e.*, (1) Wanda Boto;[73] (2) Hengyu;[74] (3) Mayrun;[75] and (4) Winrun[76]) prior to selecting Kenda Rubber (China) Co., Ltd.[77] During this time, no party commented on the CBP data used to select these companies, a process which took several months. Despite the substantial information on the record with respect to Kenda Rubber (China) Co., Ltd. at the time Kenda Rubber (China) Co., Ltd. was selected as a mandatory respondent, YC Rubber[78] and Mayrun[79] continue to argue that Commerce's practice requires that Commerce should have considered [          ]'s entries as part of Kenda Rubber (China) Co., Ltd.'s entries. As noted above, the record shows that no interested party submitted comments on the CBP data during the respondent selection process in the underlying review or the first remand[80] that discussed Kenda Rubber (China) Co., Ltd.[81] Thus, YC Rubber and Mayrun are unable identify any information on the record at the time Commerce selected Kenda Rubber (China) Co., Ltd. as a mandatory respondent in this remand redetermination to support its *post hoc* arguments.

---

[72] *See* YC Rubber Comments at 14 (citing *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012)).
[73] *See* Wanda Boto RSM.
[74] *See* Hengyu RSM.
[75] *See* Mayrun RSM.
[76] *See* Winrun RSM.
[77] *See* Kenda RSM.
[78] *See* YC Rubber Comments at 4-19.
[79] *See* Mayrun Comments at 6-11.
[80] *See First Remand Results* at 2-5.
[81] *See* Petitioner Letter, "Respondent Selection Memorandum," dated April 8, 2018. These comments did not address Kenda Rubber (China) Co., Ltd.

Contrary to YC Rubber's and Mayrun's arguments pertaining to whether Commerce followed its established respondent selection practice, in the *First Remand Results*, Commerce followed its standard respondent selection practice, though we acknowledge that we inadvertently excluded Linglong from consideration. As noted above, this error was remedied in the Draft Remand Results. As YC Rubber observes, Commerce's practice is to place CBP data on the record, and allow for the submission of record evidence concerning which CBP data entries should be combined for respondent selection purposes.[82] The record of the underlying review shows that Commerce placed CBP data on the record and solicited comments/information.[83] YC Rubber has argued that Commerce normally considers comments and information concerning the appropriate combination of CBP data entries when selecting respondents.[84] YC Rubber's argument that Commerce did not solicit comments on respondent selection thereby depriving parties of specific opportunity to provide input is inapposite.[85] As a general matter, parties are free to submit comments at any time unless the regulations or Commerce set a specific deadline. Indeed, as noted above, no party, including YC Rubber, submitted comments on respondent selection in the instant remand, which they were permitted to do even absent an explicit solicitation for comments.[86]

YC Rubber further argues that Commerce does not insist on rigid disaggregation based on company nomenclature in CBP data when the record provides a compelling evidentiary basis to combine entries.[87] Again, at the time we selected Kenda Rubber (China) Co., Ltd. as a mandatory respondent, there was no information, compelling or otherwise, to combine entries

---

[82] *See, e.g.*, *Certain Corrosion Inhibitors from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review; 2022–2023*, 89 FR 22994 (April 3, 2024) (*Corrosion Inhibitors from China*), accompanying Preliminary Decision Memorandum (PDM) at 2.
[83] *See* CBP Data Memorandum.
[84] *See* YC Rubber Comments at 12-13.
[85] *Id.* at 18.
[86] *See* YC Rubber Respondent Selection Comments.
[87] *See* YC Rubber Comments at 12-13.

from [                    ]'s with Kenda Rubber (China) Co., Ltd.'s entries.  As such, YC Rubber's

citation to *WelCom Prods* to support its assertion that Commerce did not provide a reasonable

explanation for changing its practice and thus its actions were unacceptable is inapplicable as

Commerce did not depart from its established practice.[88]

      YC Rubber and Mayrun each argue that Commerce should have determined that Kenda

Rubber (China) Co., Ltd. and [

                                                            ] and that Commerce's practice when

evaluating export volumes for respondent selection is that it "routinely accounts for minor

variations in company names and aggregates CBP data related to the same company"[89] including

company names having "minor punctuation or spelling difference{s},"[90] as well as inconsistent

parenthetical information.[91]

      As an initial matter, the fact that entries for Kenda Rubber (China) Co., Ltd. and [

                                                  ] is not, in and of itself, a compelling

reason for combining the two sets of entries.  As noted in the Draft Remand Results, Commerce

does combine entries of names with entries [                                    ] when the

name variations are the result of minor punctuation, or spelling differences, or inconsistent

parenthetical information.[92]  Indeed, Commerce did aggregate the entries for three respondents

whose name variations were the result of minor punctuation or spelling differences, inconsistent

parenthetical information, or different word order.[93]  However, as noted in the Draft Remand

