A-570-016
Remand:  Slip Op. 25-64
POR:  8/01/2016 – 7/31/2017
**Public Version** ~~Business Proprietary Document~~
E&C/OVII:  JJZ

***YC Rubber Co. (North America) LLC., et al v. United States*,**
**Consol. Court No. 19-00069, Slip Op. 25-64 (CIT May 21, 2025)**
**Passenger Vehicle and Light Truck Tires from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

issued in *YC Rubber Co. (North America) LLC., et al v. United State*s, Consol. Court No. 19-

00069 (CIT May 21, 2025) (*Third Remand Order*).  This action arises out of the final results of

redetermination pursuant to the Court remand dated October 28, 2024 (*Second Remand Results*)[1]

with respect to the antidumping duty (AD) administrative review of passenger vehicle and light

truck tires from the People's Republic of China (China) for the period of review (POR) August

1, 2016, through July 31, 2017.[2]

In its *Third Remand Order*, the Court remanded Commerce's selection of Linglong

before Kenda as an individually examined respondent and subsequent decision to deny Shandong

Linglong Tyre Co., Ltd. (Linglong) separate rate status given that Linglong timely filed its

separate rate application (SRA)[3] and should not have been selected as a mandatory respondent in

---

[1] *See Final Results of Redetermination Pursuant to Court Remand, YC Rubber Co. (North America) LLC., et al v. United States*, Consol. Court No. 19-000069, Slip Op. 25-64 (CIT May 21, 2025), dated October 28, 2024 (*Second Remand Results*), available at https://access.trade.gov/public/FinalRemandRedetermination.aspx.
[2] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 17781 (April 26, 2019) (*Final Results*).
[3] *See* Linglong's Letter, "Separate Rate Application in the Administrative Review of the Antidumping Duty Order on Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated November 13, 2017 (Linglong's SRA).

the *Second Remand Results*.[4]  However, the Court sustained Commerce's denial of separate rate eligibility for Shandong Wanda Boto Tyre Co. Ltd. (Wanda Boto); Shandong Hengyu Science & Technology Co., Ltd. (Hengyu); Mayrun Tyre (Hong Kong) Limited (Mayrun); and Winrun Tyre Co., Ltd. (Winrun).[5]

## II.    BACKGROUND

In its *First Remand Results*,[6] Commerce relied on entry data from the U.S. Customs and Border Protection (CBP) to select an additional mandatory respondent based on their reported volumes of entries.  Commerce selected companies in the following order:  (1) Wanda Boto; (2) Hengyu; (3) Mayrun; and (4) Winrun.  Each of these four companies declined to participate in the *First Remand Results* and failed to submit responses to the Commerce's questionnaire.  Commerce then selected Kenda Rubber (China) Co., Ltd. (Kenda Rubber) as an additional mandatory respondent.  Kenda Rubber submitted responses to Commerce's questionnaires.  Commerce assigned:  (1) Kenda Rubber a weighted-average rate of 18.15 percent; (2) the China-wide rate of 87.99 percent to Wanda Boto, Hengyu, Mayrun, and Winrun; and (3) a separate rate of 41.36 percent to Linglong who was not selected as a mandatory respondent.[7]

In the *Second Remand Order*, the Court remanded Commerce's methodology surrounding its selection of a second mandatory respondent, finding that the order in which Commerce selected an additional mandatory was done in error, because Commerce did not appear to include Linglong in its list of possible mandatory respondents.[8]

---

[4] *See Third Remand Order* at 14.

[5] *Id.* at 15-18.

[6] *See Final Results of Redetermination Pursuant to Court Remand, YC Rubber Co. (North America) LLC., et al v. United States*, Consol. Court No. 19-000069, Slip Op. 21-1489 (CIT February 2, 2023), dated November 1, 2023 (*First Remand Results*).

[7] *Id.* at 36-37.  As we did not have Kenda Rubber's public ranged sales data on the record, we have used the simple average of Kenda Rubber's and Junhong's final AD rate as the separate rate *i.e.*, (64.57 percent + 18.15 percent) / 2 = 41.36 percent.

[8] *See YC Rubber Co. (North America) LLC., et al v. United States*, Consol. Court No. 19-00069 (CIT June 18, 2024) (*Second Remand Order*).