---

[88] *Id.* at 14 (citing *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d  1340, 1344 (CIT 2012) (*WelCom Prods*)).
[89] *Id.* at 12 (citing *Sugar from Mexico* IDM at 12 n.53).
[90] *Id.* at 12 (citing *Shrimp from Thailand* IDM at 62).
[91] *Id.* at 12 (citing *Forged Steel Fittings from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018–2019,* 86 FR 16186 (March 26, 2021) (*FSF from China*), accompanying PDM at 1 n.2 ("for purposes of respondent selection, we considered two of the initiated companies as the same company:  Both-Well (Taizhou) Steel Fittings Co., Ltd. and Both-Well Taizhou Steel Fittings Co., Ltd.")).
[92] *See* Draft Remand Results at Attachment.
[93] *Id.* at Attachment.

Results,[94] the issue is not a question of minor punctuation, or spelling[95] differences, or inconsistent parenthetical information.  Here, the issue involves the lack of the word "[        ]" which is a name variation more significant than minor punctuation, spelling differences, or inconsistent parenthetical information.[96]

Finally, as YC Rubber concedes,[97] *Shrimp from Thailand*, as cited in the Draft Remand Results,[98] supports Commerce's practice of not aggregating volumes from companies where one name is missing a substantive word.  In *Shrimp from Thailand*, Commerce stated:

> … the differences in the names in the CBP data were not a minor punctuation or spelling difference but the significant difference of the omission of a substantive word.  We found this significant difference in the names to be a determinative factor in our decision, and we did not proceed to combine such entries based on the other details attached to these specific entries.[99]

Also, as noted in our Draft Remand Results, another illustration of our practice regarding minor name variations concerns Shandong Wanda Boto Tyre Co. Ltd.  Commerce did not include volumes for [

] when aggregating entries as we did not consider the words [

] to constitute minor name variations.[100]

We also disagree with YC Rubber's contention that the word "[        ]" is merely a reference to [

].[101]

There is no information on the record to support YC Rubber's contention that the word "[        ]" Kenda Rubber (China) Co., Ltd. is merely a reference to [                    ].  As

---

[94] *Id.* at 5.
[95] *See* YC Rubber Comments at 12 (citing *Sugar from Mexico* IDM at 12 n.53).
[96] *Id.* at 12 (citing *FSF from China* PDM at 1).
[97] *Id.* at 13.
[98] *See* Draft Remand Results at Attachment.
[99] *See Shrimp from Thailand* IDM at 62.
[100] *See* Draft Remand Results at 5.
[101] *See* YC Rubber Comments at 13-14.

discussed above, there is, however, substantial evidence on the record that the word [      ] is a

significant word in Kenda Rubber (China) Co., Ltd.'s official name.  Kenda Rubber (China) Co.,

Ltd. self-requested an administrative review.[102]  Kenda Rubber (China) Co., Ltd. submitted an

SRC.[103]  The company official certification attached to Kenda's SRC was signed by Kenda

Rubber (China) Co., Ltd.'s chairman.[104]  The SRC document indicates that Kenda Rubber

(China) Co., Ltd. is the company's full name shown in its business license.[105]  As noted in the

Draft Remand Results, Kenda Rubber (China) Co., Ltd. sought an injunction on entries exported

by Kenda Rubber (China) Co., Ltd.[106]

    YC Rubber and Mayrun are correct in that Commerce ultimately determined that Kenda

Rubber (China) Co., Ltd. sold [      ] tires during the POR,[107] a volume significantly higher than

that shown in the CBP data used for respondent selection.  Similarly, YC Rubber also notes that

Kenda Rubber (China) Co., Ltd. reported [      ] tires exported during the POR on June 23,

2023, some 105 days after Commerce selected Kenda Rubber (China) Co., Ltd. as a mandatory

respondent on March 10, 2023.[108]  YC Rubber also points out that the volume of export price

sales and constructed export price sales in the U.S. sales database that Kenda Rubber (China)

Co., Ltd. submitted on June 23, 2023[109] (again, 105 days after Commerce selected Kenda Rubber

(China) Co., Ltd. as a mandatory respondent on March 10, 2023) tied to entries in the CBP

data.[110]  YC Rubber then argues that Commerce is tasked with defending its respondent selection

now, on this record, and not going back in time to defend its selection at an earlier point in time.

---

[102] *See* Kenda Review Request.
[103] *See* Kenda SRC.
[104] *Id.* at 3.
[105] *Id.* at attachment 1.
[106] *See* Draft Remand Results at Attachment (citing CBP Message 9184306).
[107] *See* Memorandum, "Draft Remand Analysis Memorandum for Kenda Rubber (China) Co., Ltd. for the 2016-2017 Administrative Review," dated July 25, 2023 (unchanged in *First Remand Results*).
[108] *See* YC Rubber Comments at 9-10 (citing Kenda's Letter, "Kenda First Supplemental Questionnaire Response: Question 2, 3 and 5-12, Case No. A-570-016 (Remand), dated June 23, 2023 at Exhibit SC-2 (Kenda CQR).
[109] *See* Kenda CQR.
[110] *See* CBP Data Memorandum.