2

Commerce issued its *Second Remand Results* on October 28, 2024.[9]  While conducting the *Second Remand Results*, Commerce concluded that the CBP Data showed that Linglong had a higher volume of entries than Kenda Rubber.[10]  Based on this information, Commerce selected Linglong as an additional mandatory respondent.[11]  Linglong did not respond to the questionnaires, and Commerce therefore assigned it the China-wide entity rate.[12]

In its May 21, 2025, opinion, the Court noted the unusual nature of this proceeding and the challenges necessarily created by the timing of the reconsideration of respondent selection following the U.S. Court of Appeals for the Federal Circuit's decision in *YC Rubber II*.[13]  Given the information on the record because of the unusual timing of respondent selection in the *Second Remand Results*, the Court held that Commerce's finding that Linglong should have been selected as an additional respondent before Kenda Rubber based on CBP Data was unsupported by substantial evidence.[14]  The Court explained that, at the time of the *Second Remand Results*, Commerce had additional information from Kenda Rubber's questionnaire responses submitted during the *First Remand Result*s that demonstrated that Kenda Rubber had a higher volume of imports than Linglong.[15]  Accordingly, the Court held that Commerce did not properly consider the additional information of Kenda Rubber's reported sales volume before it in determining to select Linglong as an additional mandatory respondent before Kenda.[16]  Thus, the Court remanded Commerce's selection of Linglong before Kenda Rubber.

---

[9] *See Second Remand Results.*
[10] *See* Memorandum, "Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  U.S. Customs Entries," dated November 30, 2017 (AD Passenger Tires 2nd AR CBP Data).
[11] *See Second Remand Results* at 2.
[12] *Id.* at 36.
[13] *See Third Remand Order* at 10.
[14] *Id.* at 13-14.
[15] *Id.*
[16] *Id.*

In addition, the Court ordered that Commerce's determination regarding Linglong's separate rate eligibility, which would have been undisturbed had Linglong not been selected as a mandatory respondent and required to respond to the section A questionnaire, was also remanded for reconsideration or further explanation.[17]

On July 25, 2025, Commerce released its draft results of redetermination (Third Draft Remand Results) to interested parties for comment. On August 4, 2025, YC Rubber Co. (North America) LLC, Sutong Tire Resources, Inc., and ITG Voma Corporation submitted comments.[18]

## III. ANALYSIS

### A. Respondent Selection

Based on the record before Commerce during the *Second Remand Results*, Kenda Rubber had more imports than Linglong did during the underlying POR. In the instant case, the volumes of imports by Zhaoqing Junhong Co., Ltd. (Junhong)[19] and Kenda Rubber dwarfs that shown in the CBP Data for Linglong.[20] Namely, the record indicates that Kenda Rubber (China) Co., Ltd. sold [      ] tires during the POR[21] and that Linglong entered [      ] tires during the POR.[22] As such, the record indicates that Linglong should not have been selected as an additional mandatory respondent before Kenda in the *Second Remand Results*. On this basis, Commerce is no longer treating Linglong as a mandatory respondent. Based on this decision, we find that

---

[17] On August 6, 2024, Commerce selected Linglong as an additional mandatory respondent for purposes of the *Second Remand Results*. Commerce issued Linglong the standard questionnaire on August 7, 2024. *See Second Remand Results* at 2-3; *see also Third Remand Opinion* at 18.

[18] *See* YC Rubber Co. (North America) LLC, Sutong Tire Resources, Inc., and ITG Voma Corporation's Letter, "2016-2017 Administrative Review of the Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China: Comments Regarding Draft Results of Redetermination," dated August 14, 2025 (YC Rubber Comments).

[19] Junhong was the sole mandatory respondent in the underlying review to fully participate. *See Final Results*.

[20] Kenda Rubber's questionnaire response in the *First Remand Results* showed that it had substantially more entries than Linglong's volumes in shown the CBP Data. *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Draft Remand Analysis Memorandum for Kenda Rubber (China) Co., Ltd. for the 2016-2017 Administrative Review," dated July 25, 2023 (unchanged in *Final Remand Results)* (Kenda Analysis Memorandum); *see also* AD Passenger Tires 2nd AR CBP Data.

[21] *See* Kenda Analysis Memorandum.

[22] *See* AD Passenger Tires 2nd AR CBP Data.

Barcode:4811912-01 A-570-016 REM - Remand  -  Slip Op. 25-64

Linglong should not have been issued a questionnaire and that its failure to respond to that questionnaire is moot.  Further, we determine that Linglong is eligible for a separate rate, consistent with our finding in the underlying administrative review and as discussed below.