Commerce must now on second remand reconsider the order of {its} respondent selection" after Kenda Rubber submitted its questionnaire responses.[111]  YC Rubber contends the statute, and this Court require that Commerce engage with the record evidence as it currently stands.[112]

We disagree with YC Rubber.  Section 777A(c) of the Act does not direct Commerce to revisit a respondent selection redetermination when that determination was based on the selection of the largest producer or exporter.[113]  Respondent selection is based on the information available at the time of selection.  Moreover, as noted in the Draft Remand Results,[114] Commerce does not normally reconsider respondent selection determinations after they are made.  Rather, the selection process is intended for Commerce to examine a reasonable number of exporters or producers based on information available at the time the respondent analysis is conducted, rather than information that becomes available during the course of a proceeding.[115]  There is nothing in the statutory framework that requires Commerce to revisit its respondent selection determination based on information obtained during the course of the investigation.[116]  Indeed, we do not typically receive additional information regarding the mandatory respondent's quantity and volume of subject merchandise exports until after we select the respondent as a mandatory based on CBP data.  Here, the information that YC Rubber points to support its argument that we improperly did not treat Kenda Rubber (China) Co., Ltd. as the second largest producer/exporter was not available *at the time we selected* Kenda Rubber (China) Co., Ltd. as a mandatory respondent in the first remand because we did not receive Kenda Rubber (China) Co., Ltd.'s initial questionnaire response[117] in which it reported its quantity and value information

---

[111] *See* YC Rubber Comments at 19.
[112] *Id.* at 17.
[113] *See* section 777A(c) of the Act.
[114] *See* Draft Remand Results at 6.
[115] *See, e.g., Certain Uncoated Groundwood Paper from Canada:  Final Determination of Sales at Less Than Fair Value,* 83 FR 39412 (August 9, 2018), and accompanying IDM at Comment 2.
[116] *See* section 777A(c) of the Act.
[117] *See* Kenda Letter, "Kenda's Response to Section A and Double Remedy Questionnaire," dated April 17, 2023, at Exhibit A-1 (Kenda's AQR).

until after Commerce selected Kenda Rubber (China) Co., Ltd. as a mandatory respondent on March 10, 2023.[118]  In fact, the Court has previously affirmed Commerce's determination not to revisit respondent selection determinations late in a proceeding.[119]  Specifically, the Court in *Kyocera Solar* upheld Commerce's explanation that under the statute "respondent selection determination must be based on information that *is known and available at the time of selection*," notwithstanding information gained during the court of the investigation.[120]  The Court in *Kyocera* also found that sections 777A(c)(2)(A)-(B) of the Act supported this position by including the limiting phrase "based on information available to Commerce at the time of selection."[121]  In this regard, Mayrun's reliance on *CS Wind Vietnam Co.* and *Star Pipe Prods.* is unpersuasive.[122]

In addition, Mayrun's reliance on *PrimeSource Bldg. Prods.* to assert that Commerce failed to calculate dumping margins "as accurately as possible" is inapposite.[123]  There is no evidence on the record which indicates that the dumping margin calculated for Kenda Rubber (China) Co., Ltd.  China is inaccurate.

Finally, when the Court stated that questions remain as to whether Linglong had a higher volume of entries than Kenda Rubber (China) Co., Ltd for the relevant period, it compared the volume of entries in the CBP data to the volume shown in the Kenda Rubber (China) Co., Ltd.'s respondent selection memorandum (which was also based on CBP data).[124]  Contrary to YC

---

[118] We note that Commerce selected Kenda Rubber (China) Co., Ltd. as a mandatory respondent after Mayrun, Hengyu, Winrun, and Wanda Boto each declined to participate as a mandatory respondent in the first remand.

[119] *See Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States*, 253 F. Supp. 3d 1294, 1218 (CIT July 21, 2017) (*Kyocera Solar*) (The Court affirmed Commerce's position that there is no indication in the statute that the respondent selection process will evolve as proceedings evolve and that Commerce makes respondent selection decisions based on the information available to it at the time of selection.).

[120] *Id.,* 253 F. Supp. 3d at 1318 (emphasis added).

[121] *Id.*

[122] *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) (*CS Wind Vietnam Co.*);  *see also Star Pipe Prods. v. United States*, 365 F. Supp. 3d 1277 (Fed. Cir. 2016) (*Star Pipe Prods.*).