### B.  Separate Rates

As explained in the *Preliminary Results*,[23] in proceedings involving non-market economy (NME) countries, Commerce maintains a rebuttable presumption that all companies within the country are subject to government control and, therefore, should be assessed a single weighted-average dumping margin.[24]  In the *Initiation Notice*, Commerce notified parties of the process by which exporters may obtain separate rate status in the underlying review.[25]  This process requires entities that at the time did not have a separate rate from a completed segment of the proceeding to timely file a Separate Rate Application (SRA) to demonstrate eligibility for a separate rate in underlying proceeding.[26]

Commerce's policy is to assign all exporters of merchandise under consideration that are in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[27]  Commerce analyzes whether each entity exporting the merchandise under consideration is sufficiently independent under a test established in *Sparklers from China*[28] and further developed in *Silicon Carbide from China.*[29]

---

[23] *See, e.g., Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2016-2017*, 83 FR 45893 (September 11, 2018) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM), unchanged in *Final Results.*
[24] *See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 55039, 55040 (September 24, 2008).
[25] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 48051 (October 16, 2017) (*Initiation Notice*).
[26] *Id*.
[27] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers from China*).
[28] *Id.*
[29] *See Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) (*Silicon Carbide from China*).

5

According to this separate rate test, Commerce will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of both *de jure* and *de facto* government control over its export activities.  If, however, Commerce determines that a company is wholly foreign owned, then a separate rate analysis is not necessary to determine whether that company is independent from government control and eligible for a separate rate.

Commerce continues to evaluate its practice with regard to the separate rates analysis in light of the *Diamond Sawblades from China* proceeding and its determinations therein.[30]  In particular, in litigation involving the *Diamond Sawblades from China* proceeding, the Court found Commerce's existing separate rates analysis deficient in the circumstances of that case, in which a government-owned and controlled entity exercised control over the respondent exporter.[31]  Following the Court's reasoning, in recent proceedings, we have concluded that where a government entity holds a majority equity ownership, either directly or indirectly, in the respondent exporter, this interest in and of itself means that the government exercises or has the

---

[30] *See Final Results of Redetermination Pursuant to Court Remand, Diamond Sawblades and Parts Thereof from the People's Republic of China*, Consol. Court No. 09-00511, Slip Op. 12-147 (CIT November 30, 2021), dated May 6, 2013, available at https://enforcement.trade.gov/remands/12-147.pdf, in *Advanced Technology & Materials Co., Ltd., et al. v. United States,* 885 F. Supp. 2d 1343 (CIT 2012) (*Advanced Technology I*), aff'd *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd *Advanced Technology & Materials Co. v. United States*, Court No. 2014-1154 (Fed. Cir. 2014); *see also Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying Issues and Decision Memorandum (IDM) at Comment 1 (collectively, *Diamond Sawblades from China*).

[31] *See, e.g., Advanced Technology I*, 885 F. Supp. 2d at 1349 (CIT 2012) ("The court remains concerned that Commerce has failed to consider important aspects of the problem and offered explanations that run counter to the evidence before it."); *Id.*, 885 F. Supp. 2d at 1351 ("Further substantial evidence of record does not support the inference that SASAC's {state-owned assets supervision and administration commission} 'management' of its 'state-owned assets' is restricted to the kind of passive-investor de jure 'separation' that Commerce concludes.") (footnotes omitted); *Id.*, 885 F. Supp. 2d at 1355 ("The point here is that 'governmental control' in the context of the separate rate test appears to be a fuzzy concept, at least to this court, since a 'degree' of it can obviously be traced from the controlling shareholder, to the board, to the general manager, and so on along the chain to 'day-to-day decisions of export operations,' including terms, financing, and inputs into finished product for export."); *Id.*, 885 F. Supp. 2d at 1357 ("AT&M itself identifies its 'controlling shareholder' as CISRI {owned by SASAC} in its financial statements and the power to veto nomination does not equilibrate the power of control over nomination.") (footnotes omitted).

6

potential to exercise control over the company's operations generally.[32]  This may include control over, for example, the selection of board members and management, key factors in determining whether a company has sufficient independence in its export activities to merit a separate rate.  Consistent with our normal separate rate practice, any ability to control, or possess an interest in controlling, the operations of the company including the selection of board members, management, and the profit distribution of the company by a government entity is subject to Commerce's rebuttable presumption that all companies within the NME country are subject to government control.