[123] *See* Mayrun Comments at 7; *see also PrimeSource Bldg. Prods. v. United States*, 2024 U.S. App. LEXIS 19746 (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370) (*PrimeSource Bldg. Prods.*).

[124] *See Second Remand Order* at 23.

Rubber's claim that the Second Draft Remand fails to comply with the Court order in this regard, the Court did not instruct Commerce to consider Kenda Rubber (China) Co., Ltd.'s questionnaire responses in determining whether Linglong had a higher volume of entries than Kenda Rubber (China) Co., Ltd. for the relevant period.

**Comment 2:  Separate Rate Status**

The following is a verbatim summary of argument submitted by YC Rubber, Sutong and ITG Voma.  For further details *see* YC Rubber comments at 20-27.

> The Draft Second Remand should further be corrected to reinstate the separate rate status of respondents, including Shandong Hengyu Science & Technology Co., Ltd. ("Hengyu"), Winrun Tyre Co., Ltd. ("Winrun"), Shandong Wanda Boto Tyre Co., Ltd. ("Boto"), and Shandong Linglong Tyre Co., Ltd. ("Linglong"), that Commerce previously confirmed are entitled to a separate rate.  These entities' qualification for a separate rate was never challenged or questioned in the underlying final results and thus may not be reopened in this remand proceeding.  Moreover, Commerce's comparison of a Section A questionnaire to a supplemental {SRC} questionnaire contravenes both the CIT's remand order and established judicial precedent.  Commerce may not strip separate-rate status based on a respondent's failure to answer questions unrelated to issues of government control.  Further, Commerce's denial of a separate rate is unduly punitive and arbitrary and capricious, particularly when Commerce issued questionnaires six years after the POR in question ended.  Commerce's action amounts to an unlawful application of adverse inferences.  Commerce should confirm that these entities continue to qualify for the separate rate, and the Kenda rate should be applied to their entries.

The following is a verbatim summary of argument submitted by Mayrun.  For further details *see* Mayrun Comments at 8-11.

> Commerce improperly revoked Mayrun's separate rate status for its inability to act as a mandatory respondent during the remand.  Mayrun complied with applicable legal requirements for record retention, which made it unable to provide data from over seven years ago.  This inability should not be deemed as non-cooperation nor justify assigning the China-wide rate. Commerce's reopening of the record and requesting outdated information without justification was arbitrary and capricious, and not in accordance with the law.

**Commerce Position:** We disagree with YC Rubber's and Mayrun's contention that Commerce's analysis in the Draft Remand Results does not respond to the Court's concerns, and that Commerce should correct the Draft Remand Results to reinstate the separate rate status of these entities under review.  We also disagree with YC Rubber's contention that information in a

section A questionnaire response is not useful in assessing whether the presumption of government control of export activities has been rebutted (*i.e.*, (1) whether the company's export sales prices are set by, or are subject to the approval of, a government agency; (2) whether the company has the authority to negotiate and sign contracts and other agreements; (3) whether the company has autonomy from the government in making decisions regarding selection of management; and (4) whether the company retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses).  Our analysis in the Draft Remand Results explains why information in the section A response is highly relevant in assessing whether the presumption of government control of export activities has been rebutted.[125]

As YC Rubber notes, Commerce examines information in a section A response to determine whether an entity is engaging in dumping and to conduct a comprehensive review of that entity's corporate organization, accounting practices, sales markets, and merchandise for sale.[126]  Some of this information (*e.g.*, sales markets) may not inform our separate rate analysis and is not generally required of parties that submit SRA and SRCs.  However, we disagree with YC Rubber's apparent contention that the fact that other information in a section A response is used to assess whether a company is engaged in dumping[127] somehow obviates its usefulness with respect to assessing whether the presumption of government control of export activities has been rebutted.  Commerce routinely relies on certain information found in the section A response to assess whether the presumption of government control of export activities has been rebutted.[128]  Namely, Commerce's full section A questionnaire asks more detailed questions

---

[125] *See* Draft Remand Results at 7-14.
[126] *See* YC Rubber Comments at 22.
[127] *Id.*
[128] *See, e.g., Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2016-2017*, 83 FR 45893 (September 11, 2018) and accompanying PDM at 10 (Commerce received a

specifically about corporate structure than the separate rate application or certification. It asks for an organizational chart on affiliation and has more comprehensive questions about manufacturing facilities, locations, legal structure, third parties, narrative history, capital verification reports, and other information in addition to ownership and affiliation.[129] Further, Commerce's section A questionnaire requests information that supports claims that a respondent retained the proceeds of their export sales and made independent decisions regarding the disposition of profits or financing of losses.[130] In addition to requesting more data about the company's corporate structure in the initial questionnaire, Commerce frequently will issue supplemental questionnaires to learn even more details about the affiliations and structure of the respondent being examined. In essence, much of Commerce's section A questionnaire is akin to a more detailed request for information to supplement the separate rate application or certification and allows Commerce to confirm or clarify claims made in a separate rate certification or application. In addition, full participation in the proceeding overall is necessary to allow Commerce to be able to verify any information relevant to determining separate rate eligibility. Accordingly, if a respondent selected for individual examination fails to fully respond to Commerce's questionnaires and participate fully in the proceeding, Commerce determines that it also has failed to demonstrate its eligibility for a separate rate.