*a) Absence of De Jure Control*

Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) legislative enactments decentralizing control over export activities of the companies; and (3) other formal measures by the government decentralizing control over export activities of companies.[33]  As explained in the *Preliminary Results* and unchanged in the *Final Results*, the evidence provided by Linglong in its separate rate application supports a preliminary finding of an absence of *de jure* government control based on the following:  (1) an absence of restrictive stipulations associated with the individual exporters' business and export licenses; (2) the existence of applicable legislative enactments decentralizing control of the companies; and (3) the implementation of formal measures by the government decentralizing control of {NME} companies.[34]

---

[32] *See Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 79 FR 53169 (September 8, 2014), and accompanying PDM at 5-9.
[33] *See Sparklers from China*, 56 FR at 20589.
[34] *See Preliminary Results*, unchanged in the *Final Results*; *see also* Linglong's SRA.

Barcode:4811912-01 A-570-016 REM - Remand  -  Slip Op. 25-64

*b) Absence of De Facto Control*

Typically, Commerce considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions: (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.[35] Commerce has determined that an analysis of *de facto* control is critical in determining whether the respondents are, in fact, subject to a degree of government control which would preclude Commerce from assigning separate rates.

As explained in the *Preliminary Results* and unchanged in the *Final Results*, the evidence provided by Linglong supports a preliminary finding of an absence of *de facto* government control, based on record statements and supporting documentation showing that the company: (1) sets its own export prices independent of the government and without the approval of a government authority; (2) has the authority to negotiate and sign contracts and other agreements; (3) maintains autonomy from the government in making decisions regarding the selection of management; and (4) retains the proceeds of their respective export sales and make independent decisions regarding disposition of profits or financing of losses.[36]

Therefore, consistent with the *Preliminary Results* and unchanged in the *Final Results*,[37] the evidence placed on the record of the underlying administrative review by Linglong, demonstrates an absence of *de jure* and *de facto* government control under the criteria identified

---

[35] *See Silicon Carbide from China*, 59 FR at 22586-87; *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995).
[36] *See Preliminary Results*; *see also Final Results*; and Linglong's SRA.
[37] *Id.*

8

in *Sparklers from China* and *Silicon Carbide from China*. Therefore, consistent with our finding in the underlying administrative review and in accordance with the *Third Remand Opinion*, we grant a separate rate to Linglong.[38]

*Calculation of the Separate Rate*

Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an AD investigation, for guidance when calculating the dumping margin for non-individually examined companies granted a separate rate. Under section 735(c)(5)(A) of the Act, the all-others rate is normally "equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* dumping margins, and any dumping margins determined entirely {on the basis of facts available}." Accordingly, Commerce's practice is to average the weighted-average dumping margins for the individually-examined respondents, excluding rates that are zero, *de minimis*, or based entirely on facts available, when calculating the separate rate.[39]

In the underlying administrative review, Junhong was the only mandatory respondent that received a calculated weighted-average margin (*i.e.*, 64.57 percent).[40] In the *First Remand Results*, we calculated a weighted-average dumping margin for Kenda Rubber (*i.e.*, 18.15

---

[38] *See Third Remand Opinion* at 18 (holding that "{n}othing in the record suggests Commerce intended or needed to select a third mandatory respondent or was otherwise inclined to seek verification or corroboration of Linglong's separate-rate certification" and that "in the absence of such evidence…the company's separate rate status would have been undisturbed.").

[39] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part*, 73 FR 52823, 52824 (September 11, 2008), and accompanying IDM at Comment 16.

[40] *See Final Results*.

Barcode:4811912-01 A-570-016 REM - Remand  -  Slip Op. 25-64

percent).[41]  Therefore, consistent with Commerce's practice, we recalculated the separate rate by averaging Kenda Rubber and Junhong's rates and applied it to Linglong for the POR.[42]

## IV.  INTERESTED PARTY COMMENTS

**Issue:  Whether Commerce Should Grant Separate Rate Status to Wanda Boto, Hengyu, and Winrun**

The following is a verbatim summary of argument submitted by YC Rubber.  For further details *see* YC Rubber Comments at 2-3.