Finally, we also reject YC Rubber's argument that the size difference between a typical section A response and separate rate supplemental response has any bearing on the former's usefulness in assessing whether the presumption of government control of export activities has been rebutted.

---

completed response to the Section A portion of the NME questionnaire from mandatory respondent Junhong, which contained information pertaining to the company's eligibility for a separate rate.) unchanged in *Final Results*.

[129] *See* Commerce Letter, "Antidumping Duty Questionnaire and Double Remedy Questionnaire for Kenda," dated March 10, 2023 (Kenda Initial Questionnaire) at A1-A-7.

[130] *Id*.

YC Rubber points to a number of CIT cases where the Courts have found that Commerce cannot deny a separate rate status because the company failed to provide information or provided unreliable information unrelated to its separate rate status.[131]  These cases are inapplicable because here we have explained how certain missing information requested in the questionnaire relate to the *de facto* government control analysis that is part of Commerce's separate rate analysis and why full participation is necessary for Commerce's evaluation of a mandatory respondent's separate rate status.  We also find that YC Rubber and Mayrun's continued reliance on *Changzhou Hawd*[132] to justify why Wanda Boto, Hengyu, Winrun and Linglong did not respond to Commerce's questionnaire, including the section A response relevant to each company's separate rate status, be misplaced.  In *Changzhou Hawd*, the Court concluded that it was "arbitrary and capricious for Commerce to now launch an individual investigation of Changzhou Hawd" approximately three and a half years after the initial investigation.  As the Court held, *Changzhou Hawd* is inapposite as it is a non-precedential CIT decision which predates *YC Rubber II*, which is a binding Federal Circuit opinion.[133]  The Court also found:

> Although several years have passed since Commerce conducted the underlying administrative review, the exporters and producers subject to the review are either parties to this litigation or export to parties to this litigation and should have been aware of the ongoing litigation, which centered, in no small part, around the selection of a second mandatory respondent.  Thus, the passage of time does not compel Commerce to refrain from selecting a second mandatory respondent.[134]

Similarly, YC Rubber's reliance on *Linyi Chengen*[135] to support its argument that Commerce is "penalizing separate-rate respondents" having required questionnaire responses

---

[131] *See* YC Rubber Comments at 23-24 (citing *e.g.*, *Hubbell Power Sys., Inc. v. United States, 365 F. Supp. 3d 1302, 1309* (CIT 2019); *and American Mfrs. of MLWF v. United States*, CIT Consol. Case No. 21-00595, Remand Order (March 21, 2023).

[132] *See* YC Rubber Comments at 24 and Myrun Comments at 7-8. (citing *Changzhou Hawd Flooring Co. v. United States,* 44 F. Supp. 3d 1376, 1391 (CIT 2015) (*Changzhou Hawd*)).

[133] *See Second Remand Order* at 18-19.

[134] *Id.* at 19.

[135] *See* YC Rubber Comments at 26 (citing *Linyi Chengen Imp. & Exp. Co. v. United States*, 609 F. Supp. 3d 1392, 1404 (CIT 2022) ("Commerce is not permitted to create a scarcity of information, to use that scarcity as justification

here is unpersuasive. Our decision to select an additional mandatory respondent in the first remand was not an attempt to penalize Wanda Boto, Hengyu, Winrun, Linglong, and Hengyu. Rather Commerce's selection of additional mandatory respondents was a reasonable method for complying with the Federal Circuit's remand and was upheld by the Court.[136] Thus, whether the issue of separate rate eligibility was raised in the underlying review is irrelevant, because as discussed in the *First Remand Results*, once Commerce restarted its respondent selection process, the issue of separate rate eligibility remained open.[137] Further, YC Rubber's arguments about the passage of time[138] have been rejected by the Court.[139] We also disagree with YC Rubber's and Mayrun's arguments that Commerce had no "lawful basis to apply" adverse facts available (AFA) to Wanda Boto, Hengyu, Winrun, Linglong, and Hengyu, each of which demonstrated their eligibility for a separate rate in the underlying review, and that the extensive passage of time, accompanying data, and personnel difficulties are Commerce's fault.[140] Commerce did not apply AFA to Wanda Boto, Hengyu, Winrun, Linglong, and Hengyu. Rather, we found that these companies had failed to rebut the presumption of government control.[141]

Thus, we continue to find Wanda Boto, Hengyu, Winrun, Linglong, and Hengyu to be part of the China-wide entity. For this reason, YC Rubber's arguments about calculating a separate using only Kenda's rate (rather than weight averaging Junhong's and Kenda's rates) is moot.