> As set forth below, the *Third Draft Remand Results* properly recognize that a separate rate should be calculated in this proceeding.  The *Third Draft Remand Results* must be corrected, however, to apply this separate rate to other non-examined respondents that timely submitted SRAs and SRCs, including Wanda Boto; Hengyu; and Winrun.
>
> The *Third Draft Remand Results* properly recognize that a separate rate should be calculated in this proceeding.  Here, Commerce has calculated a separate rate of 41.36 percent by averaging the rates calculated for Kenda Rubber and Junhong for non-examined respondent Linglong.[43]  Commerce's calculation of a separate rate comports with its practice and the Court's instruction to reconsider and explain the "decision to deny a separate rate to Linglong."[44]  Commerce should continue to assign this separate rate in its final remand determination.
>
> The *Third Draft Remand Results* must be corrected, however, to apply the properly calculated separate rate to other non-examined respondents subject to the review that timely filed SRCs, including Wanda Boto, Hengyu, and Winrun.  The *Third Draft Remand Results* describe the factors of *de jure* and *de facto* government control described in *Sparklers from China* and *Silicon Carbide from China*.[45]  It is inconsistent and nonsensical for Commerce to conclude that these factors demonstrate that Linglong is entitled to a separate rate but then find in the same breath that Wanda Boto, Hengyu, and Winrun are not entitled to a separate rate.  After all, (1) these respondents timely filed SRCs, which were accepted by Commerce in the underlying proceeding, (2) Commerce previously recognized their separate rate status in the Final Results of the underlying review, and (3) Linglong was, just like these firms, unable to participate as a mandatory respondent many years after the 2016–2017 period and yet nonetheless received a separate rate.

---

[41] *See First Remand Results* at 36.

[42] As we do not have Kenda Rubber's public ranged sales data on the record, consistent with our practice, we have used the simple average of Kenda Rubber's and Junhong's final AD rate as the separate rate *i.e.*, (18.15 percent plus 64.57 percent) / 2 = 41.36 percent.

[43] *See* YC Rubber Comments at 2 (citing *Third Draft Remand Results* at 9–10).

[44] *Id.* (citing *Third Remand Order* at 18).

[45] *Id.* (citing *Third Draft Remand Results* at 6–8).

Indeed, Commerce recognizes "the unusual nature of this proceeding and the challenges necessarily created by the timing of the reconsideration of respondent selection following the U.S. Court of Appeals for the Federal Circuit's decision in YC Rubber II."[46]  The unusual nature of this proceeding underscores that it is unreasonable for Commerce to deny these respondents their previously granted separate rate status simply because they were unable to participate fully as mandatory respondents many years after the 2016-2017 review period concluded.

Commerce has not acted consistently or lawfully by denying Wanda Boto, Hengyu, and Winrun a separate rate while recognizing one for Linglong.  This error should be corrected in the final remand determination by granting them the newly calculated separate rate.[47]

**Commerce's Position:**  We have made no changes for these final results of remand redetermination.  Contrary to YC Rubber's argument, the Court recognized that Linglong's posture was inherently different from that of Wanda Boto, Hengyu and Winrun.[48]  In the *Third Remand Order*, based on the record of the prior remands, the Court sustained Commerce's selection of Wanda Boto, Hengyu, and Winrun as mandatory respondents and Commerce's related denial of separate rate status to them.[49]  By contrast, the Court remanded Commerce's selection of Linglong as a mandatory respondent and concluded that unlike Wanda Boto, Hengyu, and Winrun, the record demonstrated that "it is undisputed that Kenda had more imports than Linglong, and thus, should have been selected before Linglong."[50]  As such, the Court held that "Commerce would not have had reason to select Linglong as a mandatory respondent and that company's separate rate status would have been undisturbed."[51]  In light of this, the Court remanded specifically Commerce's denial of a separate rate for Linglong—not Wanda Boto, Hengyu, and Winrun.[52]  For those parties, the Court sustained Commerce's denial

---

[46] *Id.* (citing *Third Draft Remand Results* at 3 and *Third Remand Order* at 10).
[47] *Id.*
[48] *See Third Remand Order* at 15-18.
[49] *Id.*
[50] *Id.* at 18.
[51] *Id.*
[52] *Id*

of their requests to withdraw from the review and their separate rate statuses.[53]  YC Rubber raises no argument as to why the Court's prior ruling on this issue is no longer applicable nor cites any provision of law requiring Commerce to grant these companies separate rates.[54]  Further, YC Rubber fails to address the facts unique to Linglong's posture that are inapplicable to the other companies.[55]  On this basis, we have made no changes for these final results of redetermination.

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Third Remand Order*, Commerce has, as discussed above, revised certain aspects of its dumping analysis.  Based on these changes, Commerce determines that Linglong is eligible for separate rate status for the period August 1, 2016, through July 31, 2017:

| Exporter | Weighted-Average Dumping Margin (percent) |
| --- | --- |
| Shandong Linglong Tyre Co., Ltd. | 41.36 |

Should the Court affirm the final results of redetermination, Commerce intends to publish a notice of amended final results in the *Federal Register* and issue appropriate customs instructions to CBP, consistent with the discussion above.

8/18/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

12