**Comment 3: Withdrawal Requests**

---

for its determination, and to claim that a constraint on resources prevents further examination, while ignoring potentially contrary evidence on the record.")).

[136] *See Second Remand Order* at 19.

[137] *See First Remand Results* at 30-33.

[138] *See* YC Rubber Comments at 25.

[139] *See e.g.*, *Second Remand Order* at 18 ("The passage of time does not detract from Commerce's decision to select a second mandatory respondent" and "the exporters and producers subject to review are either parties to this litigation or export to parties to this litigation and should have been aware of the ongoing litigation, which centered, in no small part, around the selection of a second mandatory respondent.").

[140] *See* YC Rubber Comments at 25-26.

[141] *See First Remand Results* at 30-33.

The following is a verbatim summary of argument submitted by YC Rubber, Sutong and ITG Voma.  For further details *see* YC Rubber comments at 30-34.

> Although these withdrawals were filed outside the deadline, the criteria articulated by the {Federal Circuit} as to when {Commerce} is compelled to accept untimely withdrawal requests are satisfied because:  (1) at the time of the initial withdrawal deadline, the final results of the preceding review were not known; and (2) at the time the withdrawals were filed, {Commerce} had not expended significant administrative resources to review those companies.  Moreover, this simple and reasonable resolution is compelled by the unique circumstances presented in this case in which the respondents seeking withdrawal demonstrated their inability to participate years after the-fact on account of bankruptcy, destroyed records, and the passage of time.  The CIT specifically ordered that {Commerce} consider this "fresh question" on remand.  The Draft Second Remand does not explain its continued unwillingness to implement this simple and fair means of resolving this matter for these respondents, especially since if finalized,{Commerce's} Second Remand would constitute unreasonable agency action.

The following is a verbatim summary of argument submitted by Mayrun.  For further details *see* Mayrun Comments at 11-13.

> Mayrun's renewed request to withdraw from the review during the remand was improperly ignored by Commerce.  The remand presented "extraordinary circumstances" in part because Commerce reverted to the respondent selection stage.  Commerce failed to address Mayrun's renewed withdrawal request, which required Commerce's consideration and determination.

**Commerce Position:**  To the extent that YC Rubber[142] and Mayrun[143] continue to argue the issue of their initial requests to withdraw the review requests during the underlying administrative review, we note that the Court previously reviewed and affirmed Commerce's denial of the withdrawal requests and that holding was unaltered by the Federal Circuit.[144]

We have considered the arguments Mayrun,[145] Hengyu,[146] and Winrun[147] advanced to renew their withdrawal requests and continue to decline to accept their untimely review

---

[142] *See*, *e.g.*, YC Rubber Comments at 30-33.

[143] *See*, *e.g.*, Mayrun Comments at 11-12.

[144] *See First Remand Order*.

[145] *See* Mayrun's Letter, "Mayrun Tire (H.K.) Ltd.: Renewed Request to Withdraw from Review," dated February 16, 2023, at 4.

[146] *See* Hengyu's Letter, "Response to the Department's Request to Notify," dated February 24, 2023, at 2.

[147] *See* Winrun's Letter, "Winrun Response to Department Letter of March 3, 2023 Passenger Vehicle and Light Truck Tires from China," dated March 10, 2023, at 2.

withdrawal requests.  We also have considered Linglong's renewed withdrawal request[148] and continue to deny this untimely request.  Finally, we have considered the arguments made by YC Rubber[149] and Mayrun[150] and continue to deny the untimely requests at issue.

As noted in the Draft Remand Results, Hengyu, Winrun, and Linglong each renewed their request for withdrawal after being selected for individual examination and then stating that they would not or could not participate as mandatory respondents.  Commerce "may extend this time limit if {the agency} decides that it is reasonable to do so."[151]  Commerce continues to not find it reasonable to accept an untimely withdrawal request on the basis that parties for which a review was requested are unwilling or unable to participate in the review due to the passage of time or bankruptcy during ongoing litigation.  With respect to Mayrun, it renewed its request for review before we selected it as a mandatory respondent and informed Commerce that it would not participate as a mandatory respondent, citing the posture of this remand.[152]  Mayrun argued that "the decision to "re-start the review{ } and return to the stage of mandatory respondent selection" makes "{t}he instant remand unique" because the "prior timeline" has been "effectively swept away."[153]  For all four respondents' withdrawal requests, Commerce continues to not find it appropriate to accept these untimely withdrawal requests where the parties based their renewed requests on, among other things, the passage of time and new selection of an additional mandatory respondent as a result of litigation.  The separate rate Commerce assigned in the underlying administrative review was challenged before the Court; when the case reached the Federal Circuit, the appellate court considered the question before it to be "whether the statute permits Commerce to review a single exporter or producer when multiple

---

[148] *See* Linglong Response to Questionnaire.
[149] *See* YC Rubber Comments at 33-34.
[150] *See* Mayrun Comments at 12-13.
[151] *See* 19 CFR 351.213(d)(1).
[152] *See* Mayrun Letter, "Renewed Request to Withdraw from Review," dated February 16, 2023, at 4.
[153] *Id.*

have requested review and Commerce has not demonstrated that it was otherwise reasonable to calculate the all-others rate based on only one respondent,"[154] found that "Commerce erred in restricting its examination to only one exporter/producer"[155] in this case, and vacated Commerce's decision for the Court to remand to Commerce.  On remand, Commerce selected an additional respondent and the Court held that Commerce's "selecting a second respondent was in accordance with law,"[156] considering and addressing the manner of the selection in its opinion.[157] In light of the above activities in this case and court findings, Commerce does not find parties' arguments about the passage of time to be persuasive bases for accepting untimely withdrawals of requests for review.  The passage of time between a court challenge and resolution of the challenge is foreseeable and typical, and it is reasonable for Commerce to determine that these reasons are not sufficient to warrant acceptance of an untimely withdrawal request."[158]

Accepting Mayrun's withdrawal request made in the first remand before its selection as a mandatory respondent would have reduced the pool of potential second respondents from six companies to five companies potentially hindering Commerce's ability to comply with the *First Remand Order*.[159]  Commerce has recognized that respondents cannot be allowed to potentially abuse the review procedures by electing to continue participation only to the extent assured that the results of a review will be favorable to their interests.[160]  Moreover, this Court has recognized Commerce must have the ability to prevent a party from requesting a review and then withdrawing the request once it ascertains that the results are not likely to be in its favor as a

---

[154] *See YC Rubber Co. (N. Am.) LLC v. United States*, Court No. 2021-1418 (Fed. Cir. August 29, 2022) , at 3.
[155] *Id.*, Court No. 2021-1418 at 4.
[156] *See Second Remand Order* at 17.
[157] *Id.* at 19-24.
[158] *See* Mayrun Comments at 12-13.
[159] *See YC Rubber Co. (North America) LLC., et al v. United States*, Consol. Court No. 19-000069, Slip Op. 21-1489 (CIT February 2, 2023).
[160] *See, e.g.*, *Folding Metal Tables and Chairs from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 39680 (July 5, 2012), and accompanying IDM at Comment 1.

reason for not allowing untimely withdrawal requests.[161]  Allowing such a practice would permit gaming of U.S. AD laws, with respondents effectively selecting their own dumping rates by continuing participation in favorable reviews and withdrawing from proceedings not going their way.

YC Rubber's reliance on *Glycine*[162] to assert that Commerce must accept the untimely withdrawal requests is unpersuasive.  As noted above, the standard in *Glycine*, and the standard that Commerce utilized here on remand, is reasonableness.[163]  Specifically, the Federal Circuit in *Glycine* found that Commerce stated "the criteria for what would be a reasonable ground for extension reflects concerns for not wasting developmental resources, for giving parties an opportunity to know the results of prior administrative reviews when applicable … *among other considerations*."[164]  As discussed at length above, Commerce determined it was not reasonable to accept parties' untimely withdrawal requests based on the *Glycine* criteria, which included analyzing parties arguments on the passage of time, bankruptcy, or the procedural posture of this case.  Accordingly, Commerce continues to find it appropriate to decline to accept the untimely withdrawal requests.

**Comment 4:  Export Subsidy Adjustment**

The following is a verbatim summary of argument submitted by YC Rubber, Sutong and ITG Voma.  For further details *see* YC Rubber comments at 28-30.

> The Second Draft Remand commits an additional error by failing to adjust the China-wide rate with the appropriate countervailing duty (CVD) export subsidy offset.  Commerce found that the margins for Kenda and Zhaoqing Junhong Co., Ltd ("Junhong") should both be adjusted to account for the CVD offset, and the China-wide rate must thus be adjusted as well.  The governing statute and agency precedent confirm Commerce's obligation to apply an export subsidy adjustment.  Here, Commerce adjusted the margins of Junhong and Kenda Rubber to account for export subsidies—the agency must do the same for the China-wide and separate rates.

---

[161] See First Remand Order at 32.
[162] *See Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018) (*Glycine*).
[163] *Id.*, 880 F.3d at 1345.
[164] *Id.*, 880 F.3d at 1340.

No other interested party commented on this issue.

**Commerce Position:**  We agree with YC Rubber that we inadvertently did not adjust the China-wide rate with the appropriate CVD export subsidy offset in accordance with the statute.[165]  Thus, we have adjusted the cash deposit rate applicable to the China-wide entity for combined export subsidies and estimated domestic subsidy pass-through of 11.13 percent.[166]

## V.  FINAL RESULTS OF REDETERMINATION

We continue to find that, in the *First Remand Results*, Commerce correctly selected a second mandatory respondent in the following order:  (1) Wanda Boto; (2) Hengyu; (3) Mayrun; and (4) Winrun.  We find Wanda Boto, Mayrun, Hengyu, Winrun, and Linglong continue to be part of the China-wide entity.  We continue to find that it is inappropriate to accept the untimely review withdrawal requests filed by Mayrun, Hengyu, and Winrun, including Linglong's renewed withdrawal request.  Finally, we have recalculated the cash deposit rate applicable to the China-wide entity to account for combined export subsidies and estimated domestic subsidy pass-through of 11.13 percent.  The following estimated weighted-average dumping margin remains in effect for the POR:

---

[165] *See* section 772(c) (1)(C) of the Act.
[166] *See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 FR 34893 (June 18, 2015), unchanged in *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China:  Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 80 FR 47902 (August 10, 2015).

| Exporter | Weighted-Average Dumping Margin (percent) | Cash Deposit Rate |
|---|---|---|
| China-wide Entity[167] | 87.99 | 76.86[168] |

If Commerce's final results of redetermination are sustained by the Court, Commerce intends to publish a *Timken*[169] notice with the amended final determination in the *Federal Register* and issue appropriate customs instructions to CBP, consistent with the discussion above.

10/28/2024

X _Ryan M_____

Signed by: RYAN MAJERUS

Ryan Majerus,
Deputy Assistant Secretary
  for Policy and Negotiation,
  performing the non-exclusive functions and duties
  of the Assistant Secretary, Enforcement and Compliance.

---

[167] The China-wide entity includes:  Mayrun Tyre (Hong Kong) Limited; Shandong Hengyu Science & Technology Co., Ltd.; Shandong Wanda Boto Tyre Co., Ltd.; Winrun Tyre Co., Ltd. and Shandong Linglong Tyre Co., Ltd.
[168] We have adjusted the cash deposit rate applicable to the China-wide entity by the combined export subsidy rate and estimated domestic subsidy pass-through rate of 11.13 percent from the investigation.
[169] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*); *see also Diamond Sawblades Manufacturers Coalition v. United States,* 626 F.3d 1374 (Fed. Cir. 2010).

**ATTACHMENT**

| Company Name Subject to Review[170] | Company Name Covered by Injunction | Company Name and Minor Variations in CBP Data whose Volumes were Aggregated[171] | Aggregated Volume of Tires in CBP Data[172] |
|---|---|---|---|
| Shandong Wanda Boto Tyre Co. Ltd. | Shandong Wanda Boto Tyre Co. Ltd.[173] | [ ] [ ] [ ] | [ ] |
| Shandong Hengyu Science & Technology Co., Ltd. | Shandong Hengyu Science & Technology Co., Ltd.[174] | [ ] | [ ][175] |
| Mayrun Tyre (Hong Kong) Limited | Mayrun Tyre (Hong Kong) Limited[176] | [ ] [ ] | [ ] |
| Winrun Tyre Co., Ltd. | Winrun Tyre Co., Ltd.[177] | [ ] [ ] [ ] | [ ][178] |
| Shandong Linglong Tyre Co., Ltd. | Shandong Linglong Tyre Co., Ltd.[179] | [ ] | [ ] |
| Kenda Rubber (China) Co., Ltd. | Kenda Rubber (China) Co., Ltd.[180] | [ ] | [ ] |

---

[170] *See Final Results*.

[171] *See* CBP Data Memorandum.

[172] *Id*.

[173] *See* CBP Message 9148310, "Statutory Injunction for Sutong China Tire Resources," dated May 28, 2019; *see also* CBP Message 9161301, "Statutory Injunction for ITG Voma Corporation," dated June 10, 2019.

[174] *See* CBP Message 9148310, "Statutory Injunction for Sutong China Tire Resources," dated May 28, 2019.

[175] This total volume is 2,358 more tires than noted in Hengyu RSM. The difference in volumes would not have changed our selection order for Hengyu.

[176] *See* CBP Message 9158305, "Statutory Injunction for Mayrun Tyre (Hong Kong)," dated June 7, 2019.

[177] *See* CBP Message 9148309, "Statutory Injunction for YC Rubber Co. (North America) LLC," dated May 28, 2019.

[178] This total volume is 1,298 more tires than noted in the Winrun RSM. The difference in volumes would not have changed our selection order for Winrun.

[179] *See* CBP Message 9148310, "Statutory Injunction for Sutong China Tire Resources," dated May 28, 2019.

[180] *See* CBP Message 9184306.